UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JERAMIAH BROWN,

                           Plaintiff,

v.                                                                    5:23-CV-0490
                                                                      (GTS/ML)
CHARTER COMMC'NS HOLDING CO, LLC,

                           Defendant.
_____

APPEARANCES:                                              OF COUNSEL:

JERAMIAH BROWN
   Plaintiff, *Pro Se*
350033 Eddy Road
Lot 85
Theresa, New York 13691


MIROSLAV LOVRIC, United States Magistrate Judge

## <u>ORDER and REPORT-RECOMMENDATION</u>

The Clerk has sent this *pro se* Complaint (Dkt. No. 1) together with (1) an application to

proceed *in forma pauperis* (Dkt. No. 2), and (2) a motion to stay the case pending arbitration

(Dkt. No. 4) filed by Jeramiah Brown ("Plaintiff") to the Court for review.  For the reasons

discussed below, I grant Plaintiff's *in forma pauperis* application (Dkt. No. 2), deny Plaintiff's

motion for a stay of the case (Dkt. No. 4), and recommend that Plaintiff's Complaint (Dkt. No. 1)

be (1) accepted in part for filing, and (2) dismissed in part with leave to amend.

## I.    BACKGROUND

Construed as liberally[1] as possible, Plaintiff's Complaint—which was completed on a form complaint alleging violations of Americans with Disabilities Act ("ADA")—alleges that his civil rights were violated by Charter Communications Holding Co., LLC ("Defendant").  (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that on December 20, 2021, he sustained a physical injury at work because his supervisor, James Garrison, intentionally stepped in front of Plaintiff while walking.  (Dkt. No. 1 at 2.)  Plaintiff alleges that some time in December 2021, Mr. Garrison "smacked [Plaintiff] in the Face with a tablet," which resulted in Plaintiff chipping a tooth.  (*Id.* at 4.)  Plaintiff alleges that he was born with TAR syndrome (thrombocytopenia-absent radius syndrome).  (*Id.* at 2.)

Plaintiff alleges that Mr. Garrison refused to document Plaintiff's injury on an incident report.[2]  (*Id.* at 3.)  Plaintiff alleges that on January 25, 2022, Dan Higham, an employee in Defendant's human resources department, completed an incident report regarding the injury that Plaintiff sustained at work in December 2021, but refused to accurately document or provide requested mental health services to Plaintiff.  (*Id.*)

Plaintiff alleges that on March 3, 2022, he had a telephone conversation with Mr. Higham during which, Plaintiff requested ADA accommodations to work from home and transfer jobs.  (*Id.*)  The Complaint alleges that Mr. Higham agreed to Plaintiff's requested accommodations if

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]    However, it is unclear whether the injury Plaintiff refers to is the chipped tooth from the tablet or the injuries he sustained when Mr. Garrison stepped in front of Plaintiff while walking.

Plaintiff provided an ADA "Document filled out by [his] Primary Care Physician." (Dkt. No. 1 at 3, 5.) Plaintiff alleges that on March 14, 2022, he provided the requested ADA document from his primary care physician, Dr. Maldonado. (Dkt. No. 1 at 5.) Plaintiff alleges that on March 14, 2022, Mr. Higham called him, intimidated him, and stated that Defendant refused to accommodate Plaintiff because Mr. Garrison accurately documented Plaintiff's work injury. (*Id*.)

The Complaint alleges that on March 25, 2022, Sharon Lewis, a human resource director for New York, and Mr. Higham forged an unauthorized document for an unpaid leave of absence from March 14, 2022, to April 25, 2022. (Dkt. No. 1 at 5.)

Plaintiff alleges that he has been out of work since March 14, 2022, because Mr. Higham denied his ADA accommodations to work from home. (*Id*.)

Plaintiff alleges that in April 2022, he reported to Defendant's hotline that Mr. Higham created a hostile work environment for Plaintiff. (*Id*.) Plaintiff alleges that Mr. Higham retaliated against Plaintiff for his ethic reports and ADA accommodation requests. (*Id*.)

Plaintiff alleges that Defendant's employees "hacked into [his] work email and attempted to change the password." (*Id*. at 7.)

Plaintiff alleges that Mr. Garrison "jeopardized [Plaintiff]'s life and health by" assigning Plaintiff the task of contacting the occupants of addresses that were "already assigned to other Spectrum Employees that attempted to sell the brand." (Dkt. No. 1 at 8.)

Plaintiff alleges that Mr. Garrison "stole $950.00 from [Plaintiff]'s payroll paycheck on 12/12/2021 - The money was returned on 04/04/2022." (Dkt. No. 1 at 8.)

The Complaint alleges that on December 27, 2022, Robert Eaton, a senior human resource generalist for Defendant, e-mailed Plaintiff regarding a return to work that "insinuated

3

that accommodations would be accommodated." (Dkt. No. 1 at 8.) Plaintiff alleges that Mr. Eaton refuses to accommodate Plaintiff by permitting him to work from home. (*Id.*)

Plaintiff alleges that he received an e-mail from Defendant thanking him for expressing interest in a position but stating that he would no longer be participating in the selection process because he had not responded to attempts to contact him. (Dkt. No. 1 at 8.) However, Plaintiff alleges that he "made numerous attempts to contact" Defendant regarding the position. (*Id.*)

Based on these factual assertions, Plaintiff appears to assert the following four causes of action (1) a claim that Plaintiff was discriminated against in violation of Title I Americans with Disabilities Act ("ADA"); (2) a claim that Plaintiff was retaliated against in violation of Title V of the ADA; (3) a claim of discrimination pursuant to Sections 501 and 503 of the Rehabilitation Act; and (4) a claim that Plaintiff endured a hostile work environment in violation of Title VII. (*See generally* Dkt. No. 1.)

As relief Plaintiff seeks $90,000.00 for back wages and reinstatement of his job with a transfer and the ADA accommodation to work from home as a business call center representative. (Dkt. No. 1 at 4.)

## II.    PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[3] After reviewing Plaintiff's *in*

---

[3]    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant

*forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.

Therefore, Plaintiff's application to proceed *in forma pauperis* is granted.[4]

### III.    LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the

court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks

monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter*

*alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.

R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief

means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis

added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

shown–that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (internal citation and

punctuation omitted).

---

who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[4]    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed.  *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee).  "Legal frivolity . . . occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory . . . or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he

decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that a response be required to one of Plaintiff's claims and that other claims be dismissed.

### A.    Plaintiff's Claims Pursuant to the ADA

The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane,* 541 U.S. 509, 516-17 (2004). In addition, "Title V of the ADA, sometimes referred to as the 'retaliation provision,'" prohibits retaliation against individuals "engaged in activity protected by the ADA." *Griffiths v. Saint Josephs Hosp.*, 22-CV-0199, 2022 WL 1271533, at *3 n.5 (N.D.N.Y. Apr. 5, 2022) (Dancks, M.J.) (citing *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.)), *report and recommendation adopted by*, 2022 WL 1265761 (N.D.N.Y. Apr. 28, 2022) (Hurd, J.).

### 1.    Title I

Section 12112 of the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Title I of the ADA provides a remedy for disability discrimination committed by "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2).

The ADA further states that the term "discriminate" as used in the statute includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A).  "A discrimination claim may therefore be brought under Title I of the ADA for failure to accommodate."  *Penird v. Better*, 19-CV-1146, 2021 WL 3077853, at *8 (N.D.N.Y. July 21, 2021) (D'Agostino, J.) (citing *Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018)).

To establish a disability discrimination claim for an employer's failure to accommodate, the plaintiff must establish: "(1) he is an individual with a disability; (2) an employer covered by the ADA had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the position; and (4) the employer had refused to make such accommodations."  *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515-16 (2d Cir. 1995); *accord Naik v. Mod. Mktg. Concepts, Inc.*, 17-CV-0613, 2018 WL 4078264, at *7 (N.D.N.Y. Aug. 27, 2018) (Kahn, J.)

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Title I ADA discrimination claim.

###### 2.     Title V

42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  For an ADA retaliation claim, a plaintiff must plead the following: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse . . . action; and (4) a causal connection between the protected activity and the adverse . . . action."  *Perez v. City of New York*, 843 F. App'x 406, 407 (2d Cir. 2021) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

"Protected activity is action taken to protest or oppose statutorily prohibited discrimination."  *Shannon v. Credit Agricole Sec. (USA), Inc.*, 17-CV-0667, 2021 WL 1063183, at *9 (S.D.N.Y. Mar. 19, 2021) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019)).  "Protected activities include requests for reasonable accommodations." *Wells v. Achievement Network*, 18-CV-6588, 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) (citing *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

Here, the Complaint alleges that Plaintiff participated in a protected activity requesting a reasonable accommodation and that Defendant knew of Plaintiff's request.  (Dkt. No. 1.) Moreover, construing the Complaint with the utmost liberality, it appears to plausibly suggest that at some point in time, Plaintiff's employment with Defendant ceased.  (Dkt. No. 1 at 4 [seeking "Back-wages"].)  However, the Complaint fails to allege facts plausibly suggesting the circumstances surrounding the conclusion of Plaintiff's employment for Defendant.  It is unclear whether Plaintiff voluntarily resigned, was terminated, or some other arrangement resulted in the conclusion of his employment with Defendant.  Absent allegations plausibly suggesting that

Plaintiff was terminated or that Defendant caused a materially adverse change in Plaintiff's employment status, the Complaint fails to allege facts plausibly suggesting an adverse action. *See Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry v. Ashcroft*, 336 F.3d 128,138 (2d Cir. 2003)) ("Examples of . . . a [materially adverse] change include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'").

Moreover, the Complaint fails to allege facts plausibly suggesting any causal connection between Plaintiff's request for accommodations and the conclusion of his employment with Defendant. Although "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action," *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citations omitted), the Complaint fails to allege facts plausibly suggesting when Plaintiff's employment with Defendant ceased. As a result, the undersigned is unable to determine whether the alleged protected conduct—requesting an accommodation—was sufficiently close in time to suggest a causal connection.

Further, it appears that Plaintiff filed his request for an accommodation on or about March 14, 2022 (Dkt. No. 1 at 12), and continued to be employed with Defendant through at least December 27, 2022 (Dkt. No. 1 at 25-26). Although no bright line test has been drawn "'to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action'" *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001)), it is possible that Plaintiff's

protected conduct may be too attenuated from the alleged adverse action to plausibly suggest a causal relationship.[5]

As a result, I recommend that Plaintiff's retaliation claim pursuant to Title V of the ADA be dismissed for failure to state a claim upon which relief may be granted.[6]

## B.    Claim Pursuant to the Rehabilitation Act

Plaintiff asserts a discrimination claim pursuant to sections 501 and 503 of the Rehabilitation Act.  29 U.S.C §§ 791, 793.  However, the allegations in the Complaint fail to allege facts plausibly suggesting a claim upon which relief may be granted pursuant to those sections.

### 1.    29 U.S.C. § 791

Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, "prohibits discrimination on the basis of disability in employment decisions by the Federal Government."  *Lane v. Pena*, 518 U.S. 187, 193 (1996); *see also Rivera v. Heyman*, 157 F.3d 101, 104-05 (2d Cir. 1998) ("Congress explicitly made Title VII remedies available for violations of [S]ection 501 [of the Rehabilitation Act] . . . to obtain relief for . . . discrimination against a federal employee.").

---

[5]    The undersigned notes that Plaintiff also appears to have engaged in protected conduct on April 16, 2022, when he filed a report with Defendant outlining grievances against several of Defendant's employees, which included an allegation that "Management refuse[s] to accommodate [a] Disabled Employee due to his Compromised Immune System."  (Dkt. No. 1 at 17.)  However, as set forth above, the undersigned is unable to meaningfully analyze whether the events are sufficiently close in time to plausibly suggest a causal relationship without additional information regarding the conclusion of Plaintiff's employment with Defendant.

[6]    Plaintiff also alleged that Mr. Garrison stole $950.00 from Plaintiff's payroll check on December 12, 2021.  (Dkt. No. 1 at 8.)  However, this occurred before any alleged protected conduct occurred and thus, could not be causally connected.  *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quotation marks omitted) (emphasis added) (concluding that the "causal connection needed for a proof of retaliation claim" requires "showing that the protected activity was . . . *followed in time* by the adverse action.").

The Complaint fails to allege facts plausibly suggesting that Defendant is the federal government. As a result, I recommend that, to the extent the Complaint attempts to assert a discrimination claim against Defendant pursuant to Section 501 of the Rehabilitation Act, it be dismissed for failure to state a claim upon which relief may be granted.

### 2.    29 U.S.C. § 793

"[T]he Second Circuit has held that Section 503 of the Rehabilitation Act does not provide a private right of action." *Hoffman v. City Coll. of New York*, 20-CV-1729, 2021 WL 1226498, at *5 (S.D.N.Y. Mar. 30, 2021) (citing *Davis v. United Air Lines, Inc.*, 662 F.2d 120, 127 (2d Cir. 1981) ("we conclude, as have the other three courts of appeals that have passed upon the question, that no implied private right of action exists under section 503")).

As a result, I recommend that, to the extent the Complaint attempts to assert a discrimination claim against Defendant pursuant to Section 503 of the Rehabilitation Act, it be dismissed for failure to state a claim upon which relief may be granted.[7]

### C.    Claims Pursuant to Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

---

[7]    To the extent that Plaintiff's Complaint is construed liberally to assert a claim pursuant to Section 504 of the Rehabilitation Act, I recommend that it be dismissed for failure to state a claim upon which relief may be granted because the Complaint fails to allege facts plausibly suggesting that Defendant receives federal funds such that it would be subject to the Rehabilitation Act. *See T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 94 (2d Cir. 2021) (quoting *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 330 (2d Cir. 1998) (emphasis and internal quotation marks omitted)) (holding that "§504 applies only to entities that *receive* federal funds. The rationale is that entities that receive federal funds are 'in a position to accept or reject' corresponding 'obligations' under the Rehabilitation Act 'as part of the decision whether or not to receive federal funds.'").

employment, because of such individual's race, color, religion, sex, or national origin." 42
U.S.C. § 2000e-2(a)(1).[8]

"To state a hostile work environment claim, a plaintiff must plead facts tending to show
that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an
environment that a reasonable person would find hostile or abusive; (2) creates an environment
that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment
because of the plaintiff's sex, or another protected characteristic." *Robinson v. Harvard Prot.
Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012); *see also Feingold v. New York,* 366 F.3d 138, 149-
50 (2d Cir. 2004).

After carefully reviewing the Complaint, the undersigned concludes that Plaintiff's
allegations do not plausibly state a hostile work environment claim.  Plaintiff alleges that (1) Mr.
Garrison (a) refused to properly document an alleged injury, (b) assigned Plaintiff addresses that
were already assigned to other Spectrum employees, and (c) stole $950.00 from Plaintiff's
paycheck, which was returned approximately four months later; (2) Mr. Higham denied the
disability accommodations that Plaintiff requested; (3) Ms. Lewis forged documents related to
Plaintiff's leave of absence from work; and (4) unnamed employees hacked into his e-mail and
attempted to change the password.

---

[8]     To the extent that Plaintiff's hostile work environment claim is construed as a retaliatory
hostile work environment claim pursuant to 42 U.S.C. § 2000e-3, I recommend that it be
dismissed for failure to state a claim upon which relief may be granted.  Although the standards
for a retaliatory hostile work environment claim differ from those of a discriminatory hostile
work environment claim, for the reasons set forth above in Part IV.A.2. of this Order and Report-
Recommendation, Plaintiff fails to allege facts plausibly suggesting that he was subjected to
materially adverse actions that were causally connected to his protected conduct. *Carr v. New
York City Trans. Auth.*, 22-CV-0792, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023).

First, Plaintiff fails to allege facts plausibly suggesting that these above-listed incidents occurred at least in part because of a protected characteristic. Second, the allegations contained in the Complaint do not amount to conduct so severe or pervasive that it plausibly suggests a hostile work environment claim under Title VII. *Compare Garcia v. NYC Health & Hosps. Corp.*, 19-CV-0997, 2019 WL 6878729, at *7 (S.D.N.Y. Dec. 17, 2019) (concluding that an incident where the plaintiff was publicly questioned about his disability by his supervisor did not constitute a hostile work environment even where coupled with four incidents during which his supervisor yelled at or was aggressive towards him and an incident where the plaintiff believed his supervisor referred to him as a "f*****" in another language (asterisks added)), *with LeGrand v. WalMart Stores E., LP*, 779 F. App'x 779, 781 (2d Cir. 2019) (summary order) (holding that the plaintiff plausibly alleged a hostile work environment where her supervisor called her "r*******," disclosed her disability to others and referred to her using racial epithets among other employees (asterisks added)). Rather, the allegations appear to be "isolated instances that are neither sufficiently severe nor pervasive to alter the terms of Plaintiff's employment," and thus "fall short of a claim for a hostile work environment." *Harris v. Off. of N.Y. State Comptroller*, 20-CV-8827, 2022 WL 814289, at *11 (S.D.N.Y. Mar. 17, 2022) (finding plaintiff's allegations of separate acts of harassment by different coworkers insufficient to state a claim for a hostile work environment).

As a result, I recommend that Plaintiff's hostile work environment claim pursuant to Title VII be dismissed for failure to state a claim upon which relief may be granted.

## V.    OPPORTUNITY TO REPLEAD

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[9]

With respect to Plaintiff's claims sounding in Title V retaliation, the Rehabilitation Act, and Title VII hostile work environment, it is not clear whether better pleading would permit Plaintiff to assert a cognizable claim. Out of deference to Plaintiff's *pro se* status, I recommend that Plaintiff be granted leave to replead those claims.

If Plaintiff chooses to avail himself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which he relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). In addition, the amended complaint must include allegations reflecting how the individuals named as Defendants are involved in the allegedly

---

[9]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

unlawful activity.  Finally, Plaintiff is informed that any amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

## VI.    MOTION TO STAY PENDING ARBITRATION

Plaintiff filed a motion to stay this action to proceed with binding arbitration asserting that arbitration was mutually agreed upon by the parties.[10]  (Dkt. No. 4.)  Plaintiff's motion is denied without prejudice to refiling.  To the extent that this matter survives *sua sponte* review, it would be appropriate for the motion to stay to be refiled upon Defendant's appearance in this matter.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion to stay the case and proceed with arbitration (Dkt. No. 4) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts claims pursuant to (1) Title V of the

---

[10]    The Court notes that Plaintiff also filed a letter purporting to be a "response in opposition to the Denial of Arbitration Proceeding filed by the Defendant."  (Dkt. No. 5.)  However, Defendant's "Denial of Arbitration Proceeding" is not presently before the Court to rule on.  It is unclear what, if any, relief Plaintiff is seeking in his letter at Dkt. No. 5, and what the basis is for that relief.

ADA, (2) the Rehabilitation Act, and (3) Title VII, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

   **RECOMMENDED** that **A RESPONSE BE REQUIRED** to Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts a claim pursuant to Title I of the ADA; and it is further

   **ORDERED** that the Clerk of the Court shall file a copy of this order and report-recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[11]

   **NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: August <u>14</u> , 2023
  Binghamton, New York

          *Miroslav Lovric*

        Miroslav Lovric
        U.S. Magistrate Judge

---

[11]  The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[12]  If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Distinguished by  U.S. v. $6,787.00 in U.S. Currency,  N.D.Ga.,  February 13, 2007

1999 WL 1067841
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Francisco AGUILAR, Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant.

Nos. 3:99–MC–304 (EBB), 3:99–MC–408 (EBB).
|
Nov. 8, 1999.

*Dismissal of Plaintiff's Complaints*

BURNS, Senior J.

**\*1**  Francisco Aguilar, pro se, seeks leave to proceed in forma pauperis ("IFP") to press two meritless complaints against the government, which is prosecuting related civil forfeiture actions against his properties. Although Aguilar is otherwise financially eligible, the court dismisses these complaints sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B) because the purported claims are frivolous, baseless and irremediable.

*Background*
Would-be plaintiff Aguilar is no stranger to this court. He is currently serving a forty-year sentence for drug trafficking at the federal penitentiary in Leavenworth, Kansas. *See United States v. Tracy,* 12 F.3d 1186, 1189 (2d Cir.1993) (affirming conviction and sentence). In connection with his conviction for narcotics offenses, the government filed civil forfeiture actions pursuant to 21 U.S.C. § 881(a) in 1990 and 1991 against four of Aguilar's Connecticut properties, which have since been sold. With the help of CJA-appointed counsel, Aguilar has vigorously defended each of these four actions, three of which remain pending before this court, and are scheduled for trial in January 2000. [1]

Now Aguilar seeks to take the offensive by filing these purported claims against the government, and serving the current property owners as well as the Assistant United States Attorney who is prosecuting the related forfeiture cases. This court denied without prejudice Aguilar's initial complaint, which was erroneously captioned "United States v. One Parcel Of Property Located At 414 Kings Hwy.," one of the cases already docketed and then pending. *See* Order of June 15, 1999. Upon refiling an amended complaint (the "Amended Complaint") with the appropriate caption, Aguilar also filed a second complaint (the "Second Complaint"), seeking the same relief and asserting essentially the same claims against the government for bringing the other three forfeiture cases. The clerk returned these pleadings because Aguilar failed to complete the IFP forms. *See* Order of August 25, 1999. After Aguilar cured these pleading deficiencies, miscellaneous docket numbers were assigned to the complaints.

In Aguilar's Amended Complaint—the one originally filed against his own property at 414 Kings Highway—Aguilar seeks return of the property, compensatory damages and $100,000,000 in punitive damages "to deter the United States of America from committing a similar Abuse of Power." Aguilar pleads his case in four "Articles," asserting sundry state and federal "constitutional" claims, including conversion, false pretenses, mail fraud, and breach of fiduciary duty. The Amended Complaint also suggests an allegation that the government falsified and deliberately omitted known material facts from its probable cause affidavit in "disregard" of 19 U.S.C. § 1615, the statute outlining the burden of proof in administrative forfeiture proceedings.

The Second Complaint—the one related to the government's seizure of the other three properties—seeks similar equitable and monetary relief, including return of the properties, compensation for "suffering," "usurpation," denial of his use and enjoyment of the properties and lost rents, and one billion dollars in punitive damages. Liberally construed, the Second Complaint simply repeats the claims of the Amended Complaint except for one additional allegation: that Aguilar was entitled to, and did not receive, a hearing prior to the seizure and sale of his properties.

*Discussion*

A.  *§ 1915(e)(2)(B) Standards*
**\*2**  The Prisoner Litigation Reform Act ("PLRA") mandates dismissal of an IFP action if it: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune

from such relief." 28 U.S.C. § 1915(e)(2)(B) (as amended in 1996). Prior to the adoption of the PLRA, district courts had discretion to dismiss frivolous actions; now they are required to do so. *See* Pub.L. 104–134, 110 Stat. 1321 (1996) (making dismissal of frivolous actions mandatory, and also requiring dismissal for failing to state a claim or seeking damages from an immune defendant). Because Aguilar's claims qualify for dismissal under all three of these prongs, the standards for each are set out in turn.

### 1. *Frivolous or Malicious*

A complaint is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989) (interpreting § 1915(d), later redesignated as § 1915(e)(2)(B)(i), to preclude "not only the inarguable legal conclusion, but also the fanciful factual allegation"). Factual frivolity occurs where "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833). Legal frivolity, by contrast, occurs where "the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Livingston,* 141 F.3d at 327 (internal quotes and citation omitted); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999) (upholding dismissal as frivolous where "[t]he complaint's conclusory, vague, and general allegations ... d[id] not [ ] suffice to establish" plaintiff's claims).

In addition to frivolous claims, the court must also dismiss any malicious claims, i.e., where "[t]he manifest purpose of appellant's complaint [i]s not to rectify any cognizable harm, but only to harass and disparage." *Tapia–Ortiz,* 185 F.3d at 11.

### 2. *Failure To State A Claim*

An IFP action must also be dismissed sua sponte if it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Star v. Burlington Police Dep't,* 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (summarily affirming dismissal made pursuant to § 1915(e)(2)(B)(ii)

of purported due process challenge that failed to state a claim).

As in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a § 1915(e)(2)(B)(ii) dismissal is warranted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

**\*3** Pro se complaints, such as these, however, must be read broadly, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), and may not be dismissed "simply because the court finds the plaintiff's allegations unlikely." *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1982) (construing pre-PLRA complaint as frivolous). Therefore,

> a pro se plaintiff who is proceeding in forma pauperis should be afforded the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim [under § 1915(e)(2)(B)(ii)], unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

*Gomez v. USAA Federal Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam) (vacating § 1915(e)(2)(B)(ii) dismissal where "the district court did not give th[e] pro se litigant an opportunity to amend his complaint, and because [the court] cannot rule out the possibility that such an amendment will result in a claim being successfully pleaded").

### 3. *Relief Against An Immune Defendant*

Dismissal of an IFP case is also required where plaintiff seeks monetary damages against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii); *see also,* *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998) (affirming dismissal pursuant to § 1915(e)(2)(B)(iii) of official-capacity claims in § 1983 civil rights action because

"the Eleventh Amendment immunizes state officials sued for damages in their official capacity"). Here, even if Aguilar's claims had any merit, the complaints must be dismissed nevertheless because each seeks monetary damages from the United States, which is immune from such relief. *See Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 139 (2d Cir.1999) (noting "[t]he sovereign immunity of the United States may only be waived by federal statute").

**B.** *Dismissal Standards Applied*

Aguilar's complaints are devoid of any arguable basis in law or fact. Most of his factual allegations—to the extent they are even comprehensible—are conclusory, vague and baseless. For example, he purports to allege: "The United States of America has misused its power against the Francisco Aguilar's Intangible Rights." (Amended Complaint at 2); and "The United States of America overpassed its bound of its authority and make a tyrannic use of its powers." (Second Complaint at 4). Even the Second Circuit has recognized Aguilar's prior handiwork to be "so indisputably lacking in merit as to be frivolous within the meaning of 28 U.S.C. § 1915(e)." *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 97–6004 (2d Cir. April 23, 1997) (mandate [Doc. No. 167] dismissing appeal of Aguilar's motion to enjoin state default proceedings).

Only two allegations asserted by Aguilar are even arguably actionable: the lack-of-probable-cause argument in the Amended Complaint and the due process claim in the Second Complaint. Both of these, however, must be dismissed because each fails to state a claim for which relief may be granted.

**1.** *Probable Cause*

**\*4** The one potentially cogent legal claim that can be derived from a liberal reading of the Amended Complaint has already been conclusively decided by the court and is therefore barred from relitigation. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158 (denying lack-of-probable-cause argument in motion to dismiss [Doc. No. 64] in 1993, and in motions for summary judgment [Doc. Nos. 55, 96] in 1996). Here again, Aguilar reiterates his allegation that the government's affidavit in support of probable cause was tainted because it failed to disclose that the 414 Kings Highway property was subject to a mortgage held by People's Bank, and therefore could not have been purchased with funds traceable to drug sales.

After the government voluntarily dismissed that forfeiture action, this court initially ordered the sale proceeds of the property disbursed to Aguilar. *See id.,* Order of Oct. 25, 1996 [Doc. No. 151]. The bank appealed the order and, during the pendency of the appeal, secured a default judgment in state court against Aguilar. *See People's Bank v. Aguilar,* No. CV–96–0337761–S (Conn.Super.Ct.1997). On the Bank's appeal from this court's disbursal of proceeds to Aguilar, the Second Circuit reversed and remanded. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* 128 F.3d 125, 128 (2d Cir.1997). On remand, in accordance with the Second Circuit mandate, this court disbursed the proceeds from the sale of 414 Kings Highway to the bank in partial satisfaction of Aguilar's debt owed on the defaulted mortgage. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158, 1999 WL 301704 (D.Conn. May 11, 1999).

Because the lack-of-probable-cause claim, perfunctorily adverted to in Aguilar's otherwise meritless Amended Complaint, has already been addressed in the *414 Kings Highway* forfeiture case, the court will not consider it again. As such, it must be dismissed because it fails to state a claim for which this court could grant further relief.

**2.** *Due Process*

In addition to his now-stale probable cause allegation about 414 Kings Highway, Aguilar claims in the Second Complaint that he was wrongfully denied a hearing prior to the seizure and sale of the other three properties. However, the constitutional right to a preseizure hearing in civil forfeiture proceedings was not recognized until 1993, two years after the seizure in this case. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that Fifth Amendment Due Process protections apply to civil forfeiture proceedings against real property). Even if such due process protections applied retroactively, Aguilar's challenge to the sale of the properties would lack merit because exigent circumstances required their interlocutory sale.

In civil forfeiture proceedings "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." *Id.* at 62, 114 S.Ct. at 505; *see also United States v. One Parcel Of Property Located At 194 Quaker*

*Farms Rd.,* 85 F.3d 985, 988 (2d Cir.1996) ("[a]bsent exigent circumstances, a hearing, with notice to record owners, is held before seizure."). "To establish exigent circumstances, the Government must show that less restrictive measures— i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interest in preventing the sale, destruction, or continued unlawful use of the 🚩real property." *Id.* at 62, 114 S.Ct. at 505.

**\*5** Aguilar's properties addressed in the Second Complaint were seized because there was probable cause that each had been used to facilitate the offenses for which he was convicted. *See* 🚩21 U.S.C. § 881(a)(7) (1999). This civil forfeiture statute authorizes interlocutory sale of seized properties by two methods, which are incorporated by reference into the statute. *See* 🚩21 U.S.C. § 881(b) (authorizing seizure of property subject to civil forfeiture upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; 🚩21 U.S.C. § 881(d) (authorizing seizure and summary sale governed by the customs laws codified in the Tariff Act of 1930, 19 U.S.C. §§ 1602–1619). Though the source of authority differs, the standards for sale under each are virtually indistinguishable.

Rule E(9)(b) of the Maritime Rules permits the interlocutory sale of seized property if such property

> is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is [sic] excessive or disproportionate, or if there is unreasonable delay in securing the release of property....

Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b). Section 1612(a) of the customs laws, by contrast, provides for seizure and summary sale whenever it appears that such property

> is liable to perish or to waste or to be greatly reduced in value by keeping, or

> that the expense of keeping the same is disproportionate to the value thereof....

19 U.S.C. § 1612(a) (1999).

Here, the Chief Deputy United States Marshal certified that the properties located at both 2030–32 Main St., Bridgeport (No. 5:90–cv–544), and 8 Drumlin Rd., Westport (No. 5:90–cv–545), were abandoned and therefore subject to vandalism, deterioration and depreciation. *See* 2/20/91 Declaration in Support of Motion for Interlocutory Sale [Doc. Nos. 28 (5:90–cv–544), 31 (5:90–cv–545) ] at ¶¶ 4, 5. The marshal also certified that the mortgage obligations exceeded by over $ 1,000 per month the rental income of the 2034–38 Main St., Bridgeport (No. 5:90–cv–546), property, which was several months in arrears and had little or no equity. *See* 2/21/90 Declaration in Support of Motion for Interlocutory Sale [Doc. No. 27 (5:90–cv–546) ] at ¶ 4. This court found these reasons sufficiently exigent to order the interlocutory sales. *See* 8/1/90 Order for an Interlocutory Sale [Doc. Nos. 34 (5:90–cv–544), 50 (5:90–cv–545), 31 (5:90–cv–546) ]. Interlocutory sale was thus warranted under both Rule E(9)(b) and § 1612(a) because the two abandoned properties were liable to deteriorate or lose value and the mortgage liabilities of the rented property were disproportionate in comparison to its value. *Cf. United States v. Esposito,* 970 F.2d 1156, 1161 (2d Cir.1992) (vacating order of interlocutory sale of forfeited home where "there was no finding that t[he amount expended for maintenance and repairs] was excessive or disproportionate").

**\*6** Aguilar's claim that he was wrongfully denied an opportunity to be heard prior to the sale of his properties is therefore not a cognizable due process challenge because the exigency of the properties' abandonment and disproportionate cost of upkeep required their interlocutory sale. Thus, sua sponte dismissal is warranted because Aguilar's due process claim fails to state a remediable cause of action.

### 3. *Other Claims*
The remainder of Aguilar's claims are frivolous and can be disposed of readily. To the extent Aguilar's claim invoking 🚩19 U.S.C. § 1615 can be construed as challenging the constitutionality of shifting the burden to the claimant upon the government's showing of probable cause, the Second Circuit has "h[e]ld that it does not violate due process to place the burden of proving an innocent owner affirmative

defense on the claimant." ⚑ *194 Quaker Farms Rd.,* 85 F.3d at 987. In addition, the tort claims for false pretenses and conversion are not actionable as these are intentional torts to which the limited waiver of sovereign immunity of the Federal Tort Claims Act ("FTCA") is inapplicable.

*See* 28 U.S.C. § 2680(h); *see also* ⚑ *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) ("the FTCA does not authorize suits for intentional torts based on the actions of Government prosecutors"). Furthermore, because the United States government is not a fiduciary and owes no associated duties to Aguilar, his breach of fiduciary duty allegation against the government fails to state a claim. Finally, Aguilar also fails to state a valid mail fraud claim as that criminal code provision, ⚑ 18 U.S.C. § 1341, may only be prosecuted by the government, not against it.

### Conclusion

For the foregoing reasons, Aguilar's complaints [Nos. 3:99–mc–304 and 3:99–mc–408] are dismissed pursuant to ⚑ 28 U.S.C. § 1915(e)(2)(B) because they present frivolous allegations, none of which state a cognizable claim, and seek monetary relief from an immune defendant. Because the court cannot definitively rule out the possibility that amendment to the pleadings might result in an actionable claim, *see* ⚑ *Gomez,* 171 F.3d at 796, these dismissals are made without prejudice and may be replead after the conclusion of the related forfeiture proceedings.

### All Citations

Not Reported in F.Supp.2d, 1999 WL 1067841

## Footnotes

1      *See United States v. One Parcel Of Property Located At 2030–32 Main St.,* No. 5:90–cv–544(EBB) (pending); *United States v. One Parcel Of Property Located At 8 Drumlin Rd.,* No. 5:90–cv–545 (EBB) (pending); *United States v. One Parcel Of Property Located At 2034–38 Main St.,* No. 5:90–cv–546(EBB) (pending); *see also United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158(EBB) (closed).

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1271533
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL, et al., Defendants.

5:22-cv-00199 (DNH/TWD)
|
Signed 04/05/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, pro se, 7075 South Court
St., Canastota, NY 13032.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent to the Court for review a *pro
se* complaint submitted by Joanna Griffiths ("Plaintiff"),
together with an application to proceed *in forma pauperis*
("IFP Application"). (Dkt. Nos. 1, 2.) For the reasons
discussed below, the Court grants Plaintiff's IFP Application
and recommends that the complaint be dismissed in its
entirety with leave to amend.

**I. PLAINTIFF'S IFP APPLICATION**
When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $402, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed *in forma pauperis* status if a
party "is unable to pay" the standard fee for commencing an
action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's
IFP Application (Dkt. No. 2), the Court finds she meets this
standard. Therefore, Plaintiff's IFP Application is granted. [1]

**II. SCREENING OF THE COMPLAINT**
Section 1915(e) directs that when a plaintiff proceeds *in
forma pauperis*, "the court shall dismiss the case at any time
if the court determines ... the action ... (i) is frivolous or
malicious; (ii) fails to state a claim on which relief may be
granted; or (iii) seeks monetary relief against a defendant who

is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)
(i)-(iii).

In determining whether an action is frivolous, the court must
look to see whether the complaint lacks an arguable basis
either in law or in fact. Neitzke v. Williams, 490 U.S.
319, 325 (1989). "An action is frivolous when either: (1)
the factual contentions are clearly baseless such as when
the claims are the product of delusion or fantasy; or (2) the
claim is based on an indisputably meritless legal theory."
Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437
(2d Cir. 1998) (citation omitted). Although extreme caution
should be exercised in ordering *sua sponte* dismissal of a *pro
se* complaint before the adverse party has been served and the
parties have had an opportunity to respond, Anderson v.
Coughlin, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a
responsibility to determine that a claim is not frivolous before
permitting a plaintiff to proceed. *See, e.g.,* Thomas v. Scully,
943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding a
district court has the power to dismiss a complaint *sua sponte*
if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint
must plead enough facts to state a claim that is "plausible
on its face." Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009). While Rule 8(a) of the Federal Rules
of Civil Procedure, which sets forth the general rules of
pleading, "does not require detailed factual allegations, ... it
demands more than an unadorned, the-defendant-harmed-me
accusation." *Id.*

**\*2** In determining whether a complaint states a claim upon
which relief may be granted, "the court must accept the
material facts alleged in the complaint as true and construe all
reasonable inferences in the plaintiff's favor." Hernandez
v. Coughlin, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513
U.S. 836 (1994) (citation omitted). "[T]he tenet that a court
must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." Iqbal, 556
U.S. at 678. "Threadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice." *Id.* Similarly, allegations that "are so vague as to fail

to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009). Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. 🚩 *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).

Generally, when the court dismisses a *pro se* complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to replead may be denied where any amendment would be futile. 🚩 *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with the plaintiff's causes of action is substantive such that better pleading will not cure it. 🚩 *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

## III. SUMMARY OF PLAINTIFF'S COMPLAINT

Utilizing a form complaint pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq*, Plaintiff brings this action against Defendants Saint Joseph's Hospital ("Hospital") and CEO Jeremy Zochs. (Dkt. No. 1.[2]) As a basis for the Court's jurisdiction, Plaintiff has indicated "Federal Jurisdiction" and specifies the ADA and "disparate treatment resulting in loss of dentures, causing personal injury." (Dkt. No. 1-1.) She lists the following disabilities in the complaint:

> severe mental disability, bi-polar, post traumatic stress, ADD, borderline personality disorder. My physical condition has greatly worsened due to the loss of my dentures, my face has sunken in and I have lost 31 pounds.

(Dkt. No. 1 at ¶ 4.) As to the conduct at issue in this action, she checked "failure to make alterations to accommodate disability" and "other acts." *Id.* at ¶ 5. Plaintiff states that on November 20, 2021, she was having a nervous breakdown and was brought to "CPAP"[3] and was given "additional meds." *Id.* She has "little memory" of that day, "but some memory." *Id.* According to Plaintiff, her dentures were lost, stolen, or misplaced while she was in the Hospital's care. *Id.*

She has "since gone 3 months with no teeth causing [her] to lose 31 pounds, emotional distress." *Id.* Plaintiff wants a jury trial where she can "prove disparate treatment." *Id.* at ¶ 7. She has "suffered greatly both physically and mentally from their discrimination." *Id.* Plaintiff seeks $100,000.00 in damages. *Id.*

**\*3** In an "Affidavit of Disparate Treatment" which is attached to the complaint, Plaintiff states that from what she can remember, she "was not treated well at all." (Dkt. No. 1, Exhibit A.[4]) She avers she had her dentures when she arrived at "CPAP" but did not have them when she returned home. *Id.* On "numerous occasions" she contacted the Hospital and received "more disparate treatment from the internal investigation done by ... Jennifer from Loss Prevention." *Id.* Plaintiff claims employees of the hospital "colluded their statements as to prevent the hospital's correct responsibility." *Id.* "Jennifer told [Plaintiff] that the hospital in no way lost [her] teeth in a disparaging manner, and in fact very rudely." *Id.* As a result, she has suffered physical and mental stress and loss of enjoyment. *Id.*

## IV. DISCUSSION

The complaint refers to the ADA generally, and does not identify the title of the ADA allegedly violated by Defendants. (*See generally* Dkt No. 1.) The ADA is divided in five separate titles. Reading the complaint liberally, the Court considers whether Plaintiff has stated a claim under Title III of the ADA."[5]

### A. Title III of the ADA

Title III of the ADA prevents discrimination on the basis of a disability in places of public accommodation. 42 U.S.C. § 12182. "[P]ublic accommodations" are defined under 42 U.S.C. § 12181(7)(F), which includes a long list of qualifying private facilities, provided that their operations "affect commerce," such as an "insurance office, professional office of a health care provider, hospital, or other service establishment." To state a claim under Title III of the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability;[6] (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants on the basis of her disability. 🚩 *Doe v. NYSARC Tr. Serv., Inc.*, No. 1:20-CV-801 (BKS/CFH), 2020 WL 5757478, at \*4 (N.D.N.Y.

Sept. 28, 2020), *report-recommendation adopted*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020); *see Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008). Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief ... is not available to private individuals under Title III of the ADA.").

**\*4** As an initial matter, because Plaintiff seeks only monetary relief, the complaint "fails to state a plausible claim for relief under Title III of the ADA." *Sandler v. Benden*, 15-CV-1193, 2016 WL 9944017, at \*16 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 16-3218, 2017 WL 5256812 (2d Cir. Nov. 13, 2017); *see, e.g., Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 7040982, at \*3 (*sua sponte* dismissing the plaintiff's claims for monetary damages pursuant to Title III of the ADA with prejudice and without leave to amend).

Additionally, even assuming the Hospital is a public accommodation, 42 U.S.C. § 12181(7), and that Plaintiff is a qualified individual with a disability under the ADA, 42 U.S.C. § 12131(2), the complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of the ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *See Benyi v. New York*, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at \*14 (N.D.N.Y. Mar. 23, 2021), *report-recommendation adopted*, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citations omitted); *see, e.g., Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC)*, No. 5:15-CV-1238 (GTS/TWD), 2017 WL 1013081, at \*9 n.14 (N.D.N.Y. Mar. 14, 2017) (dismissing Title III ADA claims against St. Joseph's Hospital Health Center for failure to state a claim where the plaintiff failed to alleged that he was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" and that Defendants discriminated against him "based on [his] disability"). Rather, as described above, Plaintiff was provided with medication at "CPAP" due to her "nervous breakdown" and seems to argue that employees of the Hospital were negligent and/or rude. Thus, the complaint does not state a Title III ADA claim against the Hospital.

As to CEO Jeremey Zochs, "the question of whether a person is a proper defendant under the ADA turns ... on ... whether the defendant owns, leases, or operates a place of public accommodation within the meaning of the ADA." *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) (emphasis removed)). In assessing whether an individual is a proper defendant under Title III of the ADA, "[c]ourts ... have focused on the issue of control and whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA." *Id.* at \*4. "Under Title III, 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.' " *Id.* (quoting *Green v. DGG Properties Co., Inc.*, No. 3:11-CV-01989, 2013 WL 395484, at \*13 (D. Conn. Jan. 31, 2013) (quoting *Celeste v. East Meadow Union Free School Dist.*, 373 F. App'x 85, 91 (2d Cir. 2010)) (summary order) (additional internal quotation marks and citation omitted))). Further, "[t]he term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." *Coddington*, 45 F. Supp. 2d at 215. Moreover, courts have explained that "[s]uch discriminatory acts may result in the imposition of liability under the ADA where they are the result of the exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." *Id.*

**\*5** However, courts have held that "naked assertions devoid of further factual enhancement" concerning an individual defendant's level of control over a public accommodation are insufficient for purposes of establishing individual liability under Title III of the ADA. *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Iqbal*, 556 U.S. at 678); *see Green*, 2013 WL 395484, at \*14. For example, in *Green*, where "[p]laintiff merely assert[ed] the names of the individual defendants and their respective titles," without more, the court held that, although the individual defendants could "be proper defendants in [the] action if they exercised the requisite control over [the public accommodation], the plaintiff "failed to allege any facts in his complaint that would allow the court to conclude that [the individual defendants] exercised such control over the functioning of affairs of [the public accommodation]."

Here, even affording the complaint the most liberal construction possible, Plaintiff has not pleaded *any* facts to state a claim against CEO Jeremy Zochs under Title III of the ADA. In this regard, CEO Jeremy Zochs is listed as a party and his name is not referenced in body of Plaintiff's complaint. Thus, Plaintiff has not stated a Title III ADA claim against CEO Jeremey Zochs.

Based on the foregoing, the Court recommends that Plaintiff claims brought pursuant to Title III of the ADA for monetary damages against Defendants be dismissed. *See Benyi,* 2021 WL 1406649, at *15.

### B. State Law Claims

Inasmuch as this Court is recommending that Plaintiff's federal claims—to the extent that she alleged any—be dismissed, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over any state law claims. *See Kolari v. New York Presbyterian Hosp.,* 455 F.3d 118, 120 (2d Cir. 2006) ("[A] district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has jurisdiction have been dismissed."). Of course, Plaintiff may also pursue any state law claims in state court.

### C. Opportunity to Amend

This Court has serious doubts about whether Plaintiff can amend to assert actional ADA claims against Defendants. Nevertheless, in light of Plaintiff's *pro se* status and out of an abundance of caution, the Court recommends that Plaintiff be granted leave to file an amended complaint, except that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be dismissed with prejudice and without leave to amend. [7]

**ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is further

 \*6 **RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over any state law claims; and it is further

**ORDERED** that the Clerk shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

### All Citations

Slip Copy, 2022 WL 1271533

## Footnotes

1    Plaintiff is reminded that, although her IFP Application has been granted, she will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

2    The Court assumes Plaintiff is referring to St. Joseph's Health Hospital. The address that Plaintiff has listed for this Defendant is that of St. Joseph's Health Hospital. The Court takes judicial notice of the fact that St. Joseph's Health Hospital is a regional non-profit health care system based in Syracuse, New York, and is

part of Trinity Health, the nation's second-largest Catholic Health System. *See* https://www.sjhsyr.org/about-us/ (last visited Apr. 4, 2022); *see also* ⬜ *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (noting that, for the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court may take judicial notice of information publicly available on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' ").

3    Plaintiff may be referring to the Comprehensive Psychiatric Emergency Program, also known as "CPEP". *See* https://www.sjhsyr.org/location/st-josephs-health-hospital-comprehensive-psychiatric-emergency-program-cpep (last visited Apr. 4, 2022).

4    *See* ⬜ *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

5    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because she has not alleged that she was employed by Defendants. ⬜ 42 U.S.C. § 12117; *see* ⬜ *Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination....") (citation and internal quotation marks omitted). Title II of the ADA covers disability discrimination in public services, programs, and activities, defined as "state or local governments and their instrumentalities." *Sherman v. Black*, 510 F. Supp. 2d 193, 197 (E.D.N.Y. 2007) (citing 42 U.S.C. § 12131(1)). However, "[a] private hospital performing services pursuant to a contract with a municipality[,] even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity." ⬜🔺 *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *See Genco v. Sargent & Collins LLP*, No. 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Lastly, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that she engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against her and the protected activity. *See* ⬜ *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.).

6    Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. A physical or mental impairment can be "[a]ny mental or psychological disorder, such as an intellectual disability [or an] emotional or mental illness[.]" ⬜ 29 C.F.R. § 1630.2(h)(2). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102.

7    If the District Court adopts this Report-Recommendation, and if Plaintiff chooses to file an amended complaint, the pleading must comply with Rules 8 and 10 of the Federal Rules. The revised pleading will replace the original complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See* ⬜ *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."). The revised pleading should not attempt to resurrect any claims dismissed with prejudice in this action Additionally, although Plaintiff may submit objections to this Report-Recommendations, *see infra*, Plaintiff should wait for the District Court to rule on this Report-Recommendation before submitting an amended pleading.

8    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1265761
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL and
CEO Jeremy Zochs, Defendants.

5:22-CV-199
|
Signed 04/28/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, Pro Se, 7075 South Court
Street, Canastota, NY 13032.

MOLLY C. CASEY, ESQ., MAGUIRE CARDONA, P.C.,
Attorneys for Defendants, 22 Clinton Avenue, Albany, NY
12207.

**ORDER ON REPORT & RECOMMENDATION**

DAVID N. HURD, United States District Judge

 **\*1** On March 3, 2022, *pro se* plaintiff Joanna Griffiths
("plaintiff") filed this action alleging that defendants violated
her rights under the Americans with Disabilities Act ("ADA")
in connection with alleged mistreatment that resulted in the
loss of her dentures. Dkt. No. 1. Along with her complaint,
plaintiff sought leave to proceed *in forma pauperis* ("IFP
Application"). Dkt. No. 2.

On April 5, 2022, U.S. Magistrate Judge Thérèse Wiley
Dancks granted plaintiff's IFP Application and advised
by Report & Recommendation ("R&R") that plaintiff's
complaint be dismissed with leave to amend except as to her
claims for money damages under Title III of the ADA. Dkt.

No. 7. As Judge Dancks explained, monetary relief is not
available to private plaintiffs who sue under this title of the
ADA. *Id.* However, in light of plaintiff's *pro se* status, Judge
Dancks recommended that plaintiffs be given an opportunity
to amend the rest of her pleading in accordance with Rules 8
and 10 of the Federal Rules of Civil Procedure. *Id.*

Plaintiff has not filed objections, and the time period in which
to do so has expired. *See* Dkt. No. 7. Upon review for clear
error, the R&R will be accepted and adopted in all respects.
*See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED with leave to amend;

3. Plaintiff's claim for money damages under Title III of the
ADA is DISMISSED with prejudice and without leave to
amend;

4. Plaintiff shall have thirty days from the date of this
Order in which to amend her pleading in accordance with
the instructions set forth in Judge Dancks's Report &
Recommendation and this Order; and

5. If plaintiff does not file an amended complaint within this
thirty-day period, the Clerk of the Court shall enter a judgment
accordingly and close the file without further Order of this
Court.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1265761

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3077853
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Amy J. PENIRD, Plaintiff,
v.
Craig S. BETTER, and NYS Workers'
Compensation Board, Defendants.

5:19-CV-1146 (MAD/TWD)
|
Signed 07/21/2021

**Attorneys and Law Firms**

AMY J. PENIRD, 25 Center Street, Union Springs, New York
13160, Plaintiff pro se.

OF COUNSEL: HELENA O. PEDERSON, AAG, OFFICE
OF THE NEW YORK, STATE ATTORNEY GENERAL,
The Capitol, Albany, New York 12224, Attorneys for
Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

**\*1** On September 16, 2019, *pro se* Plaintiff Amy J.
Penird commenced this action against Defendants Craig S.
Better and the NYS Workers' Compensation Board, alleging
violations of the American with Disabilities Act ("ADA").
*See* Dkt. No. 1. Specifically, Plaintiff alleges a violation of
Title I of the ADA for disability discrimination arising from
a failure to accommodate, 🚩 42 U.S.C. § 12112 *et seq.*, a
violation of Title V of the ADA for retaliation, 🚩 42 U.S.C.
§ 12203(a), and a hostile work environment claim pursuant
to the ADA. Plaintiff seeks the following relief: (1) lost
wages; (2) an order directing Defendants to grant Plaintiff a
reasonable accommodation of telecommuting five days per
week; and (3) compensation for stress. Dkt. No. 1 at 4.

On October 13, 2020, Defendants filed a motion to dismiss
for lack of personal jurisdiction, lack of subject of matter
jurisdiction, and failure to state a claim. Dkt. No. 23. Plaintiff
requested two, sixty-day extensions to respond, which this

Court granted. Dkt. Nos. 24, 25, 26, 27. Plaintiff filed
her response on March 8, 2021 and Defendants filed their reply
on March 15, 2021. Dkt. Nos. 28, 29.

**II. BACKGROUND**

Plaintiff, Amy J. Penird, is employed as a workers'
compensation examiner by Defendant New York State
Workers' Compensation Board ("WCB"). *See* Dkt. No. 1-3 at
16. Due to limited mobility in her arms and hands, Plaintiff
took medical leave in December 2016. Dkt. No. 1-2 at 23. On
March 10, 2017, Plaintiff underwent surgery and recovered
substantial use of her arms. *Id.* at 5, 23. Plaintiff's allegations
revolve around an attempt to return to work from this injury
with a specific ADA accommodation: telecommuting five
days per week. *See* Dkt. No. 1-1 at 79-146.

On September 13, 2017, Plaintiff's injuries were reviewed
by Dr. Richard J. Mutty, M.D. at the request of Plaintiff's
insurance carrier. *See id.* at 74. Dr. Mutty indicated that
Plaintiff had "(1) Abnormality of the capitate bone wrist. (2)
Carpal tunnel compression syndrome right wrist. (3) Medical
epicondylitis left elbow persistent with significant loss of
motion. (4) Left carpal tunnel compression syndrome status
post endoscopic carpal tunnel decompression on 03/10/17."
*Id.* at 76. Dr. Mutty further noted that, "She had a positive
Tinel's sign of the median nerve in the right hand. ... She has
severe deformities of the left hand with amputation of most
of the fingers and an absent thumb. She has a middle finger
as an intact finger but does have limitation of motion and a
very small shortened little finger which is not functional."
*Id.* at 75. Dr. Mutty estimated that Plaintiff would be able
to return to work on November 7, 2017. *Id.* at 71. Upon
return, Dr. Mutty recommended that Plaintiff be limited to
"sedentary to minimal light work activity with a 15-pound
weight restriction on an occasional basis." *Id.* at 77.

Anticipating a return to work, Plaintiff submitted by email
a reasonable accommodation application to Lori Clark, one
of her supervisors, on October 26 and 27, 2017. Dkt.
No. 1-2 at 23, 32, 36-37. Plaintiff requested a reasonable
accommodation of "frequent breaks, limited driving." Dkt.
No. 1-1 at 64. Plaintiff sought to telecommute because
a traditional commute from her home in Union Springs,
New York to the WCB office in Syracuse, New York took
approximately an hour, and driving for an extended period
was difficult. Dkt. No. 1-2 at 23-24. Plaintiff's application
included a medical report from her own provider which

indicated a restriction of "no use of upper extremities," but did not reference driving or telecommuting. Dkt. No. 1-1 at 69.

**\*2** Plaintiff's supervisor told her that she was approved to telecommute. Dkt. No. 1 at 3; Dkt. No. 1-2 at 24. Plaintiff's doctor cleared Plaintiff to return to work on December 11, 2017, and Plaintiff received a laptop and telecommuted from December 11, 2017 to January 18, 2018. Dkt. No. 1-2 at 24, 48.

On January 18, 2018, WCB Affirmative Action Administrator and Designee for Reasonable Accommodations-ADA Coordinator Jamie Benitez informed Plaintiff's supervisors that Plaintiff had, in fact, not received the necessary approval to telecommute. Dkt. No. 1-1 at 112-13. Plaintiff was required to return to in-person work, submit additional medical records, and renew her reasonable accommodation form. *Id.*

On February 1, 2018, Plaintiff's reapplication to telework as a reasonable accommodation was submitted to Mr. Benitez by Ms. Clark. *Id.* at 118. Plaintiff noted her inability to drive long distances on the reasonable accommodation form. *Id.* at 120. Plaintiff's medical provider submitted additional records, this time including Plaintiff's inability to drive for more than 30 minutes at a time. *Id.* at 125.

Later on February 1, Mr. Benitez denied Plaintiff's reasonable accommodation request. *Id.* at 130. Mr. Benitez stated that "New York State does not provide accommodations that are based in the inability of an employee to report to work, due to the distance between where the employee lives and the office." *Id.*

Plaintiff retained counsel, who sent a letter requesting reconsideration to Mr. Benitez on February 28, 2018. Dkt. No. 1-2 at 67. On March 14, 2018, Defendant Craig Better, who is an associate attorney for the WCB, responded. Dkt. No. 1-1 at 133. Through the interactive process with Plaintiff's counsel, Defendant Better proposed alternative reasonable accommodations such as (1) adjustment of hours; (2) voluntary reduction in work schedule; (3) reduction to part time; (4) utilization of public transportation or carpooling; or (5) application to telecommute under the existing program for the maximum allowance of three days a week. *Id.* at 133-34.

Plaintiff did not believe any of these proposed alternatives accommodated her disability. *Id.* at 136. On April 6, 2018, Plaintiff requested discretionary leave without pay due to her injuries and inability to commute to work without further

accommodation, which was granted. Dkt. No. 1 at 3; Dkt. No. 1-3 at 28.

On July 2, 2018, Plaintiff, through counsel, filed a complaint with the EEOC under Charge No. 16GB802546. Dkt. No. 1-2 at 19. And on June 18, 2019, Plaintiff received a right to sue letter from the EEOC. Dkt. No. 1 at 7.

In June 2019, Plaintiff returned to work. *Id.* Through Defendant WCB's existing telework program, Plaintiff currently works from home three days a week and commutes two days a week to the office, the maximum amount of telework allowed. *Id.*

On September 19, 2019, Plaintiff filed a complaint to initiate this lawsuit. *See* Dkt. No. 1. This action, however, was closed due to Plaintiff's failure to pay the filing fee. *See* Dkt. No. 7. Following Plaintiff's payment of the filing fee, this case was reopened on April 10, 2020. *See* Dkt. No. 9.

Following the reopening, Plaintiff received two extensions of time to effectuate service of process on Defendants. Dkt. Nos. 13, 16. Defendants were eventually served on July 22, 2020. Dkt. Nos. 20, 21.

**\*3** Defendants filed this motion to dismiss on October 13, 2020 for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim. Dkt. No. 23.

### III. DISCUSSION

#### A. Personal Jurisdiction

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." ⚑ *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Under Rule 12(b)(5) of the Federal Rules of Civil Procedure, a defendant may assert insufficiency of process by motion. "The burden is on the plaintiff to establish that his service was not insufficient. If the court determines that it was insufficient, the court may, but is not required to, dismiss the action. Alternatively, the court may grant leave to allow the plaintiff to cure the insufficiency." *Sajimi v. City of New York*, No. 07–CV–3252, 2011 WL 135004, \*3 (E.D.N.Y. Jan. 13, 2011) (internal citations omitted).

In a *pro se* case, however, the court is obligated to "make reasonable allowances to protect *pro se* litigants" from

inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003). Furthermore, Rule 4 of the Federal Rules is to be construed liberally "to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice." *Jaiyola v. Carrier Corp.*, 73 Fed. Appx. 492, 494 (2d Cir. 2003).

Here, Plaintiff failed to serve the Complaint on Defendants. The notarized proof of service lists the documents served on Defendants and the Complaint is absent. Dkt. Nos. 20, 21. Plaintiff has not directed the Court's attention to any evidence the Complaint was served. The Court therefore concludes that Defendants were not served with a copy of the Complaint.

The failure to serve the Complaint with the summons is improper service. The Federal Rules of Civil Procedure states that, "[a] summons **must** be served with a copy of the complaint. The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service." Fed. R. Civ. P. 4(c)(1) (emphasis added); *see also Hiller v. Farmington Police Dep't*, No. 3:12-CV-1139 CSH, 2015 WL 4619624, *5 (D. Conn. July 31, 2015) (dismissing *pro se* suit where the complaint was not served with the summons).

Federal Rule of Civil Procedure 4(m) requires the dismissal of an action that is not properly served within 90 days of the filing of the complaint, or an order that service be made within a specified time. This case was initially filed on September 16, 2019. Dkt. No. 1. On June 10, 2020, Plaintiff requested an extension to complete service. Dkt. No. 12. The Court granted Plaintiff until July 13, 2020 to effectuate service. Dkt. No. 13. On July 13, Plaintiff requested another extension. Dkt. No. 15. Again, the Court granted an extension, this time until August 31, 2020 to effectuate service. Dkt. No. 16.

Defendants were served, without the Complaint, on August 20, 2020. Dkt. Nos. 20, 21. Now, Defendants have not been properly served approximately twenty-two months after the Complaint was filed. And Plaintiff has now exceeded the Court's second extension by approximately eleven months. Plaintiff has not requested another extension of time to serve Defendants, despite two previously granted extensions. Additionally, Plaintiff has not cured the service issue since she first became aware of Defendants' assertion that they did not receive the complaint. [1]

**\*4** Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction due to improper service is granted.

Generally, the dismissal for insufficient service of process is without prejudice. However, " '[w]here subsequent service of a complaint upon the defendant[s] would be futile, the Court need not dismiss the action against those defendant[s] without prejudice and may instead dismiss it with prejudice.' " *Saucier v. U.S. Dep't of Just.*, No. 1:18-CV-800, 2019 WL 587588, *3 (N.D.N.Y. Feb. 13, 2019) (quoting *Nesbeth v. New York City Management LLC*, 2019 WL 110953, * 4 (S.D.N.Y. Jan. 4, 2019)); *see also Koulkina v. City of New York*, No. 06cv11357, 2009 WL 210727, *4, n.10 (S.D.N.Y. Jan. 29, 2009) (noting that a showing of good cause by *pro se* plaintiffs, so to avoid dismissal for insufficient service of process, would be futile where plaintiff's claims would not survive a motion to dismiss).

As discussed below, Plaintiff's claims will be dismissed with prejudice where proper service is futile because the claim would not survive a motion to dismiss.

**B. Subject Matter Jurisdiction**

*1. Standard of Review*

When a party moves to dismiss a claim pursuant to Rule 12(b)(1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). For purposes of such a motion, "the allegations in the complaint are not controlling ... and only uncontroverted factual allegations are accepted as true...." *Id.* (internal citations omitted). Both the movant and the pleader are permitted to use affidavits and other pleading materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "Furthermore, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Gunst v. Seaga*, No. 05 Civ. 2626, 2007 WL 1032265, *2 (S.D.N.Y. Mar. 30, 2007) (quoting *Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

*2. Defendant WCB*

The Eleventh Amendment bars actions against state and state agencies by private individuals in federal court unless the state has waived its sovereign immunity or Congress has validly abrogated that immunity. *Bd. of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 373 (2001); *Gollomp v. Spitzer,* 568 F.3d 355, 365–66 (2d Cir. 2009). It is firmly established that Titles I and V of the ADA do not abrogate states' sovereign immunity. *Rosenfield v. New York State Div. of Veterans' Affs.,* No. 1:18CV1299, 2019 WL 4621962, *8 (N.D.N.Y. Sept. 24, 2019); *Quadir v. New York State Dept. of Labor,* 39 F. Supp. 3d 528, 536 (S.D.N.Y. 2014) ("It is well settled that states retain their sovereign immunity against discrimination claims brought under Title I of the ADA. ... And district courts within this Circuit have consistently extended *Garrett's* holding to ADA Title V retaliation claims"). Further, New York State has not waived its sovereign immunity under Titles I or V of the ADA. *See Quadir,* 39 F. Supp. 3d at 537. It is equally well-established that the WCB is an arm of the state to which Eleventh Amendment immunity extends. *See Palma v. Workers Compensation Bd.,* 151 Fed. Appx. 20, 21 (2d Cir. 2005) (summary order); *Peterec-Tolino v. Ace Am. Ins. Co.,* No. 20-CV-5354, 2020 WL 5211045, *3 (S.D.N.Y. Aug. 28, 2020).

 **\*5** Because Defendant WCB possesses sovereign immunity, which has neither been abrogated by Congress nor waived by New York State, it is futile to properly effectuate service in this action against Defendant WCB.

### *3. Defendant Better in His Official Capacity*

It is unclear from the Complaint whether Plaintiff has sued Defendant Better in his official or personal capacity. Because Plaintiff is *pro se,* the Court will read the "Complaint liberally, and where legally tenable, construe the [ ] Complaint as asserting all referenced claims against all defendants in all capacities." *Goonewardena v. New York,* 475 F. Supp. 2d 310, 320 (S.D.N.Y. 2007); *Dawkins v. Williams,* 511 F. Supp. 2d 248, 279 (N.D.N.Y. 2007).

A suit against a state officer in their official capacity is a suit against the state because "the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). And sovereign immunity, as discussed in the preceding section, protects the state against federal suits brought by citizens. *Id.* at 169.

The Eleventh Amendment, however, does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law. This exception exists because, "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 255 (2011). The Supreme Court has recognized the application of prospective injunctive relief against state officers under the ADA:

> Our holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under *Ex parte Young.*

*Garrett,* 531 U.S. at 374, n. 9; *see also* *Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir. 2003) (upholding an official-capacity suit against a state officer under the ADA for prospective injunctive relief).

Although Plaintiff seeks monetary damages for lost wages and stress, Plaintiff also seeks, "That I be allowed to work from home 5 days a week like (4) drs stated I should." Dkt. No. 1 at 4. Such relief is properly categorized as prospective injunctive relief.

This Court therefore has subject matter jurisdiction over Plaintiff's claim against Defendant Better in his official capacity for the prospective injunctive relief sought. The Eleventh Amendment, however, renders futile claims against Defendant Better for monetary damages.

### C. Failure to State a Claim

### *1. Standard of Review*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (*quoting Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

**\*6** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," see Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," see *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

Courts must afford *pro se* plaintiffs "special solicitude" before granting motions to dismiss or motions for summary judgment. *See Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994). "A document filed *pro se* is 'to be liberally construed,' ... and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)). "This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (internal quotations and modifications omitted). Therefore, courts read *pro se* filings "to raise the strongest arguments that they suggest." *Id.* at 474.

Although Plaintiff has not requested leave to amend her Complaint, the Second Circuit has clearly stated that "[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (internal marks omitted). However, leave may still be denied "where it is clear that no amendments can cure the pleading deficiencies and any attempt to replead would be futile." *Harrison v. New York*, 95 F. Supp. 3d 293, 305 (E.D.N.Y. 2015).

### *2. Defendant Better in His Personal Capacity*

To the extent Plaintiff asserts claims against Defendant Better in his individual capacity, those claims are dismissed with prejudice because properly effectuating service of process is futile. Only employers, not individual defendants, are subject to liability under the ADA. *Darcy v. Lippman*, 356 Fed. Appx. 434, 436–37 (2d Cir. 2009); *Stevens v. City of Oneonta*, No. 6:20-CV-317, 2020 WL 5909071, \*3 (N.D.N.Y. Oct. 6, 2020) ("The Second Circuit has specifically held that the ADA does not provide for actions against individuals").

### *3. Failure to Accommodate*

Section 12112 of the ADA provides as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA further states that the term "discriminate," as used in the statute, includes

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

**\*7** 42 U.S.C. § 12112(b)(5)(A). A discrimination claim may therefore be brought under Title I of the ADA for the failure to accommodate. *See, e.g.,* *Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018).

To establish a disability discrimination claim for an employer's failure to accommodate, the plaintiff must establish: "(1) [s]he is an individual with a disability; (2) an employer covered by the ADA had notice of [her] disability; (3) with reasonable accommodation, [s]he could perform the essential functions of the position; and (4) the employer had refused to make such accommodations." *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515–16 (2d Cir. 1995); *Naik v. Mod. Mktg. Concepts, Inc.*, No. 3:17CV0613, 2018 WL 4078264, \*7 (N.D.N.Y. Aug. 27, 2018). Defendants challenge the sufficiency of the first and fourth factors.

Because Plaintiff may allege in an amended complaint, to the extent the original Complaint does not already do so, that she has a disability and her employer refused to make necessary accommodations, Plaintiff's claim for prospective injunctive relief against Defendant Better under Title I of the ADA is dismissed without prejudice. Plaintiff may amend and refile her Complaint and then properly effectuate service of process on Defendant Better.

### a. Disability under the ADA

Plaintiff can allege a disability within the meaning of the ADA sufficient to withstand a motion to dismiss. Under the ADA, a disability is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 74 (2d Cir. 2003) (quoting 42 U.S.C. § 12102(2)).

Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Plaintiff alleges "severely limited use of [her] arms and hands." Dkt. No. 1 at 2. In 2017, Plaintiff was diagnosed with "(1) Abnormality of the capitate bone wrist. (2) Carpal tunnel compression syndrome right wrist. (3) Medical epicondylitis left elbow persistent with significant loss of motion. (4) Left carpal tunnel compression syndrome status post endoscopic carpal tunnel decompression on 03/10/17." Dkt. No. 1-1 at 76. The same doctor noted that

> [s]he has severe deformities of the left hand with amputation of most of the fingers and an absent thumb. She has a middle finger as an intact finger but

does have limitation of motion and a very small shortened little finger which is not functional.

**\*8**  *Id.* at 75.

Defendants are mistaken that there is a *per se* rule that carpal tunnel syndrome cannot qualify as a disability. *Yaba v. Roosevelt*, 961 F. Supp. 611, 619 (S.D.N.Y. 1997); *see also Biancamano v. Special Metals Corp.*, No. 7:12-CV-1825, 2013 WL 4082721, \*4 (N.D.N.Y. Aug. 13, 2013).

In general, the determination of whether an individual is substantially impaired in a major life activity is fact specific. *See, e.g., Gonzalez v. Rite Aid of New York, Inc.*, 199 F. Supp. 2d 122, 131 (S.D.N.Y. 2002). Because Plaintiff may allege that her disability substantially impairs a major life activity, or that she is perceived as having a disability, dismissal of this claim with leave to amend is appropriate.

### b. Reasonable Accommodation

Defendants argue that Plaintiff was granted reasonable accommodations. Dkt. No. 23 at 15-17. Plaintiff asserts that the accommodations do not properly address her restrictions. Dkt. No. 28 at 3.

In *Nixon-Tinkelman v. New York City Dep't of Health and Mental Hygiene*, 434 Fed. Appx. 17 (2d Cir. 2011), the Second Circuit held that in certain circumstances, an employer may have an obligation to assist in an employee's commute under the ADA, including by allowing them to work from home. Currently, Plaintiff is still required to commute to work two days a week. Dkt. No. 1 at 7.

Because Plaintiff may plead facts that state a claim for the refusal to accommodate her disability by allowing her to telecommute five days a week, Plaintiff's Title I claim is dismissed without prejudice.

### 4. Retaliation

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under this chapter." 42 U.S.C. § 12203(a). A retaliation case under the ADA requires "a showing that the employee was engaged in an activity protected by the ADA." *Gold v. Carus*, 131 Fed. Appx. 748, 750 (2d Cir. 2005) (quotations and citation omitted).

A *prima facie* case for retaliation under the ADA requires a plaintiff to allege that " '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse [employment] action; and (4) there was a causal connection between the protected activity and that adverse action.' " *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

Defendants argue that Plaintiff does not allege what protected activity she engaged in or what adverse action was taken against Plaintiff because of her protected activity. Dkt. No. 23 at 17-18. The Court agrees.

Nonetheless, in an amended complaint, the elements of a retaliation claim "might be stated." *Grullon*, 720 F.3d at 139. Plaintiff's retaliation claim, therefore, is dismissed without prejudice with respect to Defendant Better in his official capacity to the extent that the claim seeks prospective injunctive relief.

### 5. Hostile Work Environment

**\*9**  Defendants further contend that Plaintiff's hostile work environment claim was not properly exhausted because her EEOC charge did not allege a hostile work environment. Dkt. No. 23 at 20-21. Plaintiff's complaint states that she was "penalized for following drs. orders has created a hostile work environment." Dkt. No. 1 at 3. Plaintiff's EEOC complaint, however, only alleges that Defendant WCB failed to accommodate Plaintiff's disability and engaged in retaliation. Dkt. No. 1-2 at 28. There are no allegations to support a hostile work environment claim. *Id.*

Claims not raised in an EEOC charge may nonetheless be asserted in federal court where the claims, "(1) concern conduct that falls within the scope of the EEOC investigation that can reasonably be expected to grow out of the charge; (2) allege retaliation for filing the charge; or (3) concern further incidents of discrimination carried out in precisely the same manner alleged in the charge." *Hamzik v. Off. for*

*People with Developmental Disabilities*, 859 F. Supp. 2d 265, 277 (N.D.N.Y. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003)). In general, an EEOC charge which only complains of retaliation or discrimination cannot support a hostile work environment claim without specific allegations of a hostile work environment contained within it. *Difillippo v. Special Metals Corp.*, No. 6:13CV00215, 2016 WL 4621087, *11 (N.D.N.Y. Sept. 6, 2016); *Briggs v. New York State Dep't of Transp.*, 233 F. Supp. 2d 367, 376-77 (N.D.N.Y. 2002); *Tone v. U.S. Postal Serv.*, 68 F. Supp. 2d 147, 153 (N.D.N.Y. 1999) (dismissing hostile work environment claim for failure to exhaust where EEOC complaint only brought disability discrimination and retaliation charges).

Plaintiff's EEOC complaint did not alert Defendant WCB to any alleged hostile work environment. Plaintiff's hostile work environment claim is therefore dismissed for failure to exhaust.

## IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss is **GRANTED;** [2] and the Court further

**ORDERS** that Plaintiff shall file her amended complaint, if any, within **THIRTY (30) DAYS** of that date of this Memorandum-Decision and Order; and the Court further

**ORDERS** that if Plaintiff fails to file an amended complaint within thirty days of this Memorandum-Decision and Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case without further order from this Court; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3077853

## Footnotes

1    Plaintiff was first alerted to the defect in service on September 14, 2020, when Defendants served their premotion letter on Plaintiff. Dkt. No. 22. Plaintiff requested two extensions of time to respond to Defendants' motion to dismiss, which were granted. Dkt. Nos. 24, 25, 26, 27. Plaintiff was informed "no further extension requests will be entertained, without a showing of good cause." Dkt. No. 27.

2    Plaintiff's claims for disability discrimination arising from a failure to accommodate and retaliation against Defendant Better in his official capacity for prospective injunctive relief is dismissed without prejudice. All other claims are dismissed with prejudice.

Naik v. Modern Marketing Concepts, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 38 of 134

2018 WL 4078264
United States District Court, N.D. New York.

Caleb NAIK, Plaintiff,
v.
MODERN MARKETING
CONCEPTS, INC., Defendants.

3:17-CV-0613 (LEK/DEP)
|
Signed 08/27/2018

**Attorneys and Law Firms**

Ronald J. Lanouette, Jr., Lanouette Law Offices, PLLC, Binghamton, NY, for Plaintiff.

James S. Gleason, Hinman, Howard Law Firm—Binghamton Office, Binghamton, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Caleb Naik has sued defendant Modern Marketing Concepts, Inc., alleging violations of Title VII of the Civil Rights Act and the Americans with Disabilities Act. Dkt. No. 15 ("Amended Complaint"). Before the Court is Defendant's motion to dismiss. Dkt. Nos. 23 ("Motion to Dismiss"), 23-6 ("Memorandum"). For the reasons that follow, the Motion to Dismiss is granted in part and denied in part.

**II. BACKGROUND**

**A. Factual Background**
The following facts are taken from the allegations in the Amended Complaint, which are assumed to be true when deciding a motion to dismiss. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

Plaintiff is from India. Am. Compl. ¶¶ 11, 12. Starting in November 2001, Plaintiff performed custodial work for Defendant, including, but not limited to "cleaning bathrooms, cleaning and polishing floors, cleaning vents, replacing light bulbs and ballasts." Id. ¶¶ 13, 16. Plaintiff also did

plumbing, painting, and construction work. Id. ¶ 14. He also obtained supplies and set up conference rooms for company meetings. Id. ¶ 15. In addition to his "very physical" work, Plaintiff "over the years" supervised at least three part-time employees, including his wife and son, though Plaintiff was never promoted to a manager position. Id. ¶ 18. Plaintiff "would work routinely 6 days a week and overtime, often working 50 to 60 hours per week." Id. ¶ 17.

On "several occasions" Plaintiff was "praised" for his work by his supervisors and the company CEO. He received "only positive work reviews" during the period from November 2001 until July 2015, when he was injured on the job. After that injury and others that occurred between July and December 2015, Plaintiff requested accommodations and a reduced workload. Id. ¶ 21.

*1. Injuries and Employer Response*

On July 7, 2015, Plaintiff fell at work and injured his left wrist. Id. ¶ 23. He went to the hospital and was given a splint and medication. Id. ¶ 24. He returned to work the next day, informed Defendant of the injury and of "his need for work restrictions and accommodations" that would "lessen his need to perform manual labor requiring the use of his hands, wrists, and arms." Id. ¶¶ 25–26. Plaintiff's supervisor, Jerry Kenhurt, "consented" to the accommodations, allowing the Plaintiff "to, for instance, not have to polish the floors or clean the bathrooms as much." Id. ¶ 27. Plaintiff then "tried to do less physical work [so] as to not strain his hands, wrists, and arms as much." Id. ¶ 28.

On July 15, 2015, Plaintiff fell again, this time injuring his right shoulder. Id. ¶ 29. Plaintiff again returned to work, and informed Kenhurt "that he needed additional accommodations" because of the wrist and shoulder injuries. Id. ¶ 30.

In late August 2015, Plaintiff traveled on vacation to India. His shoulder injury "was so painful" during that trip that Plaintiff went to a doctor, who prescribed pain medication and told Plaintiff to follow up with his primary care doctor. Id. ¶ 33. Upon his return to work, Plaintiff informed Kenhurt of the continued pain. Id. ¶ 34. Around this time, Defendant reduced Plaintiff's work hours to "closer to 40 hours a week." Id. ¶ 35.

**\*2** In September 2015, Plaintiff was injured again after another employee opened a door, hitting Plaintiff in the face, breaking some of his teeth. Id. ¶¶ 36–37.

In October 2015, Plaintiff was referred to an opthalmologist for problems with his eyes. Id. ¶ 39. Plaintiff alleges that Defendant caused these eye problems by changing to "more hazardous and caustic cleaning supplies" in 2013. Id. ¶ 41. Plaintiff "developed eyesight issues, tearing eyes and general discomfort in both his eyes, breathing difficulties, and headaches." Id. ¶ 41. Plaintiff complained to his supervisor on several occasions prior to October 2015 about the fumes from the new cleaning supplies. Id. ¶ 40. Plaintiff requested either that the cleaning supplies be changed back or "for help with his issues," but "he was ignored." Id. ¶ 42. Plaintiff's eye and breathing problems "continued to get worse." Id. ¶ 43.

While Kenhurt ostensibly "granted" Plaintiff's "requests for accommodations or allowed the Plaintiff to spread his work out to other employees," Defendant, over time, "took away all of Plaintiff's duties." Id. ¶ 44. For example, for fourteen years, Plaintiff had a desk and computer to track customer service complaints and maintenance requests. Id. ¶ 45. However, around the time Plaintiff first informed Defendant of his injuries, Defendant removed the work computer and desk, removing Plaintiff's ability to perform less physically demanding work. Id. ¶ 47.

On or about December 9, 2015, Plaintiff had a follow-up appointment with his physician regarding his shoulder and wrist. Id. ¶¶ 64–65. The physician directed Plaintiff "not to return to work until he was seen by" an orthopedic surgeon. Id. The physician also provided Plaintiff with a note saying he could not work. Id. ¶ 66. The next day, on December 10, 2015, Plaintiff gave the note to Kenhurt, who said he would forward it to Defendant's human resources department. Id. ¶ 67. Human resources representative Becky Bernhardt later contacted Plaintiff to schedule a meeting. Id. ¶ 68. At that December 11 meeting, Bernhardt and another human resources representative, Stephanie Reef, without providing a reason, informed Plaintiff that "he was terminated from his job." Id. ¶ 70.

### 2. Harassment

Plaintiff, who is "dark skinned, short, overweight," and speaks with a "profound" accent, endured "some form of snide remarks or kidding from coworkers over his 14 years" working for Defendant. Id. ¶¶ 49–50. But in September/October 2015, as Plaintiff's "injuries caused him to work less" and he took, with Kenhurt's permission, more breaks, Defendant's employees "increased their verbal harassment." Id. ¶¶ 51–52. Coworkers "would come up to him and tell him that he should be taking a break, he needed to work more, why are you being lazy and things of that nature." Id. ¶ 52. In addition, they would "make fun of his accent" and "mimic his accent." Id. ¶ 53. They would also comment on his weight, saying "things like 'oh baby, look at the baby' " and ask him how many babies he had, since Indian people "had a lot of babies." Id. ¶ 53.

Plaintiff complained about this harassment to Kenhurt, who "referred" Plaintiff to the human resources department. Id. ¶ 55. The human resources department "did take some action and investigated the complaints," but "the harassment continued." Id. ¶ 56.

### 3. Promotion Decisions

**\*3** After "a few months" on a reduced work schedule (resulting in less take-home pay), Plaintiff sought a promotion and/or increased salary. Id. ¶¶ 58–61. Specifically, he discussed with "board member and financial officer" Kerin Flannery his desire to obtain either an increase in hourly pay (from $11.79 to $16.69) or a promotion to a managerial position. Id. ¶ 61. In his entire time working for Defendant, Plaintiff was "never considered" for a managerial position, and was passed over each time in favor of "someone Caucasian" until Kenhurt became his manager in July 2015. Id. ¶ 62.

### B. Procedural Background

On August 25, 2016, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") and United States Equal Employment Opportunity Commission ("EEOC") alleging unlawful employment discrimination on the basis of disability. Id. ¶ 73; Dkt. No. 23-3 ("Administrative Complaint"). After an investigation, the NYSDHR, on February 23, 2017, dismissed Plaintiff's Administrative Complaint on February 23, 2017. Dkt. No. 23-4 ("NYSDHR Order"). The EEOC then reviewed Plaintiff's action, and on March 15, 2017 issued a dismissal and right-to-sue letter. Dkt. No. 15-1 ("Right to Sue Letter").

On June 5, 2017, Plaintiff, proceeding pro se, filed a complaint in this Court, which, liberally construed, asserted claims for disability discrimination, failure to accommodate, and hostile work environment based upon disability pursuant to the Americans with Disabilities Act. Dkt. No. 1 ("Complaint"). He also brought a claim pursuant to 28 USC § 1983. Id. Upon the recommendation of Magistrate Judge David E. Peebles, Dkt. No. 4 ("Report-Recommendation"), this Court dismissed the Complaint without prejudice on the basis that Plaintiff failed to allege (1) any state action as required for a § 1983 claim; (2) that he received an EEOC right-to-sue letter; and (3) facts plausibly suggesting that he suffered a disability under the ADA. R. & R. at 10; Dkt. No. 9 ("December 2017 Order").

On February 2, 2018, Plaintiff, now represented by counsel, filed the Amended Complaint. Am. Compl. Defendant has moved for dismissal. Mot. to Dismiss. Plaintiff has since responded, Dkt. No. 26 ("Response"), and Defendant has filed a reply, Dkt. No. 27 ("Reply").

## III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient matter ... 'to state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In assessing whether this standard has been met, courts take "all factual allegations contained in the complaint" as true, Twombly, 550 U.S. at 572, and "draw all inferences in the light most favorable to the non-moving party," In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted).

On a motion to dismiss, the Court is limited to reviewing the complaint, any documents attached to the complaint or incorporated into it by reference, any documents that are "integral" to the plaintiff's allegations, even if not explicitly incorporated by reference, and facts of which the Court may take judicial notice. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Thomas v. Goord, 215 F. App'x 51, 52 (2d Cir. 2007).

The doctrine of judicial notice is governed by Federal Rule of Evidence 201, which provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In the motion to dismiss context, "a court should generally take judicial notice 'to determine what statements [the documents] contain ... not for the truth of the matters asserted.' " Schubert v. City of Rye, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ).

## IV. DISCUSSION

### A. Exhaustion

**\*4** Prior to pursuing a Title VII claim in federal court, a plaintiff must first file a complaint with the EEOC or an analogous state agency such as the NYSDHR. Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 71 (2d Cir. 2015) (citing 42 U.S.C. § 2000e-5). Claims not raised in an EEOC complaint, however, may be brought in federal court if they are "reasonably related" to the claim filed with the agency. Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006).

This Circuit has recognized that "[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Fitzgerald v. Henderson, 251 F.3d 345, 359–60 (2d Cir. 2001). In this inquiry, "the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003). When assessing exhaustion of claims based on two different types of discrimination—for example, discrimination based on disability and race—the central question is whether the complaint filed with the EEOC gave that agency "adequate notice to investigate discrimination on both bases." Id. at 202.

*1. Race-Based Discrimination Claims*

2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

In the Administrative Complaint, Plaintiff raised only claims relating to his alleged disability. Admin. Compl. Indeed, the Administrative Complaint only makes reference to Plaintiff's injuries to his wrist, shoulder, and eyes, as well as the subsequent termination of Plaintiff's employment. There is no discussion in the Administrative Complaint of anything regarding mistreatment on the basis of national origin, race, or creed.

Instructive is the decision in Young v. Lord & Taylor, LLC, 937 F. Supp. 2d 346 (E.D.N.Y. 2013). In Young, the plaintiff filed a complaint in federal court alleging disability, age, race, ethnicity, and national origin discrimination in violation of the ADA and Title VII. However, in her preceding NYSDHR complaint, she only alleged disability discrimination. Id. at 353. Accordingly, the Young court found that the plaintiff had failed to exhaust her administrative remedies with respect to her age, race, and national origin discrimination claims because "[t]here [was] nothing in her NYSDHR Complaint that allege[d] age, race, ethnicity or national origin discrimination, and therefore no reason that those claims of discrimination would be investigated." Id.; see also Acheampong v. N.Y.C. Health & Hosps. Corp., No. 11-CV-9205, 2015 WL 1333242, at *10 (S.D.N.Y. Mar. 25, 2015) ("Plaintiff's race, color, national origin and age discrimination claims are not reasonably related to the disability claims asserted in his Intake Questionnaire and Charge.").

Similarly, here, there is nothing in the Administrative Complaint that would have given the EEOC or the NYSDHR reason to investigate discrimination related to Plaintiff's national origin, race, or creed. Plaintiff seems to contend that boilerplate language referring to Title VII in the Right to Sue Letter and notarization form that accompanied the Administrative Complaint satisfies the exhaustion requirement. Dkt. No. 26 ("Naik Affidavit") ¶¶ 20–21; Admin. Compl. at 6; Right to Sue Letter. However, this argument is without merit. Whether Plaintiff properly exhausted administrative remedies depends on the claims actually detailed in the Administrative Complaint, not boilerplate language included in all administrative complaints.

**\*5** Plaintiff's Title VII claims of discrimination and hostile work environment on the basis of national origin, race, and creed therefore have not been exhausted, and these claims are dismissed. As the ADA's 300-day limitations period for filing

an administrative claim, 42 U.S.C. § 12117, has passed, the Court dismisses these claims with prejudice.

### 2. Failure to Promote Claim

Plaintiff's failure to promote claim appears to be based on discrimination on the basis of race and disability. Am. Compl.¶¶ 98–102. However, none of Plaintiff's failure to promote allegations appear anywhere in the Administrative Complaint. Admin. Compl. It is unlikely, therefore, that the NYSDHR's scope of investigation would have included Plaintiff's failure to promote claim. Thus, because Plaintiff's failure to promote claim is not reasonably related to any of the claims or allegations included in the Administrative Complaint, Plaintiff failed to exhaust his failure to promote claim. The Court therefore dismisses Plaintiff's failure to promote claim. See, e.g., Elhany v. Shinseki, No. 10-CV-3192, 2012 WL 2122178, at *14 (E.D.N.Y. June 12, 2012) (finding failure to promote unexhausted where administrative complaint asserted only discriminatory termination and did not mention any possible promotions). As the ADA's 300-day limitations period for filing an administrative claim, § 12117, has passed, the Court dismisses this claim with prejudice.

### 3. Hostile Work Environment Claim

The Plaintiff is inexact in his Amended Complaint about whether his claims of hostile work environment claim is rooted in discrimination based on race, disability, or some combination of the two. To the extent the hostile work environment claim is based on race, since race-based discrimination was not raised in nor reasonably related to any allegations included in the Administrative Complaint, any race-based hostile work environment claim is unexhausted and must therefore be dismissed.

To the extent Plaintiff alleges hostile work environment based on disability, such ADA claims "are evaluated under the same standards as hostile work environment claims under Title VII," Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).[1] A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

Case 5:23-cv-00490-GTS-ML Document 6 Filed 08/14/23 Page 42 of 134

Naik v. Modern Marketing Concepts, Inc., Not Reported in Fed. Supp. (2018)
2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

conditions of the victim's employment and create an abusive working environment." 🚩 Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). Because this kind of violation involves "repeated conduct," the Second Circuit has held than an administrative complaint does not "reasonably relate" to a hostile work environment claim when the administrative complaint details "nothing more than a single act of physical and verbal abuse." 🚩 Mathirampuzha v. Potter, 548 F.3d 70, 77 (2d Cir. 2008). Here, the Administrative Complaint makes only one mention of physical or verbal abuse—namely, Plaintiff's allegation that Kenhut "mocked" Plaintiff for his request for different cleaning products because of his eye problems. Admin. Compl. ¶¶ 11–12. As a result, the factual allegations made in the Administrative Complaint cannot "be fairly read to encompass" Plaintiff's hostile work environment claim. 🚩 Mathirampuzha, 548 F.3d at 77. Plaintiff's hostile work environment claim is therefore unexhausted and must be dismissed. As the ADA's 300-day limitations period for filing an administrative claim, 🚩 § 12117, has passed, the Court dismisses this claim with prejudice.

### 4. Retaliation Claim

**\*6** In order to establish a prima facie case of retaliation, a plaintiff must show that the alleged retaliatory action was in response to the plaintiff "engag[ing] in an activity protected by the ADA." 🚩 Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Requesting an accommodation is one form of protected activity. 🚩 Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002).

Plaintiff alleged in his Administrative Complaint that he sought the accommodation of "a reasonable period of time off" because of his medical issues, and Defendant the next day terminated his employment in response to this request for accommodation. Admin. Compl. ¶¶ 15–19. Accordingly, the Administrative Complaint provided sufficient notice to the NYSDHR to investigate possible retaliation. This retaliation claim is therefore administratively exhausted and can be addressed by the Court.

### 5. Failure to Accommodate and Termination Based on Disability Claims

Plaintiff's last two claims, for failure to accommodate and termination based on disability, are clearly raised in his Administrative Complaint, Admin. Compl. ¶¶ 11–19, and are therefore administratively exhausted and properly before this Court.

### B. Merits of Exhausted Claims

### 1. Retaliation

Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases. 🚩 Weixel, 287 F.3d at 148. In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. See 🚩 Cifra, 252 F.3d at 216.

With respect to the first element, protected activity typically "refers to action taken to protest or oppose statutorily prohibited discrimination." 🚩 Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). However, requesting a "reasonable accommodation of [a] disability" also constitutes protected activity. 🚩 Weixel, 287 F.3d at 149. Plaintiff engaged in an activity protected by the ADA by making a request for an accommodation—namely, a leave of absence. The Second Circuit has not definitively determined whether a request for leave for leave for medical treatment, like that requested by Plaintiff, constitutes a reasonable accommodation. However, the Second Circuit *has* recognized that "[m]ost other circuits and the Equal Employment Opportunity Commission have concluded that, in some circumstances, an unpaid leave of absence can be a reasonable accommodation under the ADA." 🚩 Graves v. Finch Pruyn & Co., 457 F.3d 181, 185 n.5 (2d Cir 2006) (collecting cases) ("Graves I"); see also 🚩 29 C.F.R. Pt. 1630, App. § 1630.2(o) (providing that a reasonable accommodation may include "unpaid leave for necessary treatment"). This Court, like other district courts in the Second Circuit, finds that a request for leave of absence can be a reasonable accommodation.

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 43 of 134

Naik v. Modern Marketing Concepts, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 201 (S.D.N.Y. 1999); Reddick v. Niagara Mohawk Power Co., No. 08-CV-995, 2010 WL 5185098, at *6 (N.D.N.Y. Dec. 10, 2010); Bateman v. Project Hosp., Inc., No. 07-CV-2085, 2009 WL 3232856, at *12 (E.D.N.Y. Sep. 30, 2009).

**\*7** A request for leave must still be "reasonable" however, to count as protected activity. Whether a request for leave is "reasonable" will depend in part on the length of the leave requested. Powers, 40 F. Supp. 2d at 199–201. The Amended Complaint is somewhat unclear about the exact length of leave requested. Plaintiff states that he "was directed by his physician not to work until he was seen by the orthopedic surgeon" and then provided his employer with a note "saying that he could not work." Am. Compl. ¶¶ 65–67. Drawing "all inferences in the light most favorable to the non-moving party," In re NYSE Specialists Sec. Litig., 503 F.3d at 95, the Court infers that Plaintiff's request for leave was for the finite period until he could be seen by an orthopedic surgeon. Unlike in Mitchell v. Washingtonville Central School District, in which the Second Circuit held that an employee's request for indefinite leave of absence was not a reasonable accommodation when there was no expectation the employee would be able to return to work afterward, 190 F.3d 1, 9 (2d Cir. 1999), the leave requested here was finite, until an appointment with an orthopedic surgeon. The Court declines to find as a matter of law that such a request constitutes an unreasonable accommodation. Therefore, the Court finds that Plaintiff has plausibly alleged the first element of a retaliation claim. See Sobhi v. Sociedad Textil Lonia Corp., No. 13-CV-8073, 2014 WL 7474338, at *5 (S.D.N.Y. Dec. 30, 2014) (finding request for finite period of leave constitutes a request for a reasonable accommodation).

The second required element, that the employer be aware of the protected activity, is also satisfied here since Plaintiff made the accommodation request to supervisor Kenhurt and Defendant's human resources department. Am. Compl. ¶¶ 67–70.

With respect to the third element, the Second Circuit has "defined adverse employment action broadly to include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (internal quotation omitted). Here, the termination

of Plaintiff's employment clearly qualifies as an adverse employment action. Am. Compl. ¶ 70.

With respect to the fourth element, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by [the defendant]." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). Here, the temporal proximity between Plaintiff's request for leave and his termination—one day—is sufficient to permit an inference of causation.

Plaintiff has therefore plausibly alleged a retaliation claim, which survives the Motion to Dismiss.

### 2. Failure to Accommodate Claims

A plaintiff can state a claim for discrimination under the ADA based upon his employer's failure to accommodate his disability by alleging facts showing that (1) his employer is subject to the ADA; (2) he is an individual with a disability within the meaning of the ADA; (3) with or without reasonable accommodation, he could perform the essential functions of the job; and (4) the employer had notice of the plaintiff's disability and failed to provide such accommodation. Lyons v. Legal Aid Soc., 68 F.3d 1512, 1515 (2d Cir. 1995).

Defendant challenges only the "disability" element of Plaintiff's failure to accommodate claim. Under the ADA, a disability means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of having such an impairment; or (C) being regarded as having such an impairment." EEOC v. J.B. Hunt Transp., Inc., 321 F.3d 69, 74 (2d Cir. 2003) (quoting 42 U.S.C. § 12102(2) ). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." § 12102(3).

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 44 of 134

Naik v. Modern Marketing Concepts, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

**\*8** The ADA's "definition of disability [is to be] construed in favor of broad coverage." Id. § 12102(4)(A). In particular, the requirement that a disability "substantially limit[ ]" the performance of one or more major life activities "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(I). "[M]ajor life activities include ... performing manual tasks, seeing, ... lifting, ... breathing ... and working," § 12102(2)(A), and "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," Parada v. Banco Indus. de Venezuela, C.A., 753 F.3d 62, 68 n.3 (2d Cir. 2014) (quoting § 1630.2(j)(1)(ii) ).

Plaintiff argues that he requested and was denied an accommodation in two instances: when he requested leave just prior to his termination, and when he asked to use different cleaning products. Defendant moves to dismiss the failure to accommodate claims on the basis that Plaintiff failed to allege that any of his injuries "substantially limited his ability to perform major life activities," and therefore failed to plausibly allege a disability. Mem. at 10–11; Reply at 7–9. In addition, Defendant argues that Plaintiff did not even request an accommodation when he submitted his doctor's note requesting leave. Mem. at 11.

### a. Request for Leave

First, as discussed above, the Court finds that a request for leave is indeed a request for a reasonable accommodation. See Powers, 40 F. Supp. 2d at 199–201.

As to whether Plaintiff has adequately alleged a "disability," the Court finds that he has in the case of the wrist and shoulder injuries that prompted his request for medical leave. While Plaintiff does not go into much detail about how those impairments affected his life activities, he does allege that his wrist and shoulder injuries prompted a note from his physician that "[Plaintiff] could not work." Am. Compl. ¶ 66. Plaintiff further alleges that he received wrist splints, his "shoulder injury was so painful," he had to take "more breaks," and had to do "less physical work." Id. ¶¶ 23, 28, 29, 32, 52. The Court, drawing reasonable inferences in the light most favorable to Plaintiff, and following the ADA's directive that the "definition of disability [is to be] construed in favor of broad coverage," finds that these allegations plausibly allege a disability, since Plaintiff's shoulder and wrist injuries

substantially limited two major life activities enumerated in the ADA—his ability to perform manual tasks and his ability to work. See Negron v. City of New York, No. 10-cv-2757, 2011 WL 4737068, at \*12 (E.D.N.Y. Sept. 14, 2011), adopted by 2011 WL 4729754 (Oct. 6, 2011) (finding a plausibly-alleged disability where employee alleged that pain and inflammation in her hand prevented her from working at all, and required a medical leave).

Defendant does not challenge the remaining elements of Plaintiff's failure to accommodate claim, and upon review of the record, the Court finds these other elements to have been plausibly alleged.

Accordingly, giving Plaintiff the benefit of every reasonable inference, the Court finds that Plaintiff has plausibly alleged a failure to accommodate claim with regards to his leave request for his shoulder and wrist injuries.

### b. Request for Cleaning Products Change

As for Plaintiff's other requested accommodation, a change in cleaning products, Plaintiff has not plausibly alleged a failure to accommodate claim. To make out a failure to accommodate claim, Plaintiff must allege a disability to be accommodated. However, the Amended Complaint's mention of "eyesight issues, tearing eyes, general discomfort in both eyes, his breathing and ... headaches," Am. Compl. ¶ 41, does not plausibly allege the existence of a disability. While breathing and seeing are "major life activities," § 12102(2)(A), Plaintiff fails, with this general language, to plausibly allege these activities have been "substantially limited." See Gorbea v. Verizon N.Y., Inc., No. 11–CV–3758, 2014 WL 917198, at \*8 (E.D.N.Y. Mar. 10, 2014) (finding that the plaintiff was not disabled because she did not show that her breathing difficulties were "substantial"). Nor does Plaintiff suggest that Defendant perceived Plaintiff as disabled because of these eyesight and breathing issues. Since Plaintiff has not plausibly alleged this disability, he cannot maintain a failure to accommodate claim based on it, meaning this claim must be dismissed.

### 3. Wrongful Termination Based on Disability

**\*9** Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual with a disability

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 45 of 134

Naik v. Modern Marketing Concepts, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." § 12112(a). In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show: "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability."

Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008).

The first three elements of the prima facie case of discrimination are the same as those for the failure to accommodate claim, and are plausibly alleged, for the same reasons already discussed above. As for the last element of an ADA discrimination claim, termination is an adverse employment action, and the immediate temporal proximity between Plaintiff's request for leave for his disability and his termination is sufficient to permit an inference of causation.

See Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015).

Accordingly, the Court finds that Plaintiff has plausibly alleged wrongful termination based on disability in violation of the ADA.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion to Dismiss (Dkt. No. 23) is **GRANTED in part and DENIED in part** as follows:

Defendant's Motion to Dismiss is **GRANTED** as to Plaintiff's Title VII claims, race-based claims, failure to promote claim, and hostile work environment claim. These claims are **DISMISSED with prejudice**;

Defendant's Motion to Dismiss is **GRANTED** as to Plaintiff's claim that Defendant failed to provide the accommodation of different cleaning supplies, and this claim is **DISMISSED without prejudice**.

Defendant's Motion to Dismiss is **DENIED** as to Plaintiff's retaliation claim, failure to accommodate claim for not permitting medical leave, and wrongful termination based on disability; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order upon the parties in this action.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 4078264, 2018 Fair Empl.Prac.Cas. (BNA) 307,163, 2018 A.D. Cases 307,163

---

## Footnotes

1    The Second Circuit Court of Appeals has not yet decided whether the ADA provides a basis for a hostile work environment, Farina v. Branford Bd. of Educ., 458 F. App'x 13, 17 (2d Cir. 2011), but several other circuits have recognized such claims, see, e.g., Shaver v. Indep. Stave Co., 350 F.3d 716, 719–20 (8th Cir. 2003); Fox v. Gen. Motors Corp., 247 F.3d 169, 175–76 (4th Cir. 2001); Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 232–35 (5th Cir. 2001). The Court here assumes, arguendo, that the ADA provides a basis for a hostile work environment claim.

---

**End of Document**                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1063183
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Parker SHANNON, Plaintiff,

v.

CREDIT AGRICOLE SECURITIES
(USA), INC., Defendant.

17-cv-00667 (AJN)
|
Signed 03/19/2021

**Attorneys and Law Firms**

Erica Sanders, Phillips & Associates, PLLC, White Plains, NY, Benjamin Davis Weisenberg, The Ottinger Firm, P.C., New York, NY, for Plaintiff.

David Justin Baron, Hogan Lovells US LLP, Tyler Thomas Hendry, Barbara M. Roth, Herbert Smith Freehills New York LLP, New York, NY, for Defendant.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** Plaintiff brings claims under the Americans with Disabilities Act against his former employer for allegedly terminating him because of his cancer diagnosis. Defendant moves for summary judgment on the grounds that Plaintiff's ADA claims fail as a matter of law and because they are time-barred. For the reasons that follow, Defendant's motion is GRANTED.

**I. BACKGROUND**

**A. Facts**

The facts in this section are drawn from Defendant's Rule 56.1 statement and are undisputed unless otherwise stated. As explained in section II.A. of this Opinion, the Court will not consider a fact to be "in dispute" if Plaintiff has provided only (a) a conclusory citation to evidentiary or procedural rules without any explanation or justification for the objection or (b) a citation purportedly to the record that provides the Court

no reasonable means to locate the document and without any explanation of what the document is.

Defendant Credit Agricole Securities, Inc. ("CAS") is a New York corporation and a U.S. Broker dealer. Dkt. No. 107 at 4. CLSA Limited ("CLSA") is a Hong Kong-based entity, with offices in multiple Asian countries, New York, and London. *Id.* at 5. Plaintiff was hired by one or both companies in 2007 (the parties dispute which one) as a salesman and a specialist with regards to Korea and Taiwan. *Id.* at 20. *Id.* Plaintiff's duties generally included researching and reviewing financial data and news and working with clients. *Id.* at 23. Plaintiff was a "key relationship manager" on five accounts and a "Korea / Taiwan specialist" on six or seven. *Id.* at 32.

In 2008, Plaintiff was diagnosed with a form of cancer called non-Hodgkin's lymphoma and began treatment. *Id.* at 24. Plaintiff was told by Jay Plourde, his supervisor, to take as much time off as he needed regarding his health. *Id.* Plaintiff lost all of his hair but it grew back within a year. *Id.* at 25. According to Defendant, by 2010, Plaintiff's supervisors were under the impression that Plaintiff no longer had cancer. *Id.* Plaintiff disputes this fact and claims Plaintiff that his supervisors were well aware of the fact that he still had cancer past this point, as he regularly discussed his cancer diagnosis and treatment with them, and that it was not until September 2012 that he no longer had active Lymphoma. *Id.*

From 2010 to 2011, Defendant's management team in Asia made job cuts for New York workers as a result of restructuring. *Id.* at 28. In 2011, management proposed that Plaintiff be terminated and Plourde advocated on behalf of Plaintiff that he be able to keep his job. *Id.* at 28-29. Plaintiff stayed on the job until 2012, when CLSA management engaged in more job cuts. *Id.* at 29. In or around October 2012, Defendant agreed to a merger with a Chinese company, and in preparation for that sale consolidated its Korea and Taiwan related functions to the North Asian office. *Id.* at 29-30. Plourde was told in June 2012 that Plaintiff's job would be eliminated. *Id.* at 30.

Plourde waited until November 29, 2012 to inform Plaintiff of his termination. *Id.* According to Defendant, Plaintiff then informed Plourde that he still had cancer, which Plourde was not aware of until that conversation. *Id.* at 31. Plaintiff disputes this fact and claims that Plourde was already aware that he had cancer well before that time. Plourde then told Plaintiff that he could forget about termination and return to work while Plourde looked for another position for him.

(According to Plaintiff, Plaintiff has had no active lymphoma since at least September 2012. *Id.* at 33-34.).

**\*2** On November 30, 2012, Plourde told management in Hong Kong about Plaintiff's cancer, and Plourde was permitted to try and find Plaintiff another job. *Id.* at 34. Plourde found a job for Plaintiff as "Head of Syndications." *Id.* at 35. Plourde and Plaintiff exchanged emails regarding this position on December 13, 2012. *Id.* at 37. On December 17, 2012, Plaintiff contacted Human Resources to request a disability leave and on December 20, 2012 Plaintiff told human resources that he intended to begin disability leave in January 2013. *Id.*

In his Amended Complaint and responses to Defendant's interrogatories, Plaintiff maintained that on November 20, 2012 he provided his supervisors with "a formal written complaint about the apparent discrimination that he was being subjected to in the workplace." *Id.* at 60. Plaintiff has admitted in sworn testimony that he did not mention his disability in this complaint. Dkt. No. 109 ¶ 24. In his deposition testimony, Plaintiff stated that his first written complaint regarding his disability was instead a written letter from his lawyer dated January 2, 2013, which was after Plaintiff had elected to take disability leave. *Id.* ¶ 33. Defendants responded to this letter in a letter on January 4, 2013, stating that Plaintiff was not terminated due to his disability and that, though he had been terminated in November 2012, Defendants were willing to keep him on as an employee through February 2013. Dkt. No. 115-6, Pl. Ex. N.

Plaintiff then applied for and received "short-term disability benefits" from Defendants, which permitted a 100% salary continuation for up to 26 weeks. Dkt. No. 107 at 37-38. The insurance company Prudential administrated the plan, and as would decide whether Plaintiff was eligible. Plaintiff had to provide medical records and information to show his eligibility for the disability benefits to Prudential. *Id.* Plaintiff certified in his application to Prudential that he had fatigue, anxiety, and loss of cognitive ability, including difficulty concentrating, multitasking, word retrieval and recalling simple facts. *Id.* at 41.

Plaintiff's short term disability leave began on January 14, 2013. *Id.* at 39-40. Plaintiff chose this date to begin voluntary leave. *Id.* Plaintiff remained employed by Defendants during this time. *Id.* at 44-45. Defendant did not hire anyone to fulfill Plaintiff's job at any point after he was gone. *Id.* at 43.

Plaintiff also applied for supplemental disability benefits through a second insurance company on February 2013, in which he certified that he was totally unable to work because of his disability as of January 14, 2013 and that he had "fatigue and cognitive d[y]sfunction" which were "making travel difficult, including staying awake in client meetings" and "difficult to read research to properly influence client decisions." *Id.* at 41. Plaintiff's treating physician submitted a statement in support of this application, stating that he advised Plaintiff to stop working at that time because of these issues. *Id.*

As part of the salary continuation in his short-term disability benefits, Plaintiff continued to be paid his regular salary by Defendants. *Id.* at 48. Around March 2013, Plaintiff received a $140,000 bonus from CAS or CLSA, and other New-York based workers received similar payments. *Id.* at 45.

After the short-term disability leave ended, Plaintiff began to receive long term disability benefits from Prudential. *Id.* at 51. In order to receive these benefits, Plaintiff had to show that he was "unable to perform the material and substantial duties of [his] own occupation due to [his] sickness or injury." *Id.* at 51. After 24 months, to continue receiving benefits he had to show that he was "unable to perform the duties of any occupation for which [he is] reasonably fitted by education, training, or experience." *Id.* Plaintiff never reached out to Defendants to inform them that he could return to work in any position. *Id.* at 52-53.

**\*3** Plaintiff's long term disability payments were terminated by Prudential on August 26, 2015, when Prudential learned that Plaintiff had begun work as a CEO of a new business. *Id.* Plaintiff appealed this decision, and in that appeal he and his physician argued that he was unable to perform work in any occupation at all because he was "totally disabled." *Id.* at 53. Plaintiff explained that he was "totally disabled" because of "chemo brain," which is a cognitive disorder caused by chemotherapy. *Id.* at 54. Plaintiff certified under penalty of perjury that:

> "the chemotherapy treatments have severely diminished my cognitive functioning to where I could no longer work in my occupation or frankly in any occupation. In particular, my chemo brain impairs my ability to maintain focus, multi-task, and recall simple facts and names in a disconnect I describe as 'on-tip-of-my-tongue'. So impaired, it was becoming impossible for me to sell research in the fast paced environment of Wall Street and as a result, I stopped

working as a salesman on January 12, 2013 ...
[chemotherapy] treatments have had a devastating
effect on both my physical and cognitive abilities
which continue to render me totally disabled" and
"[a]s a result of my restrictions and limitations which
I set forth above, I can no longer perform the material
and substantial duties of any occupation for which
I am reasonably suited by virtue of my education,
training and experience. Thus, without the ability to
focus on details, without the ability to multi-task,
without the ability to remember details, without the
ability to go through a day without fatigue and without
the ability to sit, stand or walk for a considerable
period of time, to say nothing about my extensive
travel requirements, I simply cannot work in any
capacity commensurate with my attempts at work."

*Id.* at 54-55. Plaintiff's physician informed Prudential and
Mass Mutual that Plaintiff reported having the above
symptoms as early as May 2011. *Id.* at 57.

### B. Procedural History

Plaintiff filed an Amended Complaint on May 9, 2017,
bringing claims for discrimination and retaliation under the
ADA, NYSHL, and NYCHRL. Dkt. No. 20. Defendant filed
a motion to dismiss on May 22, 2017. Dkt. No. 21. In an
Opinion on March 22, 2018, the Court granted Defendant's
motion in part and dismissed all claims except for Plaintiff's
ADA claims. Dkt. No. 29. The parties proceeded to discovery,
and Defendant now moves for summary judgment as to all
remaining claims. Dkt. No. 89. Plaintiff filed an opposition to
Defendant's motion, as well as a motion to strike Defendant's
Rule 56.1 Statement. Dkt. Nos. 106-107, 114.

## II. DISCUSSION

Defendant moves for summary judgment on the remaining
claims in Plaintiff's Amended Complaint: Plaintiff's
discrimination and retaliation claims under the American with
Disabilities Act. Dkt. No. 90 at 7. For the reasons that follow,
the Court determines that there are no genuine disputes of
material fact and that Defendant is entitled to judgment as a
matter of law on Plaintiff's ADA claims. Because the Court
grants Defendant's summary judgment on these grounds, it
need not consider Defendant's argument that Plaintiff's claims
are time-barred. The Court also denies Plaintiff's Motion to
Strike for the reasons stated below.

### A. Plaintiff's Objections to
### Defendant's Rule 56.1 Statement

Plaintiff has filed both a motion to strike portions of
Defendant's Rule 56.1 Statement and responses to each
purported undisputed fact. Dkt. No. 107, 114. Plaintiff has
formally disputed virtually all facts asserted by Defendant.

**\*4** "[E]vidence considered on summary judgment must
generally be admissible." *LaSalle Bank Nat. Ass'n v. Nomura
Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). The
Federal Rules of Civil Procedure Rule 56, as amended in
2010, allows that "[a] party may object that the material cited
to support or dispute a fact cannot be presented in a form that
would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).
As the Advisory Committee Notes attendant to that provision
make clear, "[t]here is no need to make a separate motion to
strike" in addition to that objection. *See* Advisory Committee
Note to Fed. R. Civ. P. 56.

To the extent that Plaintiff argues that Defendant's Rule
56.1 statement relies on inadmissible evidence, because
inadmissible evidence "is insufficient to create a genuine
dispute of material fact," the Court "need not engage
in separate analysis of the motion to strike." *Codename
Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, No.
16CIV1267ATSN, 2018 WL 3407709, at *4 (S.D.N.Y. Jan.
12, 2018). To the extent the Plaintiff otherwise argues that
Defendant's Rule 56.1 statement should be stricken because it
contains "improper arguments," the burden for demonstrating
the necessity of such a remedy is high. *See Christians of
California, Inc. v. Clive Christian New York, LLP*, No. 13-
CV-275 KBF, 2014 WL 3407108, at *2 (S.D.N.Y. July 7,
2014) ("A party seeking to strike a Rule 56.1 statement
'bears a heavy burden, as courts generally disfavor motions
to strike.' ").

In Plaintiff's motion to strike, Dkt. No. 114, Plaintiff listed
nearly 50 statements from Defendant's Rule 56.1 submission
and "objects" on the grounds of "hearsay" or "improper
argument" by providing a corresponding citation to either
the Federal Rules of Evidence 801-803, the Undersigned's
Individual Rules 3.G.v, Federal Rule of Civil Procedure 56(c)
(2), *Pacenza v. IBM Corp.*, No. 04 CIV. 5831 (SCR), 2007
WL 9817926, at *2 (S.D.N.Y. July 26, 2007) (a case that
was decided prior to the 2010 amendments to Rule 56), or
a combination of the above. Aside from these bare citations,
Plaintiff declined to provide *any* explanation or justification

for why each statement is based on inadmissible or otherwise improper. Plaintiff makes the same or similar objections to the corresponding facts in his response to Defendant's Rule 56.1 Statement. Dkt. No. 107.

Because "[a]sserting an issue without advancing an argument does not suffice to adequately raise" it, *Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010), the Court declines to deem any statements inadmissible solely on the basis of Plaintiff's indolent objections. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 20 CV 1186-LTS, 2020 WL 5370576, at *4 (S.D.N.Y. Sept. 8, 2020) (declining to consider an issue where a party did "not provide any explanation or proffer any support for these conclusory arguments."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted). Instead, when determining whether a material fact is in dispute, the Court will consider all arguments properly advanced in the parties' submissions as to the admissibility of evidence cited in support of those factual allegations. *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (to create "doubt as to the material facts," a party "may not rely on conclusory allegations or unsubstantiated speculation.").

**\*5** Moreover, in Plaintiff's response to Defendant's Rule 56.1 Statement, Dkt. No. 107, Plaintiff provides some record citations that provide no discernable method for the Court to locate the documents because there is no reference to the docket number, filing, submission, or any other indicator of the documents' location.[1] Specifically, at times Plaintiff references what appear to be bates stamps ranges but does not explain what the documents are or where they can be found. *See, e.g.,* Dkt. No. 107 at 37, 41. By citing unidentifiable documents without explanation, Plaintiff "leaves it to the Court to hunt down the evidence to evaluate Plaintiff's conclusory argument." *Florkevicz v. Comm'r of Soc. Sec.*, No. CV 19-19919 (SRC), 2020 WL 3867409, at *2 n.1 (D.N.J. July 9, 2020). *See also* *Rios v. Bigler*, 67 F.3d 1543, 1553 (10th Cir. 1995) ("It is not this court's burden to hunt down the pertinent materials."). Because "nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment," and as such "district courts are entitled to order" – and this Court *has* ordered – "litigants to provide specific record citations," *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470–71 (2d Cir. 2002), Plaintiff's failure to provide

functioning citations may result in some instances in a fact being undisputed.

## B. Defendant's Motion for Summary Judgment

Defendant moves for summary judgment as to Plaintiff's ADA discrimination and retaliation claims. "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015). Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the Court must view all facts in the light most favorable to the non-moving party. *See Eastman Kodak Co. v. Image Techn. Servs., Inc.*, 504 U.S. 451, 456 (1992); *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015). In evaluating cross-motions for summary judgment, each motion must be examined "on its own merits," and "all reasonable inferences must be drawn against the party whose motion is under consideration." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 48 (2d Cir. 2019) (internal quotations and citations omitted).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quotations omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007). The same is true for "mere speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Only disputes over material facts will "preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." 🚩*Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." 🚩*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).

### 1. Plaintiff's Discrimination Claim

The ADA provides "that no covered employer 'shall discriminate against a qualified individual on the basis of disability ... in regard to ... [the] discharge of employees.' " *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 248 (S.D.N.Y. 2015) (citing 🚩42 U.S.C. § 12112(a)). "In analyzing a discriminatory discharge claim under the ADA, [courts] apply the burden-shifting analysis established by the Supreme Court in 🚩*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)," under which the "plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination," and then "[t]he burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action." 🚩*Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal citations omitted). "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." 🚩*Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

**\*6** "To establish a prima facie case of discrimination under the ADA, plaintiff must show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." 🚩*Heyman*, 198 F.3d at 72 (citing 🚩*Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998)).

Defendant does not contest the first two elements of Plaintiff's prima facie case for the purposes of this motion. Dkt. No. 90 at 7. The Court determines that there are no genuine disputes of any material facts and that Plaintiff has failed to meet his initial "burden of production" for establishing the other two elements. 🚩*Heyman*, 198 F.3d at 72.

### a. Third Element: Qualified to Perform Essential Job Functions

Plaintiff maintains that his job position was "Key Relationship Manager" and that he was qualified to perform that job, with reasonable accommodations, when it was taken away from him on November 29, 2012. Dkt. No. 106 at 12-13. However, Plaintiff's contention that he was able to perform his job as "key relationship manager" is in direct conflict with his sworn statements made to the Social Security Administration, Prudential, and Mass Mutual in obtaining his disability benefits that, as a result of chemotherapy, Plaintiff had suffered serious disability in his cognitive functioning that rendered him incapable of performing in his occupation or *any* other occupation. Dkt. No. 107 at 50-54 ("the chemotherapy treatments have severely diminished my cognitive functioning to where I could no longer work in my occupation or frankly in any occupation").

Moreover, as explained *supra* II.A., Plaintiff's objections to the introduction of these statements are entirely conclusory and unsupported by any explanation for why the underlying evidence is inadmissible. As Plaintiff provides no evidence to rebut Defendant's claim that Plaintiff made these statements or otherwise provide an explanation as to their veracity, the Court concludes that there is no genuine dispute of material fact as to whether Plaintiff made these statements. *See* 🚩*Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

To be sure, Plaintiff's statements to the Social Security Administration, Prudential, and Mass Mutual that he is totally disabled and cannot work "do not necessarily bar [him] from claiming in an ADA action that he can perform the essential functions of the job at issue." 🚩*Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333 (2d Cir. 2000) (citing

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999)). However, because Plaintiff's earlier statements to these entities "directly contradict the allegations made in" this ADA lawsuit, Plaintiff "must offer some explanation for the inconsistency" that is "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of the job, with or without 'reasonable accommodation' " in order to "defeat summary judgment." *Id.* (citing *Cleveland*, 526 U.S. at 802).

Plaintiff has failed to make this showing. Plaintiff has sworn under oath that he had suffered serious cognitive impairment that affected his ability to read research and recall basic facts, and Plaintiff provides no discernable explanation of how he can perform the essential functions of the key manager role without those abilities or why this job is an exception to his statement that he cannot perform in any occupation. Moreover, though Plaintiff points out that he was terminated from his preferred position on November 29, 2012, two months before he began disability leave, he points to nothing in the record to explain why he was "totally disabled" in January of 2013 but not in November of 2012. He at no point claims or points to evidence in the record that his condition deteriorated in that two-month period, and in fact the undisputed evidence in the record shows that Plaintiff began chemotherapy in 2008 and complained of cognitive dysfunction as early as May 2011. Therefore, the Court concludes that there is no genuine dispute that Plaintiff was totally disabled during this time period.

**\*7** To be sure, even though he was totally disabled, Plaintiff may still have been "qualified to perform the essential functions of his job" with "a reasonable accommodation." *Heyman*, 198 F.3d at 72. Plaintiff argues that he requested that his employer "find someone else to perform certain Korea and Taiwan specialist functions," so that he could perform only the "key manager role." Dkt. No. 106. at 7. However, eliminating one of Plaintiff's key job roles that he was hired to do is not a "reasonable accommodation." To the contrary, this is the *removal* of a job function, not an accommodation for performing one. See *Turowski v. Triarc Companies, Inc.*, 761 F. Supp. 2d 107, 112 (S.D.N.Y. 2011) ("While a reasonable accommodation may include adjustments such as the modification of physical facilities, work schedules or equipment or job restructuring, reasonable accommodation does not mean the elimination of any of the position's essential

functions.") (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)); *Jasany v. U.S. Postal Serv.*, 755 F.2d 1244, 1250 (6th Cir. 1985) ("The post office was not required to accommodate [the plaintiff] by eliminating one of the essential functions of his job."). And while "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, 42 U.S.C. § 12111(9)(B)," the ADA "does not require creating a new position for a disabled employee." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006).

Second, even if this were to be considered a "reasonable accommodation" in theory, Plaintiff has still not shown that with it he would be "qualified to perform the essential functions of his job," *Heyman*, 198 F.3d at 72, because he provides no explanation of how his disability to his cognitive functioning made him unable to complete the specialist Taiwan and Korea functions but not the key manager functions. In sum, because there is no genuine dispute of fact that Plaintiff was totally disabled during this time period and that there was no accommodation that could enable him to perform his duties, the Court concludes as a matter of law that Plaintiff was not "qualified to perform the essential functions of his job." *Id.*

**b. Fourth Element: Adverse Action because of Disability**

Although the conclusion above is sufficient to dismiss Plaintiff's discrimination claim, the Court also concludes that there is no genuine issue of material fact that the Defendant took adverse action against the Plaintiff because of his disability. For the fourth element of his claim, Plaintiff must show that he "suffered adverse employment action because of his disability," *Heyman*, 198 F.3d at 72. "[T]he ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). Once "Defendant proffers a legitimate reason for Plaintiff's termination, the burden shifts to Plaintiff to demonstrate that the reason Defendant offers is merely a pretext for discrimination." *Clark*, 96 F. Supp. 3d at 254-55 (citing *Heyman*, 198 F.3d at 71) (quotations omitted). In analyzing whether there is discriminatory intent, the Court may look to factors such as whether the Defendant hired a

new person of similar qualifications after Plaintiff's discharge, criticized the Plaintiff's performance in disability-related degrading terms, or engaged in "more favorable treatment of employees not in the protected group." *Exarhakis v. Visiting Nurse Serv. of New York*, No. 02-CV-5562 (ILG), 2006 WL 335420, at *11 (E.D.N.Y. Feb. 13, 2006) (quoting *Chambers v. TRM Copy Centers Corporation*, 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff claims that his supervisors were aware of his cancer diagnosis, as evidenced by Plaintiff's testimony that he told them about it, and that he was terminated from his preferred position in November 29, 2012 as a result. Defendants have offered a "legitimate reason for Plaintiff' termination" in response, *Clark*, 96 F. Supp. 3d at 254-55, which is that he was not terminated for any reason related to his disability but because his position, along with those of other employees, was to be eliminated as a result of restructuring of the company.

**\*8** Plaintiff has not provided evidence from which a reasonable jury could conclude that Defendant's purported reason for termination was pretextual. As purported evidence of discriminatory intent, Plaintiff claims that his salary had been decreasing each year starting in 2009 after his diagnosis in 2008. Dkt. No. 106 at 13-14, 28. However, Defendant explains that the company's struggles following the financial crisis in 2008 led to salary and bonus decreases for almost all employees. Dkt. No. 107 at 28. Plaintiff has not "allege[d] that defendants treated [him] differently from non-disabled employees, [n]or that defendants' practices have a disparate impact upon disabled employees relative to non-disabled employees." *Brennen v. Comptroller of State of N.Y.*, 100 F.3d 942 (2d Cir. 1996).

In fact, to the contrary, the only conclusion a reasonable jury conclude reach from the undisputed facts in the record is that there was an absence of discriminatory intent for termination of Plaintiff from his preferred position on November 29, 2012. Defendant never hired someone else to fill his position and Plaintiff's supervisor was also terminated a year later. Dkt. No. 107 at 43, 50. Additionally, when Plaintiff was initially terminated as a result of the layoffs, his supervisors strived to find him another position in the company, which he was offered and accepted. Plaintiff was permitted to and took full advantage of the disability leave provided by Defendants in 2013. Therefore, the material facts established in the record on this issue – none of which are meaningfully disputed

– do not give rise to an inference of discrimination. *See Exarhakis*, 2006 WL 335420, at *11 (determining that the plaintiff's allegations "do not give rise to a rational inference of discrimination, especially in the context of the other events that transpired, including [defendant] offering her gratuitous leaves of absence, creating a new position for her, allowing her a tremendous amount of flexibility in the work created for her, and reviewing her work positively."). The Court concludes as a matter of law that Plaintiff did not suffer an adverse employment action as a result of his disability.

\* \* \*

Based on the undisputed facts in the record, no reasonable jury could conclude that the Plaintiff was qualified to perform the essential functions of his job or that any adverse employment action was taken against him because of his disability, both of which are required for a claim of discrimination under the ADA. Defendant is therefore entitled to summary judgment on Plaintiff's discrimination claim.

### 2. Plaintiff's Retaliation Claim

Plaintiff also brings a claim for retaliation under the ADA. The statute "provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "A prima facie case of retaliation under the ADA is made up of the following elements: (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (internal quotations omitted). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). Then, "[i]f a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation

is merely a pretext for impermissible retaliation.' " *Id.* (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

**\*9** Plaintiff claims that there were two retaliatory events arising out of his complaints to supervisors regarding their alleged discriminatory treatment. Dkt. No. 106 at 17-18. First, he states that he made a "plain English written complaint" regarding the alleged discrimination in his November 20, 2012 employee performance review, and that he was subsequently terminated from his preferred position on November 29, 2012. *Id.* However, this complaint, which was contained in an "employee performance review," Dkt. No. 106 at 18, was not "protected activity" under the ADA. "Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotations omitted). Plaintiff himself admits in sworn testimony that he did not reference his disability in this document, Dkt. No. 109 ¶ 24, and there is therefore no genuine dispute that Plaintiff did not "protest or oppose statutorily prohibited" discrimination in the November 20, 2012 complaint. Moreover, even if Plaintiff had established a prima facie case of retaliation on this claim, as discussed *supra* II.B.1.b, Defendant has proffered a legitimate reason for Plaintiff's termination and Plaintiff has not "point[ed] to evidence that would be sufficient to permit a rational factfinder to conclude that" Defendant's explanation for the firing is pretextual. *Treglia*, 313 F.3d at 721.

As to the second alleged retaliatory event, Plaintiff made a formal complaint regarding the alleged discrimination on January 2, 2012 through his attorney. Defendant responded in a January 4, 2013, letter stating that Plaintiff had not been terminated on the basis of his disability, and that the company was willing to keep him employed until the end of February 2013. Dkt. No. 115, Exhibit N.

However, Defendant's January 4, 2013 letter was not an "adverse employment action." The Second Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular

situation." *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). By the time the above correspondence occurred, Plaintiff had already been terminated and therefore the action did not constitute a "materially adverse change" in the terms and conditions of his employment. *Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1104-05 (S.D.N.Y. 1997). (holding that where a plaintiff "had already been terminated," an "alleged decision" not to hire him for freelance work was not an adverse employment action because it "did not [a]ffect his employment nor hinder him in any way from enforcing his rights."). *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Indeed, the action was not "adverse" at all considering that Defendant extended to Plaintiff the opportunity to continue working through February 2013. And the fact that this opportunity was only temporary also does not constitute an adverse employment action, because Plaintiff was not entitled to any further employment after he had been lawfully terminated from his preferred position on November 12, 2012. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006) ("[T]he ADA did not require [the defendant] give [the plaintiff] this new position for any longer than it did," because "[g]iven that the ADA does not require creating a new position for [the plaintiff] at all," it does not "dictate the duration of a new position that his employer created for him as a matter of grace."). The Court therefore concludes, based on the undisputed facts in the record, that Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### III. CONCLUSION

For the reasons described above, Defendant's motion for summary judgment is GRANTED. Plaintiff's Motion to Strike is DENIED. This resolves Dkt. Nos. 89, 114.

**\*10** SO ORDERED.

### All Citations

Slip Copy, 2021 WL 1063183

**Footnotes**

1      Plaintiff also on at least one occasion disputed a fact with "[Need citation here.]". Dkt. No. 107 at 53.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 810220
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sharon WELLS, Plaintiff,

v.

The ACHIEVEMENT NETWORK, Teimosa Martin,
Melinda Spooner, and Kimberly Cockrell Defendants.

18 Civ. 6588 (KPF)
|
Signed 03/02/2021

**Attorneys and Law Firms**

Damon McDougal, The Law Offices of Damon McDougal,
LLC, Cliffside Park, NJ, for Plaintiff.

Wendy J. Mellk, Jackson Lewis P.C., Melville, NY, Tania
Jaynelle Mistretta, Jackson Lewis P.C., New York, NY, for
Defendants.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

 **\*1** Plaintiff Sharon Wells brings claims pursuant to the
Family Medical Leave Act (the "FMLA"), 29 U.S.C.
§§ 2601 to 2654; the Americans with Disabilities Act
(the "ADA"), 42 U.S.C. §§ 12111 to 12117, 12131
to 12165, 12181 to 12189, 12201 to 12213; the New
York State Human Rights Law (the "NYSHRL"), N.Y.
Exec Law. §§ 290 to 297; and the New York City
Human Rights Law (the "NYCHRL"), N.Y. Admin. Code
§§ 8-101 to 8-131, against her former employer, The
Achievement Network, Ltd. ("ANet"), and ANet employees
Teimosa Martin, Melinda Spooner, and Kimberly Cockrell
(the "Individual Defendants" and collectively with ANet,
"Defendants"). Defendants now move, without opposition,
for summary judgment against Plaintiff pursuant to Rule 56
of the Federal Rules of Civil Procedure. For the reasons set
forth below, Defendants' motion is granted in full.

**BACKGROUND** [1]

**A. Factual Background**

**1. The Parties**

 **\*2** ANet is an educational not-for-profit organization that
works alongside school leadership teams with the goal of
improving results for students in underserved communities.
(Def. 56.1 ¶ 1). Plaintiff Sharon Wells was hired by ANet
in July 2015 for the position of Managing Director of its
New York-New Jersey Network. (*Id.* at ¶ 17). She was
subsequently elevated to Executive Director of ANet's Mid-
Atlantic Region in mid-2017 (*id.* at ¶ 167), until her role was
eliminated by ANet in June 2018 (*id.* at ¶ 223). During the
period in which Plaintiff was employed by ANet, she worked
from ANet's New York City office. (*Id.* at ¶ 18).

Kimberly Cockrell is ANet's Chief Network Officer, and
is responsible for overseeing service delivery to districts
and schools across the country, as well as sales and growth
cultivation throughout ANet. (Def. 56.1 ¶ 7). Melinda
Spooner worked at ANet as Chief Talent and Equity Officer
from 2016 to 2019, where she was responsible for overseeing
ANet's Human Resources Department. (*Id.* at ¶ 8). Teimosa
Martin is currently the Vice President of ANet's West
Region, though she has held other roles at ANet in which
she supervised Plaintiff, including as Executive Director of
ANet's New Jersey-New York Network and as Vice President
of ANet's Mid-Atlantic Region. (*Id.* at ¶¶ 9, 23-24, 35).

**2. ANet's Leave Policies**

As relevant here, ANet permits qualified employees to take
medical leaves of absence in accordance with the FMLA,
pursuant to which certain covered employees are provided
with up to 12 weeks of unpaid job-protected leave each year.
(Def. 56.1 ¶ 14). ANet also permits medical leave under
the ADA and applicable state law. (*Id.*). Additionally, ANet
maintains a Leaves of Absence Policy that provides that ANet
will endeavor to grant accommodations to employees who
need leave, but cannot guarantee that all leave requests will
be granted. (*Id.*). ANet's leave process, including its FMLA
leave, is administered through a third-party vendor, Insperity
PEO Services, L.P. ("Insperity"), which is responsible
for communicating with ANet employees regarding their
eligibility for FMLA leave. (*Id.* at ¶¶ 15-16).

**3. ANet's Initial Restructuring and Plaintiff's Role**

Prior to June 2015, ANet was organized into state-specific
"networks," including separate networks for New York and
New Jersey. (Def. 56.1 ¶ 20). Each network partnered only
with schools and districts within its own state. (*Id.*). In

June 2015, ANet combined the New York and New Jersey networks into a single network (the "NJ-NY Network") that partnered with approximately 76 schools in cities in New York, New Jersey, and Pennsylvania. (*Id.* at ¶¶ 21-22). In July 2015, Plaintiff was hired as Managing Director of the newly-formed NJ-NY Network, reporting directly to Defendant Martin, the Executive Director of the NJ-NY Network. (*Id.* at ¶¶ 23-24). As Managing Director, Plaintiff was responsible for supervising, both directly and indirectly, ANet's partnerships with approximately 30 in-network schools. (*Id.* at ¶¶ 25-26, 28).

As ANet continued to grow throughout 2015 and 2016, its state-specific network system evolved into a system of regional networks. (Def. 56.1 ¶¶ 31-32). As part of this restructuring, in Spring 2016, the NJ-NY Network expanded and was reorganized into the Mid-Atlantic Region. (*Id.* at ¶ 33). Both Plaintiff's and Martin's titles changed, with Plaintiff becoming Managing Director of the Mid-Atlantic Region, and Martin becoming Vice President of the Mid-Atlantic Region. (*Id.* at ¶¶ 34-35).

Martin was responsible for Plaintiff's annual performance reviews, which were conducted each June at the end of ANet's fiscal year. (Def. 56.1 ¶¶ 37, 39, 41). In July 2016, Martin drafted and delivered Plaintiff's 2016 performance review, rating her overall performance for the 2015-2016 fiscal year as "Meeting Expectations." (*Id.* at ¶ 41). Martin noted that "communication and relationship building may be an opportunity for development" for Plaintiff. (*Id.* at ¶¶ 44-45).

**\*3** In or around the fall of 2016, Plaintiff and Martin discussed that, with the expansion of the Mid-Atlantic Region, the work had become too much for them to manage without additional help. (Def. 56.1 ¶ 48). Martin began interviewing candidates for a Managing Director position for the Mid-Atlantic Region. (*Id.*). Martin expected that the additional Managing Director would take on responsibilities for ANet's partnerships with certain schools in the region. (*Id.* at ¶ 53). On November 21, 2016, ANet offered Gwendolyn Stephens the position. (*Id.* at ¶ 50). Though Martin had met Stephens professionally prior to her hiring (*id.* at ¶ 49), Plaintiff was also involved in the hiring decision (*id.* at ¶ 51). In particular, Plaintiff participated in Stephens's interview and was a member of the selection committee. (*Id.*). Stephens began working at ANet on January 3, 2017. (*Id.* at ¶ 50).

### 4. Plaintiff's Illness, First Leave of Absence, and Denial of FMLA Leave

On December 15, 2016, Plaintiff was diagnosed with Stage IIB breast cancer. (Def. 56.1 ¶ 58). Plaintiff called Martin to inform her of the diagnosis and to explain that she would not be able to lead a scheduled meeting with a partner school later that week. (*Id.* at ¶¶ 54, 58). In response, Martin told Plaintiff to do what she needed to take care of herself, and asked that Plaintiff call her back in two hours to walk her through the meeting materials so that Martin could lead the meeting in Plaintiff's absence. (*Id.* at ¶ 59). Plaintiff called Martin later that day, walked her through the presentation, and created a plan of action for the meeting. (*Id.* at ¶ 60).

Plaintiff sought information about the availability of medical leave at ANet, as the recommended treatment for her illness included chemotherapy, followed by a double mastectomy and radiation treatments. (Def. 56.1 ¶¶ 61, 64). On December 19, 2016, Plaintiff emailed ANet's Human Resources Manager to request information about the availability of leave under the FMLA. (*Id.* at ¶ 61). Plaintiff explained that she might need to take medical leave as she would be undergoing surgery the following month. (*Id.*). That week, Plaintiff spoke with the Human Resources Manager to discuss ANet's policies regarding leave, the process for requesting FMLA leave, the required paperwork that Plaintiff needed to complete, and Plaintiff's options, which included the decision to take intermittent or continuous leave. (*Id.* at ¶ 62).

On January 25, 2017, the week before beginning her first chemotherapy treatment, Plaintiff commenced a leave of absence that was expected to last through February 24, 2017. (Def. 56.1 ¶¶ 66, 75). Plaintiff's treatment plan involved chemotherapy treatments every three weeks over a 21-week period. (*Id.* at ¶¶ 63-64). Plaintiff hoped to return to work between chemotherapy treatments and to take intermittent leave throughout the duration of her treatments. (*Id.*). However, because Plaintiff's ability to return to work was dependent on her reaction to the chemotherapy, there was no certainty as to whether or when Plaintiff would return to work. (*Id.* at ¶ 65). Prior to Plaintiff's leave, Martin worked with her to develop a 21-week workplan (the "21-Week Plan") for Plaintiff's 21 weeks of chemotherapy treatment. (*Id.* at ¶¶ 67-68). Under the 21-Week Plan, Plaintiff anticipated that she would only work on certain days during the week, and that on those days, she would work remotely from home. (*Id.* at ¶ 69). During this time, Martin and Stephens both covered Plaintiff's workload, including handling check-ins with those coaches Plaintiff supervised. (*Id.* at ¶ 91).

On January 27, 2017, Plaintiff received leave paperwork from Insperity stating that she was not eligible for FMLA leave under ANet's policy because she did "not work and/or report to a site with 50 or employee [*sic*] employees within 75 miles." (Def. 56.1 ¶¶ 71-72).[2] The paperwork encouraged Plaintiff to contact Insperity if their understanding of her eligibility was incorrect, or if Plaintiff had any questions. (*Id.* at ¶ 73). Plaintiff did not raise any questions about the letter to either ANet or Insperity. (*Id.* at ¶ 74; Pl. Dep. 172:2-25). Plaintiff received an additional letter from Insperity on February 16, 2017, enclosing a revised copy of her leave information. (Def. 56.1 ¶ 87). The paperwork appended to the letter reiterated that Plaintiff's leave had been designated a non-FMLA Leave of Absence, as Plaintiff did not work and/or report to a work site with 50 or more employees within 75 miles. (*Id.* at ¶¶ 87-89).

**\*4** Plaintiff's intermittent leave was converted to continuous leave in February 2017, during her first round of chemotherapy treatment, upon Plaintiff's submission of paperwork from her medical provider indicating that she would require such leave until the completion of her treatment. (Def. 56.1 ¶¶ 76-80). Plaintiff also requested additional time to recover from her first chemotherapy treatment and an extension of her leave of absence from February 24, 2017, through March 6, 2017. (*Id.* at ¶ 81). ANet granted both requests. (*Id.* at ¶ 82). Given the change in Plaintiff's anticipated return date, Martin requested that Plaintiff update the 21-Week Plan to provide her "best estimate of timing." (*Id.* at ¶¶ 83-84). Plaintiff confirmed that, though she had some uncertainty about her return date, Martin could revise the 21-Week Plan to indicate that Plaintiff would return to work on a remote basis during the week of March 6, 2017. (*Id.* at ¶¶ 85-86).

Plaintiff underwent her second round of chemotherapy on February 21, 2017, and was later hospitalized due to the physical toll of the treatment. (Def. 56.1 ¶¶ 92-93). On March 3, 2017, Plaintiff and Martin spoke by phone to discuss Plaintiff's return to work, and Plaintiff expressed that she still intended to return to work intermittently beginning on March 6, 2017. (*Id.* at ¶ 101). During their call, Martin encouraged Plaintiff to take the time she needed to heal. (*Id.*). Plaintiff later told ANet's Human Resources Manager that Martin had "indicated" that Plaintiff's intermittent leave would be "disruptive to the team." (*Id.* at ¶ 103).[3]

### 5. Plaintiff's March 2017 Return to Work and Second Leave of Absence

Plaintiff returned to work on a remote and intermittent basis on March 7, 2017. (Def. 56.1 ¶ 102). Prior to her return to work, Plaintiff provided ANet with a note from her medical provider requesting limitations on her travel due to her treatment regime. (*Id.* at ¶¶ 107-08). ANet granted Plaintiff's request for an accommodation to limit her travel when she returned to work and permitted her to work remotely from home. (*Id.* at ¶ 109).

To prepare for Plaintiff's return, Martin converted the original 21-Week Plan to an 18-week workplan (the "18-Week Plan"). (Def. 56.1 ¶ 111). The 18-Week Plan included a workflow for ANet's Mid-Atlantic Region, to provide clarity on redistribution, redeployment, and reallocation of responsibilities during Plaintiff's intermittent leave. (*Id.* at ¶ 113). Prior to going on leave, Plaintiff had served in a management role for certain school districts in the region, was responsible for all district level-interactions within a certain district, and had sole responsibility for supervising six coaches and conducting their check-ins, among other things. (*Id.* at ¶¶ 118-19, 122). Under the 18-Week Plan, to account for Plaintiff's intermittent schedule and need for reduced travel, those responsibilities were redistributed to other employees, and Plaintiff was designated to "consult" with or assist those employees. (*Id.* at ¶¶ 118-23). Plaintiff's responsibilities were limited to work that she could perform remotely over videoconferencing platforms, rather than work that required going "into the field." (*Id.* at ¶ 143). Specifically, Plaintiff was responsible for conducting bi-weekly check-ins of four coaches, while Stephens and Martin were designated to assist those coaches' monthly check-ins. (*Id.* at ¶¶ 122-23). Plaintiff was also responsible for preparing and facilitating informal weekly assessments for the four coaches, which she would do remotely with Stephens's and Martin's assistance. (*Id.* at ¶¶ 124-27).

Two weeks after Plaintiff's return to work, Plaintiff had a telephonic meeting with Martin and Defendant Spooner, ANet's Chief Talent and Equity Officer, to establish a support plan for Plaintiff while she worked remotely. (Def. 56.1 ¶¶ 132, 139). In advance of the meeting, Martin provided Plaintiff with a document titled "Sharon Wells MD Expectation Adjustments Feb-June 2017" (the "Expectation Adjustments"), which outlined Plaintiff's original responsibilities, adjustments to her responsibilities that would be implemented during her intermittent leave, and her end-of-year goals. (*Id.* at ¶ 133). The document

provided that Plaintiff would be evaluated based upon these adjustments, given that her responsibilities and work hours had changed. (*Id.*).

**\*5** At the meeting with Martin and Spooner, Plaintiff raised several questions and concerns regarding the 18-Week Plan and the Expectation Adjustments, and requested several modifications to her responsibilities. (Def. 56.1 ¶¶ 139-45).[4] Most notably, Plaintiff requested that ANet temporarily reassign her to a limited support role in which she could transcribe videos of coach interactions and work with coaches to develop presentations. (*Id.* at ¶ 144). However, ANet already had a team of administrative employees assigned to video transcription, and individual coaches were responsible for developing their own presentations. (*Id.* at ¶ 145). Further, those tasks were not part of Plaintiff's responsibilities as Managing Director. (*Id.*). As such, Spooner and Martin listened to and considered Plaintiff's requests, but did not further modify the 18-Week Plan or Expectation Adjustments, given that Plaintiff's requests were not medically-based, and there was no available support role to which they could temporarily transfer Plaintiff that met her specifications. (*Id.* at ¶ 147).

Plaintiff, Spooner and Martin had a second call the next day, where Plaintiff expressed that she would prefer to resume her continuous leave rather than accept ANet's accommodations. (Def. 56.1 ¶¶ 148-49). Spooner subsequently emailed Plaintiff to provide her with instructions for resuming continuous leave. (*Id.* at ¶ 150). Plaintiff coordinated with ANet's General Counsel to submit the required forms from her medical provider confirming her need for such leave. (*Id.* at ¶¶ 151-54). Upon receipt of those forms, ANet granted Plaintiff's request for continuous leave from April 3, 2017, through September 4, 2017. (*Id.* at ¶¶ 154-55).

### 6. Plaintiff's June 2017 Return to Work, 2017 Annual Review, and Third Leave of Absence

In May 2017, Plaintiff finished her sixth and final chemotherapy treatment. (Def. 56.1 ¶ 156). On May 31, 2017, she contacted ANet's Human Resources Manager to indicate that she was considering returning to work while she waited to schedule a double mastectomy surgery. (*Id.* at ¶ 157). Plaintiff indicated that returning to work would prevent the loss of her health insurance benefits, which she understood would occur if she remained on continuous leave. (*Id.*). Upon receipt of a note from Plaintiff's doctor on June 8, 2017, ANet granted Plaintiff's request to return on an intermittent and

remote basis, with the understanding that she would resume her continuous leave when her surgery was scheduled. (*Id.* at ¶¶ 159-60).

Martin was scheduled to conduct Plaintiff's annual performance assessment at the end of June, but it was converted to an informal discussion given that Plaintiff had been on leave for approximately half of the evaluation period. (Def. 56.1 ¶¶ 37, 163). A Human Resources representative was also in attendance at the assessment. (*Id.* at ¶ 163). As in Plaintiff's 2015-2016 assessment, she was again encouraged to improve in relationship-building and conflict resolution. (*Id.* at ¶ 166). During the meeting, Martin also informed Plaintiff that ANet was again reorganizing, and that when she returned to work full-time, she would be elevated to the role of Executive Director of the Mid-Atlantic Region. (*Id.* at ¶ 167). In this role, Plaintiff would oversee ANet's Upstate New York Region, including its partnership with the Syracuse School District, while Stephens — who was also being elevated to an Executive Director position — would oversee the New York City and New Jersey Regions. (*Id.* at ¶ 168). Martin explained that the assignments took into consideration that Plaintiff had been working with coaches in Syracuse since the beginning of her employment with ANet, and that Stephens, who had no relationship with the coaches or districts in Upstate New York, had taken on the responsibility of overseeing coaches in New York and New Jersey during Plaintiff's leave. (*Id.* at ¶¶ 169-73). Martin indicated that she would discuss the details of Plaintiff's new role when Plaintiff returned from her surgery. (*Id.* at ¶ 174).

**\*6** On July 5, 2017, Plaintiff went on continuous leave to undergo a double mastectomy surgery. (Def. 56.1 ¶ 175). ANet granted Plaintiff's initial leave request through September 30, 2017, and subsequently extended her leave through December 1, 2017, at Plaintiff's request. (*Id.* at ¶¶ 175-76).

### 7. Plaintiff's November 2017 Return to Work and EEOC Complaint

On November 27, 2017, Plaintiff returned to work with her doctor's authorization, and with ANet's agreement to limit her air travel. (Def. 56.1 ¶ 177). As Plaintiff returned to work the day ANet had scheduled a retreat in Washington, D.C., Martin invited Plaintiff to either travel to the retreat or attend virtually. (*Id.* at ¶ 179). Plaintiff elected to attend in person. (*Id.* at ¶ 180). During a "breakout session" held at the retreat, Martin asked Plaintiff for her "vision" for the Upstate New York Region. (*Id.* at ¶ 181). Plaintiff responded that she did

not have a vision, and wanted to build from Martin's vision for the region. (*Id.*). Plaintiff later told Defendant Cockrell, ANet's Chief Network Officer, that she perceived Martin's body language during this discussion as “aggressive. (*Id.* at ¶¶ 302-03). She has alleged that Cockrell “belittl[ed”] her in response. (Compl. ¶ 100).

On November 30, 2017, Martin provided Plaintiff with a re-entry plan for her return, which outlined Plaintiff's role, responsibilities, and goals as Executive Director. (Def. 56.1 ¶ 182). The re-entry plan emphasized that in this new role, Plaintiff was expected to focus on developing a growth strategy for the Upstate New York Region. (*Id.*). Beginning in December, Martin and Plaintiff met on a weekly basis to discuss developing and supporting the Upstate New York Region. (*Id.* at ¶¶ 184, 290).

On December 29, 2017, Plaintiff filed an administrative Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (the “EEOC”) alleging claims of disability discrimination and retaliation against ANet. (Def. 56.1 ¶ 224). The Charge of Discrimination was not issued or otherwise communicated to ANet at the time. (*Id.* at ¶ 226). On April 27, 2018, the EEOC issued Plaintiff a Notice of Right to Sue. (*Id.* at ¶ 225). ANet was not made aware of Plaintiff's Charge of Discrimination until May 1, 2018, when it was mailed to them by the EEOC. (*Id.* at ¶ 227).

**8. ANet's 2018 Reorganization and Plaintiff's Termination**

In February 2018, the Syracuse School District experienced a $24 million budget deficit. (Def. 56.1 ¶ 189). In March 2018, ANet learned that district's proposal for its 2018-2019 school year was $100,000 less than the prior year, and reduced the number of ANet's partnership schools. (*Id.* at ¶ 191). Given the budget deficit, ANet's partnership with the district began shrinking. (*Id.* at ¶ 192). The same month, as part of a number of structural changes, ANet divided its Mid-Atlantic Region into “Metro-NY” and “Washington, D.C./Maryland” Regions. (*Id.* at ¶ 195). ANet's Upstate New York Region, which had previously been part of the Mid-Atlantic Region, was absorbed into ANet's New England Region, meaning ANet's partnership with the Syracuse School District would now be managed out of ANet's office in western New England. (*Id.* at ¶ 196).[5]

***7** On April 11 and 17, 2018, Cockrell met with Plaintiff to discuss the reorganization of the Mid-Atlantic Region, as well as the possibility that ANet might eliminate her role. (Def. 56.1 ¶¶ 197-200). Cockrell explained that for ANet to maintain Plaintiff's Executive Director position, Plaintiff would be required to develop growth in other districts, to make up for the shortfall caused by the Syracuse School District's budgetary issues. (*Id.* at ¶¶ 197-98, 200). During their meetings, Cockrell asked Plaintiff whether she was willing to take on these changes to her role, or if there was a different position she wanted to explore. (*Id.* at ¶¶ 199-200). Cockrell and Plaintiff subsequently exchanged emails regarding the potential elimination of Plaintiff's position, as well as Plaintiff's views on Cockrell's proposed changes to her role. (*Id.* at ¶¶ 201-06). Plaintiff initially indicated she was open to developing ANet's Upstate New York Region, but that she would need a “blueprint” she could follow. (*Id.* at ¶ 202). Cockrell's view was that Plaintiff should not require a blueprint, given that she had been responsible for the Upstate New York Region for the prior five years. (*Id.* at ¶¶ 203-04). Cockrell and Plaintiff also discussed alternative roles Plaintiff could apply for at ANet, but Plaintiff did not identify any roles for which she felt well-suited. (*Id.* at ¶ 206).

Between April 23, 2018 and May 1, 2018, Cockrell informed Plaintiff that her role would be eliminated as of June 30, 2018. (Def. 56.1 ¶ 207).[6] ANet was unaware of Plaintiff's allegations of discrimination and the fact that Plaintiff had filed a Charge of Discrimination at the time that Cockrell decided to eliminate her role. (*Id.* at ¶ 228). On May 1, 2018, Plaintiff emailed Cockrell stating she understood the decision, and hoped another position would open up given ANet's ongoing reorganization. (*Id.* at ¶ 208). Cockrell continued to discuss alternative positions with Plaintiff, and encouraged her to apply for other roles, including a Managing Director position on another team. (*Id.* at ¶¶ 209-13, 222). Though Plaintiff has indicated that she declined to apply for certain of the roles suggested by Cockrell because they would have involved working with Martin, Defendants represent that such interaction would not have been a requirement of the positions. (*Id.* at ¶¶ 216-17). An ANet Human Resources representative also emailed Plaintiff on several occasions throughout May 2018 to identify possible positions for Plaintiff, and highlighted three positions for which Plaintiff may have been eligible. (*Id.* at ¶¶ 218-19). However, as of June 29, 2018, Plaintiff had not applied for any positions within ANet, and her role as Executive Director was eliminated. (*Id.* at ¶ 223).

**B. Procedural History**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff commenced this action with the filing of her Complaint on July 22, 2018, asserting claims under the FMLA, the ADA, the NYSHRL, and the NYCHRL for interference with her FMLA rights, failure to accommodate, discrimination, and retaliation. (Dkt. #1). On September 21, 2018, Defendants filed their Answer to the Complaint (Dkt. #25), and this action was thereafter referred to mediation (Dkt. #26). After an unsuccessful mediation, the parties filed a proposed Case Management Plan on December 18, 2018, which the Court subsequently endorsed. (Dkt. #32, 35).

Following a protracted discovery period (Dkt. #37-44, 51-59), Defendants requested leave to move for summary judgment (Dkt. #58). The Court granted such leave and set a briefing schedule on Defendants' motion (Minute Entry for February 12, 2020), and subsequently extended the briefing schedule at the parties' request (Dkt. #62). On May 4, 2020, Defendants filed their motion for summary judgment, as well as accompanying memorandum, Local Rule 56.1 Statement, and declarations. (Dkt. #65-71). On May 19, 2020, Plaintiff applied for an extension of time to file her opposition to Defendants' motion, which the Court granted. (Dkt. #72, 73). Pursuant to the Court's extension, Plaintiff's opposition was due on or before June 22, 2020. (*See* Dkt. #73). However, Plaintiff did not submit an opposition, leaving Defendants' motion unopposed. The motion is now ripe for review.

## DISCUSSION

### A. Applicable Law

#### 1. Unopposed Summary Judgment Motions Under Fed. R. Civ. P. 56

**\*8** Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[7] A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. "In

assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' " *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001). Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010). It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. ... [O]nly

admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).

**\*9** The Second Circuit has made clear that "the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts[.]" *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014). However, on such unopposed motions, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* at 194. "Even when unopposed, a motion for summary judgment should be granted only when the moving party has met its burden of establishing no genuine dispute of material fact and its entitlement to judgment as a matter of law." *Levitant v. City of New York Human Res. Admin.*, 558 F. App'x 26, 30 (2d Cir. 2014) (summary order) (citing *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Lyman v. New York & Presbyterian Hosp.*, No. 11 Civ. 3889 (KPF), 2014 WL 3417394, at \*7 (S.D.N.Y. July 14, 2014) (citing *Gorzynski*, 596 F.3d at 101 (internal quotation marks and citation omitted)). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted)).

## 2. The FMLA

Under the FMLA, eligible employees are "entitled" to twelve weeks of unpaid leave per year. 29 U.S.C. § 2612(a)(1). A "serious health condition" is one ground for FMLA leave, *id.* § 2612(a)(1)(D), and such leave "may be taken intermittently or on a reduced leave schedule when medically

necessary" *id.* § 2612(b)(1). It is unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. *Id.* § 2615(a)(1); *see also Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 4 (2d Cir. 2020) (summary order).

"FMLA claims come in at least two varieties: interference and retaliation." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Id.* And an employee may bring a retaliation claim based on "actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Id.*

### 3. Employment Discrimination Under the ADA, the NYSHRL, and the NYCHRL

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees[.]" 42 U.S.C. § 12112(a). Discrimination under the ADA includes the failure to make "reasonable accommodations to the known physical ... limitations" of an otherwise qualified employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business[.]" 42 U.S.C. § 12112(b)(5)(A); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008). The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice ... [f]or an employer ... because of an individual's ... disability ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). Under the NYSHRL, it is unlawful for any employer to fail to provide reasonable accommodations for known disabilities of their employees. *Id.* § 296(3)(a).

**\*10** Discrimination, failure to accommodate,[8] and retaliation claims under the ADA and the NYSHRL are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014); *see also Snowden v. Trustees*

*of Columbia Univ.*, 612 F. App'x 7, 8 (2d Cir. 2015) (summary order); *Zann Kwan* v. *Andalex Group LLC*, 737 F.3d 834, 843-44 (2d Cir. 2013).[9] Under this framework,

> the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so ... the defendant [must] articulate some legitimate, nondiscriminatory reason for its action. If such a reason is provided, plaintiff ... may still prevail by showing ... that the employer's determination was in fact the result of [discrimination].

*Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted).

### a. Discrimination and Retaliation Claims

To establish a *prima facie* case of discrimination under the ADA or the NYSHRL, a plaintiff must show: (i) that her employer is subject to the statute; (ii) that she is disabled within the meaning of the statute or perceived to be so by her employer; (iii) that she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) that she suffered an adverse employment action because of her disability. *See Jacques* v. *DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004); *see also Nelson* v. *City of New York*, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *6 (S.D.N.Y. Aug. 19, 2013) (applying this test to claims under the NYSHRL). To establish retaliation, the *prima facie* case is similar insofar as a plaintiff must demonstrate that: "[i] she engaged in protected activity, [ii] the employer was aware of this activity, [iii] she was subjected to an adverse employment action against her, and [iv] a causal connection existed between the alleged adverse employment action and her protected activity." *McGuire-Welch* v. *House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018) (summary order) (citing *Weixel* v. *Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

**\*11** An adverse employment action is defined as one that is "materially adverse with respect to the terms and conditions of employment," and it includes termination. *Flieger* v. *Eastern Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (summary order) (quoting *Davis* v. *N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam)). Protected activities include requests for reasonable accommodations. *Weixel*, 287 F.3d at 149. Causation can be shown through indirect proof "that the protected activity was closely followed in time by the adverse action." *Clark* v. *Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).

Once a plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. *See Treglia* v. *Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). "If ... the defendant ... points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra* v. *G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

### b. Failure to Accommodate Claims

To establish a *prima facie* case of discrimination for failure to provide a reasonable accommodation under the ADA or the NYSHRL, a plaintiff must demonstrate that "[i] [she has] a disability under the meaning of the ADA; [ii] [the defendant, an entity covered by the ADA] had notice of [her] disability; [iii] with reasonable accommodation, [she] could perform the essential functions of the job at issue; and [iv] the [covered entity] has refused to make such accommodations." *McMillan* v. *City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013); *see also Noll* v. *Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). "A reasonable accommodation is one which permits an employee with a disability to perform in a reasonable manner the activities involved in the job and does not impose an undue hardship on the employer's business." *Vangas* v. *Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016) (internal quotation marks omitted).

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.' " *Noll*, 787 F.3d at 94 (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)). If the proposed accommodation is "plainly reasonable," then "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Id.* "An employer is "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.* at 95. Rather, "[t]he hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015).

### c. The NYCHRL

Claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Loeffler v. Staten Island Uni v. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)); *see generally Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible' " (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011))). Under the NYCHRL, a plaintiff is not required to show an adverse employment action and need only "show differential treatment — that she is treated 'less well' — because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. "Though the NYCHRL has more liberal standards than do its federal and state counterparts, courts in the Second Circuit typically 'appl[y] [the] liberal standards [of the NYCHRL] to the basic *McDonnell Douglas* framework.' " *Alexander v. N.Y.C. Dep't of Educ.*, No. 19 Civ. 7023 (AJN), 2020 WL 7027509, at *3 (S.D.N.Y. Nov. 30, 2020) (quoting *Farzan v. Wells Fargo Bank, N.A.*, No. 12 Civ. 1217 (RJS) (JLC), 2013 WL 6231615, at *15 (S.D.N.Y. Dec. 2, 2013)).

### B. Analysis

**\*12** Plaintiff elected not to oppose Defendants' summary judgment motion. As such, the Court views Defendants' motion as unopposed and all statements of fact in Defendants' Rule 56.1 submission as admitted. *See Balderas v. Barmadon Mgmt. LLC*, No. 17 Civ. 7489 (GHW), 2019 WL 1258921, at *1 (S.D.N.Y. Mar. 19, 2019). However, the Court must nonetheless determine whether Defendants have "met [their] burden of establishing no genuine dispute of material fact and [their] entitlement to judgment as a matter of law." *Levitant*, 558 F. App'x at 30.

Defendants have moved for summary judgment on Plaintiff's claims brought under the FMLA, the ADA, the NYSHRL, and the NYCHRL. The Court will consider each in turn. [10]

### 1. The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's FMLA Claims

The Court begins with Plaintiff's FMLA claims. Plaintiff has alleged both interference with her FMLA rights, as well as retaliation for the exercise of her FMLA rights. (Compl. ¶¶ 134-39). Defendants have moved for summary judgment on the grounds that Plaintiff was not eligible for FMLA leave, and thus cannot establish either claim. (Def. Br. 11-12). Defendants also address the merits, arguing that they did not interfere with any of Plaintiff's FMLA-protected rights and did not engage in any retaliatory conduct. (*Id.* at 12-18).

### a. FMLA Interference

Plaintiff alleges that Defendants interfered with her exercise of rights protected under the FMLA by, *inter alia*, restraining and denying her ability to work under her FMLA leave. (Compl. ¶¶ 43, 45, 47, 134-36). Defendants argue that a threshold matter, Plaintiff has not established her FMLA eligibility and, further, that Plaintiff made her own decisions regarding leave in consultation with her medical provider. (Def. Br. 11-12).

To succeed on a claim of FMLA interference, a plaintiff is required to plead: "[i] that she is an eligible employee under the FMLA; [ii] that defendant is an employer as defined by the FMLA; [iii] that she was entitled to leave under the FMLA; [iv] that she gave notice to the defendant of her intention to take leave; and [v] that she was denied benefits to which she

was entitled under the FMLA." *Ziccarelli v. N.Y. Univ. Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017) (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).

Throughout her Complaint, Plaintiff presupposes the dispositive issue of whether she was an "eligible employee" under the FMLA. (*See, e.g.*, Compl. ¶ 11 (stating that Plaintiff was an "eligible employee" within the meaning of the FMLA at all relevant times)). A threshold issue for an interference claim under the FMLA is "whether an employee is eligible under the statute to claim its protections." *Arroyo-Horne v. City of New York*, 831 F. App'x 536, 539 (2d Cir. 2020) (summary order). And the FMLA excludes from its definition of eligible employees "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii).

**\*13** Defendants' administrator of its leave process, Insperity, determined that Plaintiff was not eligible for FMLA leave based on this statutory exclusion. (Def. Br. 12; Def. 56.1 ¶¶ 71-72, 87-89). The record evidence submitted by Defendants supports this determination. (*See* Def. 56.1 ¶¶ 18, 236-38). Specifically, during the relevant period, ANet's New York City office did not employ more than 40 employees. (*Id.* at ¶ 18). Further, the ANet offices closest to its New York City office were more than 75 miles away. (*Id.*). Defendants submit that Plaintiff was twice informed by Insperity that she was not covered by the FMLA because she worked at a site with fewer than 50 employees in a 75-mile radius. (Def. Br. 12).

Plaintiff failed to challenge Insperity's determination as to her eligibility, and has since put forth no evidence demonstrating that she was an "eligible employee" under the FMLA. [11] As such, Plaintiff cannot prevail on a claim of interference with her FMLA rights as a matter of law. *See, e.g.*, *Watkins v. First Student, Inc.*, No. 17 Civ. 1519 (CS), 2018 WL 1135480, at \*12 (S.D.N.Y. Feb. 28, 2018) (finding that plaintiff could not "sustain an FMLA interference action" because, among other things, "she had not alleged any facts indicating that she was an eligible employee"); *Anderson v. N.Y.C. Health & Hosps. (Coney Island Hosp.)*, No. 18 Civ. 3056 (BMC) (LB), 2019 WL 1765221, at \*3 (E.D.N.Y. Apr. 22, 2019) (holding plaintiff failed to state a claim for FMLA interference or retaliation under the FMLA because plaintiff did not allege facts showing that she was eligible for FMLA benefits);

*Diby v. Kepco Inc.*, No. 16 Civ. 583 (KAM) (LB), 2016 WL 5879595, at \*3-4 (E.D.N.Y. Oct. 7, 2016) (dismissing FMLA interference claim for, among other reasons, failure to adequately plead that plaintiff was eligible employee).

Further, the record establishes that Defendants went beyond any requirements of the FMLA, offering Plaintiff 33 weeks of continuous leave, as well as months of intermittent leave. (Def. 56.1 ¶ 250). As such, there is no evidence that Plaintiff was denied any benefits to which she would have been entitled under the FMLA. *See Stuart v. T-Mobile USA, Inc.*, No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at \*4 (S.D.N.Y. Aug. 12, 2015) (finding "fatal defect" in Plaintiff's FMLA interference claim where employer "approved each and every request for leave that she made"); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999) (holding that plaintiff failed to establish an interference claim because he had received the twelve weeks of leave to which he was entitled).

Plaintiff alleges that she was forced to go on continuous leave between March 2017 and June 2017, ostensibly due to the "work environment" created by Defendants. (Compl. ¶ 74). Even were this allegation supported by the record, it would not change the outcome. "[F]orced leave, by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006). Plaintiff must demonstrate that "such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA[.]" *Id.* Plaintiff has not demonstrated any such impingement on any FMLA right. Rather, the evidence reflects that, after Defendants designed a workplan for Plaintiff's return to work in March 2017, and denied Plaintiff's requests for further accommodations that were not based on any medical needs, Plaintiff elected to resume her continuous leave with the approval of her medical provider, and voluntarily returned from such leave in June 2017. (Def. 56.1 ¶¶ 111, 147-55, 158-60). As such, there is nothing in the record that suggests that Plaintiff was denied any FMLA benefits to which she was entitled, or that Defendants otherwise interfered with her FMLA rights. Summary judgment is warranted as to Plaintiff's FMLA interference claim.

### b. FMLA Retaliation

**\*14** Plaintiff further claims that Defendants retaliated against her for exercising her rights under the FMLA. (Compl. ¶¶ 137-39). [12] To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that: "[i] [she] exercised rights protected under the FMLA; [ii] [she] was qualified for [her] position; [iii] [she] suffered an adverse employment action; and [iv] the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (citation omitted). "If the plaintiff makes out a *prima facie* case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.*

Though the requirements for establishing *prima facie* cases for FMLA interference and retaliation differ, courts in this Circuit agree that proving entitlement to FMLA leave is a necessary prerequisite to a valid FMLA retaliation claim. *See Arroyo-Horne*, 831 F. App'x at 539 ("A threshold issue for both FMLA interference claims and FMLA retaliation claims is whether an employee is eligible under the statute to claim its protections."); *see also Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012) (collecting cases). As discussed above, Plaintiff cannot prove that she was entitled to FMLA leave because she has not established that she was an eligible employee under the statute. Thus, her FMLA retaliation claim likewise fails to survive summary judgment. *See Watkins*, 2018 WL 1135480, at \*12 ("Plaintiff's inability to establish that she was entitled to FMLA leave also prevents her from asserting an FMLA retaliation claim."); *see also Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 357 (S.D.N.Y. 2017); *Milne v. Navigant Consulting*, No. 08 Civ. 8964 (NRB), 2010 WL 4456853, at \*10 (S.D.N.Y. Oct. 27, 2010).

Though Plaintiff alleges that Defendants advised her that she was eligible for FMLA, and that she went on intermittent leave based upon this representation, this does not change the Court's assessment of her retaliation claim. (Compl. ¶¶ 37-38). To the extent Plaintiff is alleging a theory of equitable estoppel, she has not established detrimental reliance, as required to make out such a claim. *See Vangas v. Montefiore Med. Ctr.*, 925 F. Supp. 2d 574, 579 (S.D.N.Y. 2013) (" 'Reliance' means ... that [plaintiff] 'must have relied on [her] adversary's conduct 'in such a manner as to change [her] position for the worse.' " (quoting *Heckler v. Cmty.*

*Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984) (alterations in original))). Plaintiff has not alleged or otherwise demonstrated that she could have, or would have taken any action that would have resulted in a better outcome, such as going on continuous leave, or returning to work before exhausting her leave. Nor could she, as Defendants granted every request made by Plaintiff to either commence, extend, or return from her leave. (Def. 56.1 ¶¶ 82, 150-55, 159-60, 175-76). For these reasons, no triable issues exist concerning Plaintiff's *prima facie* showing of FMLA interference and retaliation, and summary judgment is granted as these claims. [13]

### 2. The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Failure to Accommodate Claims

**\*15** Plaintiff brings failure to accommodate claims under the NYSHRL and the NYCHRL. (Compl. ¶¶ 140-46, 152-54). However, because Plaintiff's discrimination claims under the ADA, the NYSHRL, and the NYCHRL rely, at least in part, on Defendants' alleged denial of a reasonable accommodation (*see id.* ¶¶ 128, 141), the Court will construe Plaintiff's failure to accommodate claims as brought under the ADA as well. (Compl. ¶¶ 123-30). *See Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 369 n.8 (S.D.N.Y. 2018). The Court will first address Plaintiff's failure to accommodate claims before turning to her broader discrimination claims.

In her Complaint, Plaintiff alleges that Defendants either promised her accommodations that were not implemented, or outright denied her requests for reasonable accommodations. (*See, e.g.*, Compl. ¶¶ 55, 67). These claims are focused on Defendants' alleged failures during Plaintiff's initial leave of absence in January 2017, her first return to intermittent work in March 2017, and her subsequent return to full-time work in November 2017. Defendants argue that the accommodations they provided Plaintiff were reasonable and effective, and that any requested accommodations they did not provide were not medically necessary. (Def. Br. 19-20).

As stated above, to establish a *prima facie* case of discrimination for failure to provide a reasonable accommodation under the ADA, the NYSHRL or the NYCHRL, a plaintiff must demonstrate that (i) she has a disability under the meaning of the statute; (ii) an employer covered by the statute had notice of her disability; (iii) with reasonable accommodation, she could perform the essential functions of the job at issue; and (iv) the employer has

refused to make such accommodations. *See* *McMillan*, 711
F.3d at 125-26; *see also* *Noll*, 787 F.3d at 94; *Lawtone-Bowles* v. *City of New York.*, No. 17 Civ. 8024 (WHP),
2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019) ("Courts
apply the same standard for failure to accommodate cases
under the ADA ... NYSHRL, and NYCHRL."). "A reasonable
accommodation is one which permits an employee with a
disability to perform in a reasonable manner the activities
involved in the job and does not impose an undue hardship on
the employer's business." *Vangas*, 823 F.3d at 180 (internal
quotation marks omitted).

Defendants dispute neither that Plaintiff had a disability under
the meaning of the ADA, the NYSHRL and the NYCHRL,
nor that ANet is an employer covered by those statutes
with notice of her disability. The Court's inquiry therefore
concerns whether Plaintiff made a sufficient showing that,
with reasonable accommodation, she could perform the
essential functions of her job, and that Defendants failed to
make such accommodations. [14]

"Summary judgment is ... appropriate where a plaintiff fails
to identify a facially reasonable accommodation that the
defendant refused to provide ... or when the employer offers
an accommodation that is plainly reasonable." *Howard*
v. *United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352-53
(S.D.N.Y. 2015) (quoting *Gronne* v. *Apple Bank for Sav.*, 1
F. App'x 64, 67 (2d Cir. 2001) (summary order) (internal
quotation marks and citations omitted)), *aff'd sub nom.*
*Howard* v. *United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016)
(summary order). Defendants have established that they are
entitled to summary judgment on both of these bases.

**\*16** As an initial matter, the Court observes that Defendants
provided Plaintiff with a number of accommodations.
Defendants granted Plaintiff several requested medically-
based accommodations, including allowing Plaintiff
intermittent and continuous leave, and facilitating her
requests to work remotely and to limit her travel. (Def. 56.1
¶¶ 66, 82, 108-09, 154-55, 159-60, 175-76, 178). They further
redeployed resources to reassign tasks during Plaintiff's
intermittent and continuous leave to ensure her needs were
met. (*Id.* at ¶¶ 91, 111-27). The Court will consider whether
these accommodations were plainly reasonable within the
meaning of the relevant statutes.

*First*, prior to Plaintiff's first leave of absence, she worked
with Martin to create a 21-Week Plan to accommodate
Plaintiff's work schedule during her chemotherapy
treatments. (Def. 56.1 ¶¶ 68-69). The plan took into account
Plaintiff's initial request for intermittent leave and anticipated
remote-work return date of February 24, 2017. (*Id.* at
¶ 70). When Plaintiff subsequently requested to go on
continuous leave, with a return date of March 6, 2017,
Defendants granted those requests and adjusted the plan,
including by reallocating Plaintiff's workload. (*Id.* at ¶¶
80-86, 267). These accommodations were reasonable on
their face. *McMillan*, 711 F.3d at 127 ("Reasonable
accommodations may include adjustments to work schedules
or other job restructuring." (citation and internal quotation
marks omitted)). And Plaintiff has not suggested that these
accommodations were not reasonable, but rather argues
that Defendants, particularly Martin, failed to follow the
plan during her first leave of absence, including failing to
cover Plaintiff's responsibilities during this time. (Pl. Dep.
233:23-234:9; Compl. ¶ 55). [15] However, Plaintiff has not
supported these allegations with any evidence demonstrating
that Martin or anyone else at ANet in fact failed to cover
Plaintiff's responsibilities during this time. And Defendants
have put forth sworn testimony and documentary evidence
reflecting that Plaintiff's workload during her first leave of
absence *was* covered by Martin and Stephens, with support
from the ANet national team. (Martin Decl. ¶ 33; *see also id.*,
Ex. T at 4 (indicating that Stephens had assumed Plaintiff's
meeting times with coaches during her absence)). As such,
the Court accepts that the accommodations provided during
Plaintiff's initial leave, even if they varied to some extent from
the written 21-Week Plan, were reasonable.

*Second*, upon Plaintiff's return from leave in March 2017,
Martin converted the 21-Week Plan into the 18-Week Plan
to reflect Plaintiff's intermittent work schedule and need
for remote work, and to clarify and reduce Plaintiff's
responsibilities during the remainder of her chemotherapy
treatments. (Def. 56.1 ¶¶ 110-27). Shortly after Plaintiff's
return to work, she met with Martin and Spooner to discuss
the Expectation Adjustments, a support plan for her remote
work. (*Id.* at ¶ 132). The Expectation Adjustments outlined
Plaintiff's original responsibilities, new accommodations, and
modifications to Plaintiff's end-of-year goals to reflect those
changes. (*Id.* at ¶¶ 133-34).

With respect to the 18-Week Plan and the Expectation
Adjustments, Plaintiff argues that Defendants should have
provided her with additional or different accommodations.

However, ANet's accommodations to Plaintiff appear to have been designed to allow her, to the extent possible, to continue her work supervising, developing, and managing coaches in school districts in Upstate New York. (Def. 56.1 ¶¶ 25-27, 118). While this work previously required traveling to schools to observe and provide feedback to coaches, Plaintiff's limitations on travel during her treatment required adjustments to account for her inability to conduct in-person supervision and training. (*Id.* at ¶¶ 108-10). As such, Martin assigned team members to assist Plaintiff with her supervisory responsibilities, and contemplated Plaintiff performing some of her responsibilities by video to account for her travel limitations. (*Id.* at ¶¶ 119, 123-27). Plaintiff appears to accept that she was unable to carry out her supervisory responsibilities remotely, and to agree that neither the 18-Week Plan nor the Expectation Adjustments contained tasks that she was medically unable to perform. (*Id.* at ¶ 146; Pl. Dep. 258:25-259:3).

 **\*17** The Court concludes on the record before it that because Defendants provided Plaintiff with numerous accommodations to address her medical needs and intermittent work schedule, while enabling Plaintiff to carry out the essential functions of her job, their accommodations were reasonable as a matter of law. *See* Howard, 101 F. Supp. 3d at 355-56 (finding that accommodations were reasonable where employer made "numerous modifications" to allow employee to perform job functions). With this finding, the Court is permitted to end its inquiry into Plaintiff's federal and state failure to accommodate claims.

*See* Berger, 304 F. Supp. 3d at 369 ("If the proposed accommodation is 'plainly reasonable,' '[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable.' " (quoting Noll, 787 F.3d at 94)). But in the interest of completeness, the Court will briefly address Plaintiff's arguments that Defendants should have provided her with additional or different accommodations upon her return from leave.

Plaintiff's objections to Defendants' accommodations largely pertain to her personal preferences, rather than any medical necessities. For example, Plaintiff expressed ethical concerns with performing coach evaluations by video, rather than in person. (Def. 56.1 ¶ 139). But Defendants had the discretion to choose among effective accommodations and were not required to provide a perfect accommodation, or even the accommodation most strongly preferred by Plaintiff. *See*

Berger, 304 F. Supp. 3d at 369; Welch v. United Parcel Serv., Inc., 871 F. Supp. 2d 164, 188 (E.D.N.Y. 2012) ("[A]n employer need not accept the employee's preferred accommodation, even if reasonable, if another accommodation had already been made."); *see also* Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 73-74 (S.D.N.Y. 2016) (deeming plaintiff's desire to take breaks without alerting his supervisor "nothing more than a personal preference" and finding that "failure to accommodate that preference [did not] support a claim of discrimination").

Plaintiff's other issues with Defendants' accommodations were similarly not driven by medical necessity. Plaintiff requested that she be made responsible for schools in the New York City area, where she could potentially support coaches in the field, rather than being assigned to support coaches in the Syracuse School District by video. (Pl. Dep. 281:18-282:10). But Plaintiff had herself requested restrictions on travel (Def. 56.1 ¶ 109), and thus her assigned responsibilities ensured that she would be able to work entirely remotely, while her colleagues with relationships to the New York City coaches continued with those responsibilities (*id.* at ¶¶ 138, 143, 172-73). Because Plaintiff's request was again a matter of preference, it does not support her failure to accommodate claims. *See* Woldeselassie v. *Am. Eagle* Airlines/Am. Airlines, No. 12 Civ. 7703 (LGS), 2015 WL 456679, at \*9 (S.D.N.Y. Feb. 2, 2015) (finding no violation of the ADA and NYSHRL where plaintiff's transfer request was a matter of preference rather than medical necessity), *aff'd sub nom.* Woldeselassie v. Am. Eagle Airlines, Inc., 647 F. App'x 21 (2d Cir. 2016) (summary order).

Plaintiff also requested that she instead receive a new support role, under which she could transcribe videos and help develop power point presentations for coaches. (Def. 56.1 ¶ 144). However, ANet already had a team of employees responsible for transcribing videos, and ANet coaches had developed their own PowerPoint presentations. (*Id.* at ¶ 145). Further, those tasks were not part of Plaintiff's responsibilities as Managing Director, and there were no available open support roles to which to transfer Plaintiff. (*Id.* at ¶¶ 145, 147). Plaintiff cannot satisfy her burden to identify a potential accommodation "merely by reciting the formula that her employer could have reassigned her." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009). "Instead, she must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned." *Id.* at

97-98. Plaintiff has not demonstrated that Defendants refused to assign her to any such existing vacant position.

**\*18** *Lastly*, Plaintiff objected to Defendants' failures to adjust certain of her documented goals upon her return from leave in November 2017. (Compl. ¶ 101). On November 30, 2017, Plaintiff was provided with a re-entry plan outlining her responsibilities and goals in her new role as Executive Director of ANet's Mid-Atlantic Region, which plan included goals related to developing growth in the Upstate New York school districts. (Def. 56.1 ¶ 182). Plaintiff alleges that Martin indicated that these goals would not be adjusted to account for the five months of Plaintiff's medical leave. (Compl. ¶ 101). But Plaintiff does not explain what adjustments should have been made. Additionally, Plaintiff herself acknowledged that she did not raise any further concerns about these goals in her subsequent weekly check-ins and discussions with Martin. (Def. 56.1 ¶ 184; Pl. Dep. 360:20-361:15). And Plaintiff further recognized that business development was the "linchpin" to continuing her position. (Pl. Dep. 374:9-10). Having failed to raise this issue at the time, Plaintiff may not now make it the basis of a failure to accommodate claim, particularly in light of the record of Defendants' willingness to provide reasonable accommodations. *See* 🔖 *Elmessaoudi v. Mark 2 Rest. LLC*, No. 14 Civ. 4560 (PGG), 2016 WL 4992582, at \*8 (S.D.N.Y. Sept. 15, 2016) ("[A]ny such inadequacy in the accommodation granted to Plaintiff ... is attributable to Plaintiff's failure 'to make reasonable efforts to help [the employer] determine what specific accommodations [were] necessary.' " (quoting *Shroeder* v. *Suffolk Cnty. Cmty. Coll.*, No. 07 Civ. 2060 (JFB) (WDW), 2009 WL 1748869, at \*14 (E.D.N.Y. June 22, 2009))).

Plaintiff's failure to accommodate claim cannot survive even under the broader protections of the NYCHRL. Under the NYCHRL, Plaintiff must show that she was treated "less well" than her colleagues "at least in part for a discriminatory reason." 🔖 *Mihalik*, 715 F.3d at 110 n.8. Plaintiff has not made any such showing, and there is no evidence in the record that similarly-situated colleagues were provided accommodations that Plaintiff was denied. Moreover, while under the NYCHRL, all accommodations are presumed reasonable until proven otherwise, a defendant can overcome this presumption by showing the accommodation would be an undue burden or that the employee could not perform her duties even with the accommodation. 🔖 *LeBlanc* v. *United Parcel Serv.*, No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at \*18 (S.D.N.Y. Apr. 11, 2014). Plaintiff has herself

acknowledged that the further accommodations she requested were not medically necessary, and that none of the requests was related to her medical condition. (Def. 56.1 ¶ 146). And as discussed above, Defendants have in turn demonstrated that Plaintiff's requested accommodations were not reasonable as there was no available role that met her specifications. As such, Defendants have overcome the NYCHRL's reasonable accommodation presumption. *See Stryker* v. *HSBC Sec. (USA)*, No. 16 Civ. 9424 (JGK), 2020 WL 5127461, at \*12 (S.D.N.Y. Aug. 31, 2020) (dismissing NYCHRL failure to accommodate claim where defendant demonstrated that it had offered a reasonable alternative accommodation and that plaintiff's proposed alternative was not reasonable); *Lazzari* v. *N.Y.C. Dep't of Parks & Recreation*, 751 F. App'x 100, 103-04 (2d Cir. 2018) (summary order) (finding that proposed accommodation was not reasonable under the NYCHRL where it impeded defendant's ability to maintain city facilities and placed a strain on other employees).

In sum, Defendants worked with Plaintiff to craft several accommodations that were plainly reasonable, and Plaintiff has failed to identify a facially reasonable accommodation that Defendants refused to provide. Thus, Defendant's motion for summary judgment is granted as to Plaintiff's failure to accommodate claims.

### 3. The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Discrimination Claims

Plaintiff alleges that following her diagnosis, she was subjected to several allegedly discriminatory actions by the Defendants, culminating in the eventual elimination of her position. (Compl. ¶¶ 128-29, 143-45). Defendants argue that Plaintiff has not established a *prima facie* case of discrimination, as she has not demonstrated that she suffered an adverse employment action because of her disability. (Def. Br. 21-22).

As stated above, to establish a *prima facie* case of discrimination under the ADA or NYSHRL, a plaintiff must show that (i) her employer is subject to the statute; (ii) she is disabled within the meaning of the statute or perceived to be so by her employer; (iii) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) she suffered an adverse employment action because of her disability. *See* 🔖 *Jacques*, 386 F.3d at 198; *see also* 🔖 *Nelson*, 2013 WL 4437224, at \*6. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate

a legitimate reason for the challenged employment decision. *Sista*, 455 F.3d at 169. Plaintiff must then carry the burden of persuasion that the proffered reason is a pretext. *Id.* Here, Defendants do not dispute that Plaintiff has established the first three prongs of a *prima facie* case of discrimination. However, they contend that Plaintiff has not met the fourth prong, that is, that she has not established that she suffered an adverse employment action *because of* her illness.

**\*19** Plaintiff alleges that after ANet learned of her diagnosis, it hired and "groomed" Stephens to fill her role, phased out Plaintiff's job and ultimately eliminated her position. (Compl. ¶ 68). However, there is no evidence in the record supporting Plaintiff's assertion that Stephens was hired with any improper goal of replacing her. Rather, in the fall of 2016, when Plaintiff and Martin became responsible for the broader Mid-Atlantic Region, Martin told Plaintiff that they needed an additional team member to assist with their work. (Def. 56.1 ¶ 48; *see also* Pl. Dep. 151:15-152:4).[16] Though Stephens did not begin work with ANet until January 2017, she was hired prior to Plaintiff's diagnosis, which establishes fairly definitively that Defendants had no such discriminatory motive as alleged by Plaintiff. (Def. 56.1 ¶ 277).[17]

The record is equally lacking in support for Plaintiff's claim that Defendants "groomed" Stephens to replace Plaintiff due to her disability. Rather, it appears that Stephens took on many of Plaintiff's responsibilities while she was out on leave and working remotely, including temporarily assuming Plaintiff's duties for ANet's New York City school-based partnerships. (Def. 56.1 ¶¶ 138, 172). Further, the decision to promote Stephens and Plaintiff to Executive Directors of the New York-Metro and Upstate New York Regions, respectively, was not an adverse action, as Plaintiff continued her prior work with the Upstate New York Region, and the title change was in fact a promotion. (*Id.* at ¶¶ 168-69). *See Hoag* v. *Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 486 (S.D.N.Y. 2017) (finding that a teacher's transfer from a high school to an elementary school was not an adverse employment action because there was "no other evidence that her job responsibilities were diminished, that teaching at the elementary school was less prestigious than teaching at the [high school], that her transfer was tantamount to a demotion, or that there was any other meaningful difference between her jobs at the two schools"). Plaintiff's subjective "dissatisfaction with the work assigned (or not assigned)," absent some evidence that the assignment or lack thereof materially worsened Plaintiff's working conditions, "is insufficient to make out an adverse employment action."

*Johnson* v. *Morrison & Foerster LLP*, No. 14 Civ. 428 (JMF), 2015 WL 845723, at \*5 (S.D.N.Y. Feb. 26, 2015); *see also* *Smith* v. *City of New York*, 385 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) (finding that police cadet's objection to his reassignment from training to mail duty "amounted to nothing more than subjective dissatisfaction where plaintiff "offer[ed] no detail as to how mail duty resulted in tangibly worse working conditions").

Plaintiff alleges two additional adverse employment actions stemming from meetings with Martin during: (i) Plaintiff's June 2017 employment performance review (Compl. ¶ 82); and (ii) a December 2017 meeting to discuss Plaintiff's goals (*id.* at ¶ 101). With respect to the first alleged adverse employment action, Plaintiff does not ascribe any negative consequences to the June 2017 review. Her primary objection appears to be with the review's very occurrence. (*Id.* at ¶ 82). However, "negative evaluations, standing alone without any accompanying adverse results, are not cognizable" under the anti-discrimination laws." *Siddiqi* v. *N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) (quoting *Bennet* v. *Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001)); *see also* *Farina* v. *Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (summary order) (observing that negative employment evaluation letters "may be considered adverse employment actions," but not without "proof that the evaluation had any effect on the terms and conditions of [plaintiff's] employment" (internal citations omitted)). Because Plaintiff proffers no evidence that the review led to a "demotion, diminution of wages, or other tangible loss[,]" this alleged conduct does not qualify as an adverse employment action. *See* *Siddiqi*, 572 F. Supp. 2d at 367. As to the December 2017 meeting, Plaintiff alleges that Martin refused to adjust her annual goals to account for Plaintiff's leaves of absence that year. (Compl. ¶ 101). However, as discussed in connection with Plaintiff's failure to accommodation claims, Plaintiff offers no explanation as to why her goals required adjustments going forward, or why failing to make such adjustments was an adverse employment action.[18] And, fatally, she also has not demonstrated that the failure to adjust her goals had any negative consequences.

**\*20** Separately, Plaintiff alleges that Martin demonstrated various lapses in empathy, including requesting that Plaintiff walk her though a presentation within hours of Plaintiff's diagnosis, telling Plaintiff her intermittent leave was disruptive, asking Plaintiff to complete a self-

evaluation after Plaintiff shared that she was suffering from a fingernail infection and could only communicate by phone, and displaying aggressive body language. (Compl. ¶¶ 31, 42, 80, 99). These allegations, even construed in the light most favorable to Plaintiff, are at most "speculation and conjecture," with little offered to link them to any discriminatory intent. *Nieblas-Love*, 165 F. Supp. 3d at 68 ("[A]llegations [ ] founded on nothing more than Plaintiff's self-serving *ipse dixit*, are ... insufficient to defeat a motion for summary judgment.").

In short, Plaintiff has failed to establish that she suffered any adverse employment actions within the meaning of the ADA or the NYSHRL prior to the elimination of her role. And even if Defendants' conduct qualified as adverse employment actions, Plaintiff has not shown that such actions were taken "*because of* her disability" — that is, "under circumstances giving rise to an inference of discrimination." *Davis*, 804 F.3d at 235 (emphasis added and internal quotation marks omitted).

The only potentially adverse employment action Plaintiff has alleged is her termination from ANet. *See E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 843 (S.D.N.Y. 2013) (identifying termination of employment as an adverse employment action within the ADA). However, the Court will address whether Defendants have met their burden of establishing legitimate, non-pretextual reasons for Plaintiff's termination when it considers Plaintiff's retaliation claims. (*See* Def. Br. 22-25). The Court otherwise finds that Plaintiff has failed to offer evidence sufficient to establish a *prima facie* case of discrimination under the ADA and the NYSHRL. As such, Defendants are granted summary judgment as to these claims.

With respect to the NYCHRL, a plaintiff is not required to show an adverse employment action and need only "show differential treatment — that she was treated 'less well' — because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. But a plaintiff must still offer evidence that the complained-of conduct was "caused by a discriminatory motive." *Id.* Even under this lenient standard, Plaintiff has not demonstrated that discriminatory intent played any role in Defendants' employment actions, let alone that similarly-situated employees received more favorable treatment. As a result, summary judgment must be granted as to her NYCHRL claim as well. [19]

### 4. The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Retaliation Claims

Plaintiff alleges that Defendants retaliated against her for engaging in the following protected activities: (i) exercising her rights under the FMLA; (ii) filing a Charge of Discrimination with the EEOC; and (iii) reporting Martin's unlawful employment practices. (Compl. ¶¶ 86, 90, 107, 109-10, 120, 132). The conduct alleged by Plaintiff to be retaliatory overlaps to a significant degree with the conduct challenged in Plaintiff's failure to accommodate and discrimination claims, which conduct the Court has discussed above. Defendants counter that they were not aware of Plaintiff's Charge of Discrimination at the time the decision was made to eliminate Plaintiff's role, and thus they could not have made the decision based on any retaliatory motive. (Def. Br. 24-25). Further, they argue that to the extent Plaintiff alleges that Defendants retaliated against her for engaging in other protected activities, such conduct had a legitimate, non-pretextual basis. (*Id.* at 25).

**\*21** As stated above, to establish a *prima facie* case for retaliation under the ADA and the NYSHRL, a plaintiff must show that "[i] she engaged in protected activity, [ii] the employer was aware of this activity, [iii] she was subjected to an adverse employment action against her, and [iv] a causal connection existed between the alleged adverse employment action and her protected activity." *McGuire-Welch*, 720 F. App'x at 62 (citing *Weixel*, 287 F.3d at 148). Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. *See Treglia*, 313 F.3d at 721. If the defendant proffers such evidence, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216.

The Court first considers the extent of Plaintiff's proffered protected activities. First, Plaintiff claims that she was retaliated against for exercising her rights under the FMLA. (Compl. ¶ 107). As discussed above, Defendants determined that Plaintiff was ineligible for FMLA leave, and she has not otherwise demonstrated any entitlement to such leave; she cannot therefore have engaged in a protected activity on this basis. (Def. 56.1 ¶¶ 18, 236-38). Plaintiff next alleges that she made several internal complaints about Martin's conduct, including: (i) complaining generally to the Human Resources

Manager about Martin and "culture"-related challenges on the team; (ii) complaining to ANet's Managing Director of Talent Development in June 2017 that she did not feel supported by Martin; and (iii) complaining to Cockrell that Martin's body language at a work retreat in November 2017 was "aggressive." (*Id.* at ¶ 297). For such internal complaints to constitute protected activity, Plaintiff must show that she had "a good faith, reasonable belief that [she has] made a complaint opposing an employment practice made unlawful ... by the ADA." *Salas v. N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018) (citation and internal quotation marks omitted). Plaintiff acknowledges that when making her complaints, she did not express that she felt she was being discriminated against, as she did not know the "why" behind Martin's actions, and she did not otherwise characterize Martin's conduct as unlawful. (Def. 56.1 ¶¶ 302-03). As such, though Plaintiff may have had a genuine concern about Martin's behavior towards her, her generalized complaints do not constitute protected activity within the ADA or the NYSHRL. *See Woldeselassie*, 2015 WL 456679, at *8 ("[I]t is well established that a complaint of generalized harassment unrelated to disability does not constitute protected conduct under the discrimination statutes.").

The Court next addresses Plaintiff's filing of a Charge of Discrimination with the EEOC, which was protected activity. This is undisputed by Defendants, who instead argue that ANet lacked knowledge of the Charge until after it made the decision to eliminate Plaintiff's role. (Def. Br. 24; Def. 56.1 ¶¶ 294-95). Specifically, Defendants submit that while Plaintiff filed her charge with the EEOC in December 2017, the EEOC did not transmit a copy of the Notice of Charge of Discrimination to ANet until April 23, 2018, and, further, that ANet did not learn of the Charge until May 1, 2018. (Def. 56.1 ¶ 226; *see also* Cockrell Decl. ¶ 41). Plaintiff was informed that her position had been eliminated at some point between April 23, 2018 and May 1, 2018. (Def. 56.1 ¶ 207). From these facts, Defendants argue that at the time Cockrell decided to eliminate Plaintiff's role, ANet was unaware of Plaintiff's Charge of Discrimination. (*Id.* at ¶ 228; *see also* Cockrell Decl. ¶ 41).

**\*22** Plaintiff has put forth limited evidence indicating that Defendants were aware of her filing with the EEOC. In her deposition, she testified that she had told two employees at ANet about her filing with the EEOC, though neither employee was her supervisor. (Pl. Dep. 498:7-25). She could not recall if she had otherwise spoken with

anyone at ANet regarding her intention to file. (*Id.* at 498:2-6). The Second Circuit has observed that "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *see also Zann Kwan*, 737 F.3d at 844 (holding that imputation to corporation's officer sufficed to impute "general corporate knowledge of plaintiff's protected activity" to corporation); *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (finding that defendant university's knowledge of protected activity could be inferred from complaint to university employee responsible for investigating and resolving such complaints. Here, Plaintiff has not alleged or put forth evidence that she made complaints of discrimination, or otherwise reported her EEOC filing to an ANet officer or employee responsible for investigating and resolving such complaints.

But even were the Court to find that Plaintiff had met her *prima facie* burden,[20] Defendants have proffered a legitimate, non-retaliatory basis for the termination of Plaintiff's role.[21] Plaintiff's position was eliminated in connection with an organization-wide restructuring prompted by the Syracuse School District's budget deficit in 2018. (Def. 56.1 ¶¶ 189, 192, 195-207). Because of the impact of this budget deficit on ANet's partnerships in its Upstate New York Region, Plaintiff was informed that, in order to maintain her role, she would be required to increase sales and growth cultivation efforts. (*Id.* at ¶ 198). Moreover, rather than seeking to terminate Plaintiff, Cockrell asked Plaintiff if she was willing to take on changes to her role, or if there was a different position within ANet she wanted to explore. (*Id.* at ¶¶ 199-201). However, Plaintiff indicated she would need a "blueprint" to follow were she to maintain her position, which Cockrell found troubling given Plaintiff's experience with the region. (*Id.* at ¶ 203). Plaintiff also did not pursue any other positions with ANet, despite being invited to do so by both Cockrell and others. (*Id.* at ¶¶ 206-13, 216-19). Notably, once ANet did receive notice of Plaintiff's EEOC filing, rather than seeking to terminate Plaintiff, ANet employees continued to encourage her to apply for other positions. (*Id.* at ¶¶ 209-13, 218-19). Given this evidence, Defendants have put forth legitimate, nondiscriminatory reasons for Plaintiff's termination. *See Ben-Levy v. Bloomberg L.P.*, No. 11 Civ. 1554 (KBF), 2012 WL 2477685, at *8 (S.D.N.Y. June 26, 2012) (accepting employer's proffered

reasons for employment decisions, which included corporate reorganization and plaintiff's performance), *aff'd*, 518 F. App'x 17 (2d Cir. 2013) (summary order). And Plaintiff has demonstrated no basis for pretext.

**\*23** Turning to the NYCHRL, to prevail on a retaliation claim, a plaintiff must show that "she took an action opposing her employer's discrimination ... and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." 🚩 *Mihalik*, 715 F.3d at 112 (internal citations omitted). Even under this "less demanding standard," a "plaintiff still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive." 🚩 *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (citation and internal quotation marks omitted). Plaintiff's NYCHRL retaliation claim suffers from the same defects as her federal and state claims — because Defendants did not have notice of her EEOC Charge at the time they decided to eliminate her position, Plaintiff has not met her burden of demonstrating

that retaliation was a motivating factor in that decision. *Stryker*, 2020 WL 5127461, at \*14.

Even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not conclude either that Plaintiff has established a *prima facie* case of retaliation, or that Plaintiff has shown that Defendants' legitimate reasons for their employment decisions were pretextual. Thus, Defendants are entitled to summary judgment as to Plaintiff's retaliation claims.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 810220

## Footnotes

1    The facts set forth in this Opinion are largely drawn from Defendants' submissions in support of their motion for summary judgment. Defendants' Local Rule 56.1 Statement of Undisputed Material Facts is referred to as "Def. 56.1" (Dkt. #66). Plaintiff's Complaint is referred to as "Compl." (Dkt. #1).

     Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein. *See* Local Rule 56.1(d). Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Rule 56.1(c), (d); *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). And where a nonmoving party fails to respond to a Local Rule 56.1 Statement, the court is "permit[ted] .... to conclude that the facts asserted in the statement are uncontested and admissible." 🚩 *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009). However, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." 🚩 *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014). "In so doing, the Court may rely on other evidence in the record even if uncited." *Id.* (citing Fed. R. Civ. P. 56(c)(3)). In recognition of this obligation, and in fairness to Plaintiff, the Court has considered Plaintiff's statements and pleadings where relevant in the course of deciding the instant motion.

For ease of reference, Defendants' brief in support of their motion for summary judgment is referred to as "Def. Br." (Dkt. #70). References to attorney and witness declarations and affidavits submitted in support of Defendants' motion, and the exhibits contained therein, are referred to using the convention "[Name] Decl." Citations to Plaintiff's deposition will be referred to using the convention "Pl. Dep." (Dkt. #67-3). Other submissions will be cited by their docket entry number.

2      The Court understands that this determination was based on the fact that ANet's New York City office, where Plaintiff was employed, never had more than 40 employees throughout Plaintiff's employment. (Def. 56.1 ¶ 18). Further, the closest offices to ANet's New York City office were its Washington D.C. and Boston offices, both of which were more than 75 miles away from ANet's New York City office. (*Id.*).

3      Martin does not recall making this statement to Plaintiff, but has acknowledged that she did feel that Plaintiff's leave was disruptive, and that Plaintiff may have drawn this inference based on the context of their conversation. (*See* Def. 56.1 ¶¶ 104, 247).

4      Plaintiff has acknowledged that these requested accommodations were not medically necessary, and that none of the requests was related to her medical condition. (Def. 56.1 ¶ 146).

5      ANet also made personnel changes as part of this reorganization, with Martin accepting the role of Vice President of the newly-formed West Region. (Def. 56.1 ¶¶ 193-94).

6      As part of ANet's reorganization, 18 roles were eliminated between 2017 and 2018. (Def. 56.1 ¶ 285). To date, the roles of all employees assigned to the Upstate New York Region have been eliminated, though some of the employees applied for other open positions and remain employed by ANet. (*Id.* at ¶¶ 288-89).

7      The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

8      The Court acknowledges that some courts in this District have found that applying the *McDonnell-Douglas* test to a failure to accommodate claim is "not helpful and could introduce unwarranted intent requirements into the analysis." *Nazario* v. *Promed Personnel Servs. NY Inc.*, No. 15 Civ. 6989 (LGS), 2017 WL 2664202, at *5 n.1 (S.D.N.Y. June 19, 2017).

9      The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard under the NYCHRL. *See* A8421/S6577 (as amended by S6594/A8424). These amendments were signed into law by Governor Andrew Cuomo on or about August 12, 2019. Significantly, however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to Plaintiff's claims here. *See* Wellner v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

10     At the outset, the Court grants the Individual Defendants summary judgment on Plaintiff's ADA discrimination, failure to accommodate and retaliation claims. Defendants correctly observe that the ADA does not provide for individual liability. (Def. Br. 18 n.1). And a number of courts in this Circuit have held that there is no cause of action against a supervisor for violations of the ADA. *See* Gomez v. *N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302-03 (S.D.N.Y. 2016); *Lane* v. *Maryhaven Ctr. of Hope*, 944 F. Supp. 158, 161-62 (E.D.N.Y. 1996) (collecting cases). Thus, the Court will proceed to consider Plaintiff's ADA claims as to ANet, rather than as to the Individual Defendants.

11    Though Plaintiff alleges in her Complaint that she was an "eligible employee" within the meaning of the FMLA, and that ANet "employs more than 50 employees, operating within a 75-mile radius of where Plaintiff worked[ ]" (Compl. ¶ 11), that allegation has since been refuted by Defendant's unopposed Local Rule 56.1 Statement (*see* Def. 56.1 ¶¶ 18, 236-38).

12    In her Complaint, Plaintiff does not distinguish between the alleged retaliatory conduct underlying her FMLA claims and the conduct underlying her other claims of retaliation. And she has testified that the facts underlying her various retaliation claims are "connected" and "intertwined". (*See* Def. 56.1 ¶ 293). The Court thus understands Plaintiff's FMLA retaliation claim to be premised upon the same retaliatory conduct alleged in support of her ADA, NYSHRL, and NYCHRL retaliation claims, which conduct is discussed further elsewhere in this Opinion.

13    Even had Plaintiff established entitlement to FMLA leave as required for a claim of FMLA retaliation, she would also need to demonstrate that she suffered an adverse employment action under circumstances giving rise to an inference of retaliatory intent. *See* Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016). The Court will later address, in connection with Plaintiff's retaliation claims brought under the ADA, the NYSHRL, and the NYCHRL, Defendants' proffered justifications for the adverse employment actions alleged by Plaintiff.

14    The Individual Defendants can also be found liable under the NYSHRL if they contributed to any failure to make reasonable accommodations. *See* Diaz v. Viagran, No. 16 Civ. 9106 (CM), 2018 WL 4360790, at *15 (S.D.N.Y. Aug. 29, 2018).

15    For example, Plaintiff stated that Martin had indicated that "no one" was supporting Plaintiff's team of coaches during her January 2017 to March 2017 leave. (Pl. Dep. 220:7-9, 236:9-12, 280:6-8). However, Plaintiff has not put forth any evidence demonstrating that her teams in fact went unsupported.

16    Plaintiff has also acknowledged that she was part of the hiring process and that she interviewed Stephens. (Pl. Dep. 152:11-18).

17    Although the underlying record does not reflect Stephens's offer date, it does indicate that the hiring process for her role began in or around late August 2016, and was fully underway by September 2016. (Mellk Decl., Ex. K at 21, 24). Further, Stephens was selected as the new Managing Director in November 2016. (*Id.* at 16; *see also* Def. 56.1 ¶ 277).

18    The Court further observes that Martin had demonstrated willingness to adjust Plaintiff's goals while she was on intermittent leave, as evidenced by the Expectation Adjustments that modified her end-of-year goals. (Def. 56.1 ¶¶ 132-34).

19    Plaintiff's aiding and abetting claims under the NYSHRL and the NYCHRL are in turn dismissed as well. *See* Tulino v. City of New York, No. 15 Civ. 7106 (JMF), 2016 WL 2967847, at *5 (S.D.N.Y. May 19, 2016) (observing that where a plaintiff's NYSHRL discrimination and hostile work environment claims were dismissed "it [was] unclear what unlawful conduct the [defendants] could have aided and abetted").

20    In addition to the Court's other enumerated concerns with Plaintiff's *prima facie* case, the Court observes that Plaintiff may not have demonstrated the the requisite "causal connection" between her protected activity (her EEOC filing) and Defendants' adverse employment action (her termination). *See* Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). Absent any evidence to support an inference that the decisionmakers knew of her filing — and Plaintiff has put forth none — Plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation. *See* Murray v. Visiting Nurse Servs. of N.Y., 528 F.

Supp. 2d 257, 271 (S.D.N.Y. 2007). While Plaintiff can point to the temporal proximity of her EEOC filing and the termination of her position, "the lack of knowledge on the part of particular *individual* [Defendants or their agents] is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity[.]" ⚑ *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). That being said, for the purposes of assessing Defendants' proffered reasons for their conduct, the Court will assume here that Plaintiff has established the requisite causal connection for a *prima facie* case of retaliation.

21   With the exception of Plaintiff's termination, the other adverse employment actions alleged in the Complaint have been addressed and found insufficient in the course of the Court's analysis of Plaintiff's failure to accommodate and discrimination claims.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1226498
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tynan HOFFMAN, Plaintiff,
v.
CITY COLLEGE OF NEW YORK, and
City University of New York, Defendants.

20 Civ. 1729 (PGG)
|
Signed 03/30/2021

**Attorneys and Law Firms**

Brittany Sloane Weiner, Imbesi Law Group PC, New York, NY, for Plaintiff.

Alissa Schecter Wright, Johane Severin, New York State Office of the Attorney General, New York, NY, for Defendants.

**MEMORANDUM OPINION & ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

 **\*1**  In this action, Plaintiff Tynan Hoffman alleges disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; Section 503 of the Rehabilitation Act, 🚩 29 U.S.C. § 793; the New York State Human Rights Law ("NYSHRL"), 🚩 New York Executive Law § 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101 et seq. (See Am. Cmplt. (Dkt. No. 12)) Defendants are the City College of New York ("City College") and the City University of New York ("CUNY") (collectively, "Defendants"). (Id.) Plaintiff has moved to file a Second Amended Complaint, which includes a claim under Section 504 of the Rehabilitation Act, 🚩 29 U.S.C. § 794. (See Dkt. No. 23) Defendants have moved to dismiss.[1] (See Dkt. No. 25) For the reasons stated below, Plaintiff's motion for leave to file a Second Amended Complaint will be granted as to the Section 504 claim, and Defendant's motion to dismiss the Amended Complaint will be granted.

**BACKGROUND**

**I. FACTS**[2]

Plaintiff suffers from "major depressive disorder," which causes "a variety of symptoms, including but not limited to loss of energy, loss of motivation, difficulty concentrating, difficulty learning and more." (Am. Cmplt. (Dkt. No. 12) ¶ 10) "Plaintiff receives ongoing treatment for his disability." (Id. ¶ 11)

In 2008, when Plaintiff was a student at City College,[3] he began working at the City College library as an assistant. (Id. ¶ 12) In July 2013, Plaintiff became a full-time reference librarian at City College. (Id. ¶ 13) "Defendants require that all librarians have two master's degrees. A librarian must have a master's degree upon hiring and the second must be completed within five years of employment." (Id. ¶ 14) Plaintiff had one master's degree when he became a full-time employee. (Id. ¶ 15) In the spring of 2014, Plaintiff enrolled in courses to obtain his second master's degree. (Id. ¶ 16)

"[I]n 2015[,] [Plaintiff's] grades began to suffer due to his disability," and he "struggled to complete his courses and final papers," receiving "four incompletes." (Id. ¶ 17) In 2018, Plaintiff asked Chief Librarian Charles Stewart "to accommodate him by allowing him an extra year to obtain his [second] master's degree because of his disability and the symptoms he experienced as a result of his disability." (Id. ¶ 18) Plaintiff's request was granted, and he was given an additional year to obtain his second master's degree. (Id. ¶ 19) While completing the course work necessary to obtain the second master's degree, Plaintiff "was performing his tasks at work." (Id. ¶ 20)

 **\*2**  In the spring of 2019, Plaintiff asked Stewart for "an additional year to obtain his second master's degree." (Id. ¶ 21) Plaintiff was later "informed via email that his contract was not going to be renewed." (Id. ¶ 22)

"On May 11, 2019, Plaintiff made a formal request for a reasonable accommodation," requesting additional time to obtain his second master's degree. (Id. ¶ 23) In his request, Plaintiff noted "that he was taking medication, which he believed would alleviate his symptoms, allow him to prioritize his schoolwork, and complete the program." (Id. ¶ 24) Plaintiff also provided "documentation regarding his medication and treatment," and a letter from his doctors stating that he "would benefit from a one-year extension of

the Defendants' arbitrary deadline." (Id. ¶ 25) He claims that "no one approached him to afford him the chance to engage in the interactive process." (Id. ¶ 26)

On August 20, 2019, Defendants denied Plaintiff's request for a reasonable accommodation. (Id. ¶ 27; see id. ¶ 28 ("Defendants informed Plaintiff that they were not obligated to 'fundamentally modify the nature, operation, or standards of its business.' ")) [4] On October 14, 2019, Plaintiff submitted an internal appeal regarding the denial of his reasonable accommodation request. (Id. ¶ 35) That same day, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 34)

On December 5, 2019, Defendants informed Plaintiff that his appeal had been denied. (Id. ¶ 36) On December 19, 2019, Plaintiff received a Notice of Right to Sue from the EEOC. (Id. ¶ 37)

## II. PROCEDURAL HISTORY

The Complaint was filed on March 2, 2020, naming "City College of New York" as the sole defendant. (Cmplt. (Dkt. No. 1))

In a March 27, 2020 letter, CUNY asserted that "Plaintiff improperly names City College as the defendant in this action. City College, a senior college in the CUNY system, is not a 'legally cognizable entity apart from CUNY.' CUNY is thus the sole proper institutional defendant in this action." (Mar. 27, 2020 Def. Ltr. (Dkt. No. 6) at 1 (quoting Clissuras v. City Univ. of N.Y., 359 F.3d 79, 81 n.2 (2d Cir. 2004) (per curiam)))[5] CUNY also sought permission to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiff's claims are barred by sovereign immunity. (Id.)

On April 23, 2020, Plaintiff requested leave to amend (Apr. 23, 2020 Pltf. Ltr. (Dkt. No. 9)), which this Court granted the next day pursuant to Federal Rule of Civil Procedure 15(a)(1). (Apr. 24, 2020 Order (Dkt. No. 10))

The Amended Complaint was filed on May 5, 2020, and names City College of New York and City University of New York as Defendants. (Am. Cmplt. (Dkt. No. 12)) The Amended Complaint pleads claims of disability discrimination under the ADA, Section 503 of the Rehabilitation Act, the NYSHRL, and the NYCHRL. (Id. ¶¶ 39-72)

In a May 19, 2020 letter, CUNY sought permission to move to dismiss, contending that all of the claims pled in the Amended Complaint fail as a matter of law. (May 19, 2020 Def. Ltr. (Dkt. No. 15))

*3 In a May 25, 2020 letter, Plaintiff again sought leave to amend, stating that he wished to add a claim pursuant to Section 504 of the Rehabilitation Act. (May 25, 2020 Pltf. Ltr. (Dkt. No. 17) at 1)

The Court then set a briefing schedule for both CUNY's motion to dismiss and Plaintiff's motion to amend. (June 1, 2020 Order (Dkt. No. 19))

Plaintiff filed his motion to amend on August 4, 2020. (Pltf. Mot. (Dkt. No. 23)) The proposed Second Amended Complaint ("SAC") drops Plaintiff's claim alleging a violation of Section 503 of the Rehabilitation Act, and adds a claim under Section 504 of the Rehabilitation Act. (SAC (Dkt. No. 23-1))

CUNY thereafter filed its opposition to Plaintiff's motion to amend, along with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). (Def. Mot. (Dkt. No. 25); Def. Br. (Dkt. No. 26); Def. Reply Br. (Dkt. No. 27))

## DISCUSSION

## I. LEGAL STANDARDS

### A. Rule 12(b)(1) Motion

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)."

Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (citation and quotation marks omitted); see also Aurecchione v.

Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."). "Under Rule 12(b)(1), even a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient." Castillo v. Rice, 581 F. Supp. 2d 468, 471 (S.D.N.Y. 2008) (citation and quotation marks omitted).

In considering a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).

### B. **Rule 12(b)(6) Motion**

For a complaint to survive a Rule 12(b)(6) motion to dismiss, a "plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege " 'enough facts to state a claim to relief that is plausible on its face.' " Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, a court accepts as true all well-pled factual allegations but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. Moreover, a court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). Where a court can infer no more than the mere possibility of misconduct from the factual averments – in other words, where the well-pled allegations of a complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible" – dismissal is appropriate. Twombly, 550 U.S. at 570.

### C. **Motion to Amend**

**\*4**  Under Fed. R. Civ. P. 15(a), district courts "ha[ve] broad discretion in determining whether to grant leave to amend," Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000), and generally "leave to amend should be freely granted when 'justice so requires.' " Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)); see Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.' " (quoting Foman v. Davis, 371 U.S. 178, 182 (1962))).

A court may properly deny leave to amend, however, in cases of " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman, 371 U.S. at 182).

"[A] party opposing a motion to amend ... bears the burden of establishing that an amendment would be futile." Bonsey v. Kates, No. 13 Civ. 2708 (RWS), 2013 WL 4494678, at *8 (S.D.N.Y. Aug. 21, 2013). "Ordinarily, leave to amend may be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014), aff'd sub nom. APEX Employee Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 725 F. App'x 4 (2d Cir. 2018); see also Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").

## II. **ANALYSIS**

### A. **Motion to Dismiss the Amended Complaint**

In its motion dismiss, CUNY argues – as an initial matter – that City College of New York is not a proper defendant in this action, because it is part of the CUNY system and is not a " 'legally cognizable entity apart from CUNY.' " (Def. Br.

(Dkt. No. 26) at 2 n.1 (quoting 🚩 Clissuras v. City Univ. of N.Y., 359 F.3d 79, 81 n.2 (2d Cir. 2004) (per curiam)))

In Clissuras, the Second Circuit explained that, "[u]nder New York Law, CUNY is a separate corporate body ... [that] is composed of 'each senior college and each community college.' " 🚩 359 F.3d at 81 n.2 (citation omitted). The court went on to find that one of CUNY's senior colleges – New York City Technical College – is not a "legally cognizable entity apart from CUNY." Id. Here, the Amended Complaint pleads that "City College is a public senior college of the CUNY school system." (Am. Cmplt. (Dkt. No. 12) ¶ 7) Accordingly, City College is not a legally cognizable entity, and all claims against it will be dismissed. See id.

CUNY further contends that Plaintiff's ADA, NYSHRL, and NYCHRL claims are barred by the Eleventh Amendment, and moves to dismiss those claims under Rule 12(b)(1) for lack of subject matter jurisdiction. (Def. Br. (Dkt. No. 26) at 5-6)

"The Eleventh Amendment bars suits against state agencies unless the state waives its sovereign immunity or it is validly abrogated by Congress." Quadir v. New York State Dep't of Lab., 39 F. Supp. 3d 528, 536 (S.D.N.Y. 2014); see also 🚩 Clissuras, 359 F. 3d at 81 ("It is well settled that the 'ultimate guarantee' of the Eleventh Amendment is that 'nonconsenting States may not be sued by private individuals in federal court.' " (quoting Bd. of Trustees v. Garrett, 531 U.S. 356, 363 (2001)). "[T]he Eleventh Amendment extends immunity 'not only to a state, but also to entities considered "arms of the state." ' " Id. (quoting 🚩⚠️ McGinty v. New York, 251 F.3d 84, 95 (2d Cir. 2001)).

 *5  In Clissuras, the Second Circuit held that CUNY and each of its senior colleges "is an 'arm of the state,' " and that "suits against CUNY are equivalent to suits against the State of New York and are therefore barred by the Eleventh Amendment." 🚩 Id. at 83; see also Garcia v. City Coll. of New York, No. 05CIV3664LTSGWG, 2005 WL 3312253, at *1 (S.D.N.Y. Dec. 5, 2005) ("CUNY and all of its senior colleges are legal entities of the State of New York and are accordingly entitled to Eleventh Amendment immunity from suit in federal court absent waiver of suit."); Hamilton v. City Coll. of the City Univ. of New York, 173 F. Supp. 2d 181, 184 (S.D.N.Y. 2001) ("This court agrees with the conclusion of other courts in this district that the senior colleges of the CUNY system are arms of the state of New York for Eleventh Amendment purposes." (citations omitted)).

"The Supreme Court has unequivocally held that Congress has not effectively abrogated Eleventh Amendment immunity with respect to an individual's ADA claim for damages against a state (or an arm of a state) based on a theory of employment discrimination, i.e., a Title I claim." [6] Relf-Davis v. NYS Dep't of Educ., No. 13 CIV 3717 PAC, 2015 WL 109822, at *6 (S.D.N.Y. Jan. 7, 2015) (collecting cases). And "the New York Legislature has never waived its sovereign immunity from liability under Title[ ] I ... of the ADA." Quadir, 39 F. Supp. 3d at 537. Accordingly, Plaintiff's ADA claim against CUNY is barred by the Eleventh Amendment and will be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

Moreover, because "[t]he Eleventh Amendment [also] bars suits, regardless of the relief sought, alleging violations of state law against the State of New York, its agencies and agents, unless the state has consented to being sued in a federal forum," "claims under the NYSHRL and the NYCHRL" are likewise barred. Canales-Jacobs v. New York State Off. of Ct. Admin., 640 F. Supp. 2d 482, 499 (S.D.N.Y. 2009); see also Quadir, 39 F. Supp. 3d at 537 ("New York has not waived its Eleventh Amendment immunity for NY[S]HRL suits in federal courts." (citation and quotation marks omitted)); id. at 538 (dismissing claims against New York State under the NYCHRL on Eleventh Amendment grounds). Accordingly, Plaintiff's NYSHRL and NYCHRL claims against CUNY will likewise be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

Although Plaintiff – in the proposed SAC – drops his claim under Section 503 of the Rehabilitation Act, the Court notes that the Second Circuit has held that Section 503 of the Rehabilitation Act does not provide a private right of action. See Davis v. United Air Lines, Inc., 662 F.2d 120, 127 (2d Cir. 1981) ("we conclude, as have the other three courts of appeals that have passed upon the question, that no implied private right of action exists under section 503"). Accordingly, Plaintiff's Rehabilitation Act Section 503 claim fails to state a claim, and it will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**B. Motion for Leave to File a Second Amended Complaint**

**\*6** Plaintiff seeks leave to file a Second Amended Complaint, which adds a claim under Section 504 of the Rehabilitation Act. (See SAC (Dkt. No. 23-1) at 7-8; see also Pltf. Mot. (Dkt. No. 23)) In his proposed Section 504 claim, Plaintiff alleges that "Defendants discriminated against [him] on the basis of his disability by failing to provide a reasonable accommodation and subsequently terminating his employment." (Id. ¶ 56)

As discussed above, a motion to amend may be denied where amendment would be futile, and "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente, 310 F.3d at 258.

Here, CUNY does not contend that Plaintiff's proposed Section 504 claim is barred by the Eleventh Amendment.[7] Instead, CUNY argues that the proposed amendment would be futile, because Plaintiff's Section 504 claim fails to state a claim under either a theory of disability discrimination in employment or a reasonable accommodation theory. (Def. Br. (Dkt. No. 26) at 7-11)[8]

A plaintiff must allege the following four elements to state a prima facie claim of disability discrimination under Section 504 of the Rehabilitation Act: "(1) [his] employer is subject to the [Rehabilitation Act]; (2) [he] was disabled within the meaning of the [Act]; (3) [he] was otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodation; and (4) [he] suffered an adverse employment action because of [his] disability." Quadir, 39 F. Supp. 3d at 540 (citation and quotation marks omitted).

**\*7** To establish a prima facie case under Section 504 for failure to provide a reasonable accommodation, a plaintiff must plead facts satisfying the following four elements:

> "(1) plaintiff is a person with a disability under the meaning of the [Rehabilitation Act]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

Id. at 539 (quoting Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)). " '[T]he determination of whether a particular modification is "reasonable" involves a fact-specific, case-by-case inquiry that considers, among

other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it.' " Id. (quoting Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995)). "Thus, the reasonab[leness] of any proposed accommodation is generally a fact question to be investigated through discovery." Id.

Here, CUNY contends that Plaintiff's proposed Section 504 claim fails for multiple reasons.

As an initial matter, CUNY asserts that Plaintiff was not "qualified for his position as a librarian," because CUNY requires that all librarians obtain a second master's degree within the first five years of their CUNY employment. (Def. Br. (Dkt. No. 26) at 8)

"To be qualified [for purposes of a Section 504 disability discrimination claim], the individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position and must be able to perform the essential functions of the position, with or without reasonable accommodation." Misek-Falkoff v. Int'l Bus. Machines Corp., 854 F. Supp. 215, 226 (S.D.N.Y. 1994), aff'd sub nom. Misek-Falkoff v. IBM, 60 F.3d 811 (2d Cir. 1995); see also D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998) ("The Supreme Court defines an individual as 'otherwise qualified' if he 'is able to meet all of a [position's] requirements in spite of his handicap.' " (quoting School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 17 (1987))).

In determining whether a plaintiff is "qualified," courts conduct a two-step analysis. See Mark v. Burke Rehab. Hosp., No. 94 Civ. 3596 RLC, 1997 WL 189124, at \*4 (S.D.N.Y. Apr. 17, 1997).[9] "The first step is to decide whether the individual satisfies the prerequisites for the position, such as having the appropriate education, employment experience, skills, or license. Id. "The second step is to decide whether the individual can perform the essential function of the job position, with or without reasonable accommodation." Id.; see also id. at \*5 ("The determination of whether any function is essential is a fact-specific inquiry to be made on a case-by-case basis.").

**\*8** Here, the proposed Second Amended Complaint acknowledges that "Defendants require that all librarians have

two master's degrees," one "upon hiring and the second must be completed within five years of employment." (SAC (Dkt. No. 23-1) ¶ 14) Plaintiff likewise concedes that he did not obtain a second master's degree within the first five years of his CUNY employment, and that he sought and obtained from CUNY a one-year extension within which to obtain the second master's degree. (Id. ¶¶ 15-19) He also concedes that he did not obtain the second master's degree during the one-year extension, and that he sought another one-year extension, which CUNY denied. (Id. ¶¶ 21-25, 27) Accordingly, from the face of the proposed SAC, it appears that CUNY has clear educational requirements for its librarians, which Plaintiff does not meet. Mark, 1997 WL 189124, at *4. That does not end the inquiry, however.

"The Second Circuit has observed that the notion of 'otherwise qualified' is inextricably linked to the meanings of both 'essential functions' and 'reasonable accommodation.' " Parisi v. Coca-Cola Bottling Co. of New York, 995 F. Supp. 298, 303 (E.D.N.Y. 1998), aff'd, 172 F.3d 38 (2d Cir. 1999) (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 135 (2d Cir. 1995)); see also Borkowski, 63 F. 3d at 135 ("Although the phrase 'otherwise qualified' is hardly unambiguous on its face, its meaning in the context of an employment discrimination claim is fairly clear: an individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation."). And, as noted above, in determining the essential functions of a position, "a court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." McMillan, 711 F.3d 120, 126 (2d Cir. 2013) (citation and quotation marks omitted); Kelleher v. Fred A. Cook, Inc., 939 F.3d 465, 469 (2d Cir. 2019) ("Although courts are deferential to an employer's judgment regarding what functions are essential to a particular position, the question involves a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice. Discovery may be necessary to determine whether an employee was qualified for a particular position." (citations and quotation marks omitted)).

Here, CUNY hired Plaintiff as a full-time reference librarian in July of 2013. (SAC (Dkt. No. 23-1) ¶ 13) Plaintiff claims that during the first five years of his employment, and during the one-year extension period, he "was performing his tasks at work as a librarian." (Id. ¶¶ 18-20) Plaintiff further alleges that his "schedule and job responsibilities would not change upon the completion of his second master's degree." (Id. ¶ 31; see id. ("Plaintiff would have similar responsibilities and teaching requirements with one master's degree as he would have with two.")) And Plaintiff "worked in 2019 without a second master's, with no complaints, disciplinary actions or issues of any kind. At all times, [he] was able to perform the essential functions of his job." (Id. ¶ 32)

Acknowledging that universities have the right to set educational and other requirements for their employees, see Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999), as amended on denial of reh'g (Dec. 22, 1999); see also Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980) ("A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom." (citation and quotation marks omitted)), "there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions," such as "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." McMillan, 711 F.3d at 126. "Usually, no one listed factor will be dispositive," and "a court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." Id. (citation and quotation marks omitted).

**\*9** Here, the proposed SAC pleads facts demonstrating that Plaintiff was able to perform the essential functions of his job – functions that will not change once he obtains a second master's degree. (SAC (Dkt. No. 23-1) ¶¶ 13, 18-20, 31-32) It would be premature at this stage of the proceedings to conclude, based solely on CUNY's requirement that librarians obtain a second master's degree within five years of being hired, that Plaintiff is not "qualified" for his position.

There are, of courses, circumstances in which job requirements are legally mandated. In such circumstances, a plaintiff lacking the legally mandated requirements may not be deemed "qualified," because it is unlawful for that individual to perform the job absent the legally mandated license or certification. See, e.g., Dancause v. Mount Morris Cent. Sch. Dist., No. 13-CV-6019, 2013 WL 2946063,

at *1-3 (W.D.N.Y. June 14, 2013), aff'd, 590 F. App'x 27 (2d Cir. 2014) (granting school district's motion to dismiss where plaintiff-teacher – who did not allege "that her periodontal disease in any way interfered with her ability to obtain the proper certification to teach" – lacked a legally required state teaching certification; while the teacher might have been "competent to teach the subject," having taught the subject "for years," she lacked the legally required certification necessary to teach); see id. at *3 ("Where a professional license is required as part of a qualification for a job, a lack of such license renders the employee unqualified for the position"); see also ⚠️ Kinneary v. City of New York, 601 F.3d 151, 152, 156-57 (2d Cir. 2010) (rejecting disability discrimination claim where a sludge boat captain failed to retain his Coast Guard captain's license; "[b]ecause Kinneary failed to retain his captain's license despite receiving the accommodation to which he claims he was entitled, he was not otherwise qualified to perform the essential functions of his job and cannot make out a successful claim under the ADA"); Falchenberg v. New York City Dep't of Educ., 375 F. Supp. 2d 344, 346-48 (S.D.N.Y. 2005) (granting school district's motion to dismiss where plaintiff-teacher did not take a test established by the state education department; plaintiff was "not a qualified individual because she did not take the examination, which the State ha[d] set as a necessary prerequisite to qualification for a teaching certification"); id. at 348 ("Even more significantly, the complaint against the City Defendants must be dismissed because Plaintiff does not allege that she requested a reasonable accommodation from the City Defendants which was refused."); cf. Giblin v. College, No. 5:2-CV-00477(LEK/ATB), 2021 WL 781363, at *1, 6-10 (N.D.N.Y. Mar. 1, 2021) (denying in part defendant's motion to dismiss a plaintiff-teacher's disability discrimination claims and rejecting defendant's argument that the plaintiff was not otherwise qualified for the position despite her inability to obtain a doctoral degree within one year; noting that "[c]ertain allegations [in the complaint] regarding how the job is actually performed in practice[ ] provide additional support for an inference that Plaintiff was qualified despite her delayed acquisition of a degree," including "a positive work evaluation that downplayed the significance of her delay in acquiring a degree" (citation and quotation marks omitted)). But this case does not involve a legally mandated license, certification, or other job requirement.

**\*10** In sum, given the facts pled in the proposed SAC as to the functions of the librarian position and Plaintiff's job performance in that position, the Court concludes that it

would be premature to determine, as a matter of law, that Plaintiff is "unqualified" for the librarian position. [10]

CUNY also argues that the proposed SAC does not allege facts showing that Plaintiff was not reasonably accommodated. (Def. Br. (Dkt. No. 26) at 9)

"The Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Quadir, 39 F. Supp. 3d at 538 (quoting 29 U.S.C. § 794). "[R]egulations promulgated under the Rehabilitation Act by the Department of Health and Human Services require recipients of federal funds to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped ... employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." Id. at 538-39 (citation and quotation marks omitted) (emphasis in original).

"Although the reasonableness of an employer's accommodation is a fact-specific question that often must be resolved by a factfinder, where an employer has ... offered[ ] measures to accommodate the disability," the employer may be entitled to judgment as a matter of law "if, on the undisputed record, the existing accommodation is plainly reasonable." ⚠️ Berger v. New York City Police Dep't, 304 F. Supp. 3d 360, 369 (S.D.N.Y. 2018) (citations and quotation marks omitted).

As discussed above, based on the proposed SAC's factual allegations, whether Plaintiff was "qualified" to perform the essential functions of his job – with or without reasonable accommodation – presents a question of fact. Acknowledging that CUNY offered Plaintiff an accommodation – the one-year extension he sought to obtain his second master's degree – it rejected his request for a second one-year extension. Whether or not Plaintiff's request for a second extension was reasonable presents a fact question, given well-pleaded facts suggesting that the second master's degree has little bearing on the job functions of a CUNY librarian. See, e.g., ⚠️ Ralph v. Lucent Techs., Inc., 135 F.3d 166, 172 (1st Cir. 1998) ("The defendant argues that it has already made a reasonable accommodation to the plaintiff's disability by giving him 52 weeks of leave with pay, plus changing

his work assignment and supervisor. The duty to provide reasonable accommodation is a continuing one, however, and not exhausted by one effort."). [11] "Ultimately, these fact-intensive questions are reserved for later proceedings. All that [a plaintiff] must do at the motion to dismiss stage is plead the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Limauro v. Consol. Edison Co. of New York, Inc., No. 20-CV-03558 (CM), 2021 WL 466952, at *8 (S.D.N.Y. Feb. 9, 2021) (citation and quotation marks omitted) (emphasis omitted).

## CONCLUSION

*11  For the reasons stated above, Defendants' motion to dismiss the Amended Complaint (Dkt. No. 25) is granted. Plaintiff's motion for leave to amend (Dkt. No. 23) is granted to the extent that Plaintiff may file a Second Amended Complaint against Defendant CUNY pleading a Rehabilitation Act Section 504 claim. The Second Amended Complaint is to be filed by **April 2, 2021**.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 1226498

## Footnotes

1  Defendants assert that they are moving to dismiss Plaintiff's proposed Second Amended Complaint. (See Mot. (Dkt. No. 25)) Because the proposed Second Amended Complaint has not yet been approved for filing, Defendants' motion to dismiss it is premature. The Court construes Defendants' motion as one to dismiss the operative complaint, which is the Amended Complaint.

2  The facts set forth in the Amended Complaint are presumed true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

3  Defendant "City College is a public senior college of the CUNY school system." (Am. Cmplt. (Dkt. No. 12) ¶ 7)

4  The Amended Complaint does not identify the source of the quoted material.

5  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

6  Although the Amended Complaint does not reference a particular title under the ADA, only ADA Title I provides a basis for Plaintiff's ADA claim for disability discrimination in employment. See Mary Jo C. v. New York State & Loc. Ret. Sys., 707 F.3d 144, 171 (2d Cir. 2013) ("[W]e conclude that the [ADA] unambiguously limits employment discrimination claims to Title I. A public employee may not bring a Title II claim against his or her employer, at least when the defendant employer employs fifteen or more employees."). Accordingly, the ADA Title II cases cited by Plaintiff (Pltf. Opp. Br. (Dkt. No. 28) at 4) are not on point.

7  "Courts in this Circuit have held that New York State's continued receipt of federal funds under § 504 after [Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 113 (2d Cir. 2001)] 'constitutes a knowing waiver of sovereign immunity.' " Seitz v. New York State, No. 2:18-CV-4149 (PKC) (LB), 2019 WL 4805257, at *6 (E.D.N.Y. Sept. 30, 2019) (quoting Gentleman v. State Univ. of N.Y.-Stony Brook, 16-cv-2012 (ADS) (AKT), 2016 WL 6892151, at *5 (E.D.N.Y. Nov. 21, 2016)); see also Hamm v. City Univ. of New York, 20-CV-2876 (LLS), 2020 WL 4547226, at *3 (S.D.N.Y. Aug. 5, 2020) (finding that claims against CUNY pursuant to Section 504 are not barred by the Eleventh Amendment); Quadir v. New York State Dep't of Lab.,

39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014) ("Since the Rehabilitation Act does include such a requirement [*i.e.*, Congress conditioning acceptance of funds pursuant to the Rehabilitation Act on the waiver of immunity] and New York does accept federal funds, New York has waived sovereign immunity with respect to [Rehabilitation Act] claims." (citation and quotation marks omitted)).

8    CUNY also argues that "Plaintiff's opposition brief does not address [CUNY's] arguments regarding [Plaintiff's] failure to state a claim of employment discrimination under Section 504 of the Rehabilitation Act," and that accordingly Plaintiff has "abandon[ed] that purported claim." (Def. Reply Br. (Dkt. No. 27) at 4) While it is true that, "[a]t the motion to dismiss stage, ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim," Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08-CV-442 (TPG) (FM), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014), as discussed above, in moving to dismiss a pleading that has not yet been received for filing, Defendants acted prematurely. Moreover, Plaintiff's arguments in support of his Section 504 claim are set forth in his motion to amend. (See Dkt. No. 23)

9    Because Section 504 claims and ADA claims are analyzed pursuant to the same standards, this Court may rely on cases brought under the ADA. See Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (explaining that unless the "subtle distinctions" between a Title II ADA claim and a Section 504 claim are "pertinent to a particular case," "claims under the two statutes" are treated "identically"); De Figueroa v. New York, 403 F. Supp. 3d 133, 158 (E.D.N.Y. 2019) ("Claims of disability discrimination brought pursuant to Title I of the ADA and the Rehabilitation Act are analyzed under the same standards"). While a Section 504 plaintiff "must [also] show that the defendants receive federal funding," Ramirez v. Bernstein, No. 17 CV 3825 (VB), 2020 WL 7230729, at *7 (S.D.N.Y. Dec. 7, 2020) (citation and quotation marks omitted), that element is not contested here.

10    CUNY also contends that "the allegations in the proposed Second Amended Complaint fail to meet the fourth factor required to state a claim under Section 504. Plaintiff concedes that his employment contract was not renewed six years after he was first employed as a reference librarian and after he failed to earn a second graduate degree. Nowhere does Plaintiff allege that his employment was terminated because of his disability." (Def. Br. (Dkt. No. 26) at 9 (citing SAC (Dkt. No. 23-1) ¶¶ 13-14, 22)) The Court disagrees. Plaintiff has alleged that he was terminated because he was denied a reasonable accommodation – an additional year to obtain his second master's degree due to his disability. (SAC (Dkt. No. 23-1) ¶¶ 17-18, 20-25, 27, 29)

11    Parker v. Columbia Pictures Industries, 204 F.3d 326 (2d Cir. 2000) – cited by CUNY – is not on point. In Parker, the Second Circuit stated that "[t]he duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover...." Id. at 338. Here, Plaintiff requested a second year-long extension of the deadline to obtain his second master's degree. He did not seek an indefinite extension of time.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 85 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 6878729
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joshua GARCIA, Plaintiff,

v.

NYC HEALTH & HOSPITALS CORPORATION
doing business as NYC Health + Hospitals, Defendant.

19 Civ. 997 (PAE)
|
Signed 12/17/2019

**Attorneys and Law Firms**

Michael Patrick Hilferty, Nina Alexandra Ovrutsky, White, Hilferty & Albanese P.C., New York, NY, for Plaintiff.

Kimberly Kirsten Brown, The City of New York Law Department, New York, NY, for Defendant.

OPINION AND ORDER

PAUL A. ENGELMAYER, District Judge:

**\*1** Plaintiff Joshua Garcia brings this action against defendant New York City Health and Hospitals Corporation ("H+H"), which operates New York City's public hospitals. Garcia works as a hospital care investigator ("HCI") in the Managed Care Department at the Woodhull Medical and Mental Health Center ("Woodhull Medical") in Brooklyn, New York. He has been employed by H+H since 2010. He alleges that H+H discriminated against him by failing to promote him, fostering a hostile work environment, and retaliating against him on the basis of his race, sexual orientation, and disability. He brings these claims under Title VII of the Civil Rights Act, 🔖 42 U.S.C. § 2000e-3(a) *et seq.* ("Title VII"), the Americans with Disabilities Act of 1990, 42 U.S.C. § 2000 *et seq.* ("ADA") (as amended 2008); the Civil Rights Act of 1866, 🔖 42 U.S.C. § 1981; the Civil Rights Act of 1964, 🔖 42 U.S.C. § 1983; and the New York City Human Rights Law ("NYCHRL").[1]

Pending now is H+H's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants H+H's motion in its entirety.

## I. Background [2]

### A. Facts

#### 1. The Parties

H+H is a non-profit organization that operates the public hospitals in New York City. Since May 2010, Garcia has worked for H+H at Woodhull Medical and Mental Health Center as a hospital care investigator. FAC p. 3 ¶¶ 16, 18.[3] Garcia is a gay Hispanic man who suffers from several mental health conditions as well as HIV. *Id.* p. 2 ¶¶ 13–15. As summarized below, throughout his employment as an HCI at Woodhull Medical, Garcia was transferred among workstations within the hospital.

#### 2. Overview of Garcia's Factual Allegations

In August 2017, Wedith Pascal became Garcia's supervisor. *Id.* p. 4 ¶ 23. In September 2017, Pascal promoted one of Garcia's co-workers, Marie Louissaint, to an unspecified management position. *Id.* p. 4 ¶ 30. According to Garcia, this position had not been posted online in accordance with H+H's policies. *Id.* p. 5 ¶ 31. Garcia believed that Louissaint had been promoted instead of him as a result of discrimination by Pascal on the basis of Garcia's race, sexual orientation, and/or disability. *Id.* p. 5 ¶ 32, p. 21 ¶¶ 136–41. Garcia complained to his union. *Id.* p. 5 ¶ 33.

**\*2** Following his union complaint, Garcia observed a co-worker monitoring his attendance and performance, and surmised that this was being done at Pascal's direction. *Id.* p. 5 ¶ 35. Pascal then informed Garcia that she was aware that he had filed a union complaint against her and that he would be relocated to a workspace in the Rehab Office. *Id.* pp. 5–6 ¶¶ 36–38. Garcia told Pascal that the proposed workspace would exacerbate his mental health conditions, including his claustrophobia. *Id.* p. 6 ¶ 39. Garcia later provided Pascal with medical documentation of his condition, and asked to remain at his workspace in the Managed Care Department. *Id.* p. 6 ¶ 41.

This marked the beginning of a series of communications between Garcia and H+H, in which H+H informed Garcia that he would be relocated to various workspaces in the hospital, and Garcia objected on account of disabilities. Between

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 86 of 134

September 2017 and September 2018, H+H relocated or attempted to relocate Garcia's workstation from the Managed Care Department to the Rehab Office, *id.* pp. 5–6 ¶¶ 36–38, the Pharmacy Department, *id.* p. 8 ¶ 60, several unspecified workspaces, *id.* pp. 11–12 ¶¶ 80–82, p. 14 ¶ 96, the Patient Accounts Office, *id.* p. 16 ¶ 107, the Accounts Receivable room, *id.* p. 17 ¶ 112, and the Rehab Office again, *id.* p. 18 ¶ 117. Garcia alleges that, despite his medical documentation, H+H repeatedly refused to engage in good faith in reasonably accommodating his condition, and that Pascal's repeated attempts to move him from his workspace in the Managed Care Department were acts of retaliation for his union complaint about Louissant's promotion.

Separately, Garcia alleges that he was subjected to other acts of retaliation, including further monitoring of his performance and attendance by a co-worker, *id.* p. 6 ¶ 45, and a baseless accusation by a co-worker that he had become irate and pushed her, *id.* p. 16 ¶ 110.

Garcia also alleges that on several occasions, Pascal and other hospital employees improperly disclosed protected information about his medical conditions. On one occasion, Garcia alleges, Pascal publicly questioned him about his disabilities in response to his request for Family Medical Leave Act ("FMLA") leave. *Id.* p. 4 ¶¶ 26–29. On another, Garcia alleges that H+H Equal Employment Officer ("EEO") David Smart, in a meeting about Garcia's reasonable accommodation requests, "began probing [Garcia] about the events which triggered [his] anxiety and panic attacks." *Id.* p. 10 ¶ 70. Garcia also alleges that Smart improperly disclosed his health information to another EEO, James Keys. *Id.* p. 10 ¶ 73. Garcia further alleges that another supervisor, Joelle Auguste, improperly asked Garcia about the circumstances surrounding his FMLA leave, inquired with human resources about Garcia's FMLA status, and then sent Garcia an email, on which other employees were copied, in which Auguste disclosed information about Garcia's FMLA leave for his mental health and claimed that Garcia's leave had expired. *Id.* p. 18 ¶¶ 113–16.

Finally, Garcia alleges a number of incidents that he claims amounted to a hostile work environment. The Court first summarizes the incidents predating Garcia's complaint to the New York State Department of Human Rights ("SDHR") on January 4, 2018, and then those that occurred afterwards.

*i. Before January 4, 2018*

Garcia alleges that, on four occasions between September and December 2017, Pascal verbally berated him and/or slammed her hands on a desk while speaking with him. *Id.* p. 6 ¶ 44, p. 7 ¶¶ 51–52, p. 9 ¶ 66, p. 10 ¶ 68. On October 11, 2017, Garcia alleges that he overhead Pascal and Smart speaking in Haitian Creole and referring to him as a "faggot." *Id.* p. 8 ¶ 55. The following day, Garcia alleges that he entered a room and one of his co-workers "began singing religious music while sitting at a table with an open bible" and then said, in what Garcia perceived to be a reference to him, "God Bless him. God Bless everyone." *Id.* p. 8 ¶ 57. In December 2017, Garcia's supervisor Auguste, in an email requesting Garcia's schedule of medical appointments for which he had requested FMLA leave, stated that it was "unfair" to staff members who had to cover Garcia's shifts. *Id.* p. 13 ¶ 90.

*ii. After January 4, 2018*

**\*3** In March 2018, Garcia complained to his union that co-worker Emma Flynn had begun referring to Garcia as "the sick one" in reference to his disabilities and requests to maintain his workstation in the Managed Care Department. *Id.* p. 15 ¶ 105. On July 5, 2018, Garcia alleges that another coworker, Raquel Kenley, placed her hand on Garcia's rear end and commented that she had "never seen a man with a butt so big." *Id.* p. 17 ¶ 109. In August 2018, Garcia's supervisor Auguste refused to sign Garcia's FMLA requests. *Id.* p. 18 ¶ 113. In September 2018, Kenley told Garcia she had decided to nickname him "Skittles," which Garcia understood to be a reference to his sexual orientation. *Id.* p. 18 ¶ 118. Thereafter, in December 2018, Garcia alleges that Kenley began throwing Skittles wrappers in the garbage can by his desk, *id.* p. 20 ¶ 130, and, on January 2, 2019, left a bag of green Skittles with a red bow on his desk, *id.* p. 20 ¶ 131. Finally, Garcia alleges that in November 2018, he was subjected to unfounded complaints about his timesheets. *Id.* p. 19 ¶¶ 128–29.

**B. Procedural History**
On January 4, 2018, Garcia filed a complaint of discrimination with the SDHR. Dkt. 19 ("Brown Dec."), Ex. A ("SDHR Complaint") at 5. The complaint was forwarded to the EEOC and, on March 8, 2018, the EEOC notified H+H of the complaint. Brown Dec., Ex. B. On July 6, 2018,

the SDHR issued a finding of "no probable cause" and closed the complaint. Brown Dec., Ex. C. ("SDHR Findings"). On November 5, 2018, the EEOC adopted the SDHR's findings, closed its investigation, and issued a right to sue letter. Brown Dec., Ex. D.

On February 1, 2019, Garcia filed his initial complaint. Dkt. 1. On May 23, 2019, H+H filed a motion to dismiss, Dkt. 13, a supporting declaration of Kimberly K. Brown, Esq., Dkt. 14, and a supporting memorandum of law, Dkt. 15.

On May 24, 2019, the Court issued an order directing Garcia either to file an amended complaint or oppose H+H's motion. Dkt. 16. On June 12, 2019, Garcia filed the FAC. FAC. On July 2, 2019, H+H filed a motion to dismiss the FAC, Dkt. 18, a supporting declaration by Brown, "Brown Dec.," and a supporting memorandum of law, Dkt. 20 ("Def. Mem."). On July 18, 2019, Garcia filed an opposition. Dkt. 21 ("Opp'n"). On July 25, 2019, H+H filed its reply. Dkt. 23 ("Reply").

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. Garcia's Title VII Claim of Discrimination

In his first claim, Garcia alleges that H+H discriminated against him in violation of Title VII, on the basis of both his sexual orientation and race. FAC pp. 20–21 ¶¶ 133–42. This claim challenges H+H's decision to promote his coworker Louissaint over him, and alleges that H+H created a hostile work environment in which Garcia was called derogatory names, yelled at by his supervisor Pascal, and had co-workers leave Skittles candy wrappers near his workstation.

### 1. Conduct Post-Dating Garcia's SDHR Complaint

H+H first argues that a portion of Garcia's allegations—those based on incidents which occurred after he filed his complaint with the SDHR on January 4, 2018—must be dismissed for failure to exhaust administrative remedies. Def. Mem. at 7–8; Reply at 1–2. H+H is correct.

**\*4** "Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to exhaust the administrative remedies provided by the statute. That is, a Title VII plaintiff generally must file a charge of discrimination with the EEOC 'within three hundred days after the alleged unlawful employment practice occurred,' 42 U.S.C. § 2000e-5(e)(1), and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency, *id.* § 2000e-5(f)(1)." *Duplan v. City of New York*, 888 F.3d 612, 621–22 (2d Cir. 2018) (internal citation omitted). Garcia never filed a second EEOC complaint alleging conduct occurring after January 2018.[4] Nor is the later conduct "reasonably related" to the conduct Garcia had previously alleged. *Id.* at 622; *see also Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (1991). For example, Garcia pleads that on July 5, 2018, a coworker put her hand on his rear end and stated that she had "never seen a man with a butt so big." FAC p. 17 ¶ 109. This conduct finds no precursor in the earlier acts Garcia alleged in January 2018. Similarly, Garcia pleads that beginning in September 2018, a coworker began calling him "Skittles," which Garcia interpreted to refer to his sexual orientation, and later left Skittles wrappers near his workstation. *Id.* p. 18 ¶ 118, p. 20 ¶¶ 130–31. This, too, is completely unrelated to any of the conduct that Garcia alleged in his January 2018 SDHR complaint. The post-January conduct Garcia pleads thus cannot be considered in assessing his Title VII claims.

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 88 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

## 2. Garcia's Failure to Promote Claim

At the outset, the Court notes that Garcia did not include his failure to promote claim in his SDHR complaint. Garcia did not check the box "denied me a promotion / pay raise" in the section of the form that asks complainants to list all discriminatory acts they are alleging. SDHR Complaint at 2. Nor does he mention the failure to promote him in his narrative of H+H's alleged discrimination. [5] *Id.* at 3. And the SDHR's decision, which details the allegations raised by Garcia, does not mention the denied promotion. SDHR Findings at 1–2.

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court. The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action. The administrative exhaustion requirement applies to *pro se* and counseled plaintiffs alike." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (internal quotation marks and citations omitted) (emphasis added).

Had H+H pursued this point, the Court might well have dismissed this claim for failure to exhaust. The requirement, however, "is not a jurisdictional requirement; rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses." *Id.* Here, H+H has not claimed failure to exhaust, but instead attacks this claim on the merits, and Garcia therefore had no notice of exhaustion as a basis for dismissal. The Court will not dismiss this claim for an exhaustion defect it has identified *sua sponte*. The Court instead finds that H+H has waived any argument that Garcia has failed to exhaust his administrative remedies with regard to his failure to promote claim. *Francis v. City of New York*, 235 F.3d 763, 766 (2d Cir. 2000) (holding that city had waived any objection that plaintiff failed to exhaust his administrative remedies with regard to Title VII failure to promote claim).

**\*5** The Court, however, agrees with H+H that Garcia has failed to plead sufficient facts to state a plausible claim of a discriminatory failure to promote. Specifically, H+H argues that Garcia has failed to plead facts making out a prima facie case. Def. Mem. at 15–16; Reply at 4–5. To establish a prima facie case of discriminatory failure to promote under Title VII, a plaintiff must allege that: "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a

job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004) (citation omitted). Thus, "in establishing a prima facie case the plaintiff must show that '[he] applied for an available position for which [he] was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.' " *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Garcia has not pled facts to establish that he was qualified for the position for which he was allegedly passed over. Indeed, the only fact he pleads regarding his qualifications is that he has maintained employment in his current position since 2010. FAC p. 29 ¶ 133 ("Mr. Garcia performed her [sic] responsibilities in a satisfactory manner since 2010, evincing that he is qualified for the position."); *see also id.* p. 21 ¶ 137, p. 25 ¶ 158, p. 28 ¶ 174. This, without more, is insufficient to establish that Garcia was qualified for the different, managerial post to which Louissant was appointed. Garcia's qualification to retain his current position simply does not speak to that required element. The Court therefore dismisses Garcia's failure to promote claim for failure to plead a prima facie case. *Brown*, 163 F.3d at 710. [6]

## 3. Garcia's Hostile Work Environment Claim

H+H argues that Garcia fails to allege facts making out a prima facie case of a Title VII hostile work environment claim. Def. Mem. at 16–19; Reply at 5–7.

To prevail on such a claim, a plaintiff must establish that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. This standard has both objective and subjective components: the conduct complained of must be severe or

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 89 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive. The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.

🔖 *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (internal quotation marks and citations omitted). "[A] work environment's hostility should be assessed based on the totality of the circumstances." 🔖 *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). Factors that may be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See* 🔖 *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (citation omitted).

Significantly, Title VII "does not set forth a general civility code for the American workplace." 🔖 *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). "[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." 🔖 *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*

**\*6** Finally, to hold an employer liable for such a hostile work environment, "federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90–91 (2d Cir. 2019) (quoting 🔖 *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)). "Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment, *see* 🔖 *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015), and negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it, *see* 🔖 *Summa*, 708 F.3d at 124." *Id.* at 91.

Garcia's hostile work environment claim here turns on the incidents that he alleges occurred before January 4, 2018, the date he filed his EEOC complaint. The allegations he makes relating to such a claim—as opposed to the alleged failure to accommodate his medical needs—are that: (1) Garcia's supervisor "publicly interrogat[ed] [Garcia] about his disability" in response to his FMLA leave request, causing Garcia to suffer "serious humiliation," FAC p. 4 ¶¶ 28–29; (2) Garcia perceived that, on two occasions, a co-worker was monitoring his attendance and job performance, and that this was at the direction of his supervisor, *id.* p. 5 ¶ 35, p. 6 ¶ 45; (3) Garcia overheard his supervisor conversing with another employee and referring to him as a "faggot" in "Haitian," a "dialect" which with Garcia is "familiar," *id.* p. 8 ¶ 55 [7] ; (4) Garcia entered a room and a co-worker "began singing religious music while sitting at a table with an open bible" and then said, in what Garcia took as a reference to him, "God Bless him. God Bless everyone," *id.* p. 8 ¶ 57; and (5) four incidents in which his supervisor verbally berated him and/or slammed her hands on a desk. [8]

Two of these incidents clearly do not support Garcia's claim. His claim that his performance was "monitored" by a coworker fails, without more, to describe hostile or abusive conduct. And a coworker's religious singing and statements towards Garcia are not acts imputable to H+H, as the coworker is not pled to have been his supervisor. Garcia has not pled that "a supervisor used his or her authority to further the creation of a discriminatorily abusive working environment, or that the employer knew or reasonably should have known about harassment by non-supervisory co-workers, yet failed to take appropriate remedial action." 🔖 *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (internal quotation marks and citation omitted). In any event, this conduct, as pled, occurred on one occasion, and it was not so "extraordinarily severe ... [as] to have altered the conditions of [his] working environment." 🔖 *Alfano*, 294 F.3d at 374 (internal quotation marks omitted).

**\*7** As to the remaining incidents, "assess[ing] [them] based on the totality of the circumstances," 🔖 *Patane*, 508 F.3d at 113, Garcia has failed to allege conduct that was either sufficiently severe or pervasive to state a hostile work environment claim under Title VII. These acts do not describe

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 90 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

"harassment of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)) (internal ellipsis omitted).

To be sure, the FAC describes an incident where Garcia was publicly questioned about his disability by his supervisor, four incidents where his supervisor yelled at or was aggressive towards him, and an incident where Garcia believes his supervisor referred to him as a "faggot" in another language. But these isolated acts, however inappropriate, do not rise to the level of creating a hostile work environment under Title VII, even considering "all the circumstances." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993); *see Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) ("Conduct that is merely offensive and not severe or pervasive enough to create an objectively hostile or abusive work environment ... is beyond Title VII's purview." (internal quotation marks and citation omitted)). That Garcia's supervisor yelled at him on four occasions over three months is not "sufficiently continuous and concerted ... to be deemed pervasive," or to make "the workplace ... so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Garcia's] employment were thereby altered." *Alfano*, 294 F.3d at 373, 374. The incidents here are merely "episodic." *Littlejohn*, 795 F.3d at 321. They fall well short of the standards to plead such a claim. [9] Critically, too, with the exception of the incident in which Garcia alleges that he was referred to as a "faggot," the facts alleged do not link the workplace hostility he encountered to his race or sexual orientation. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015) (to survive motion to dismiss, plaintiff must "plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent' " (quoting *Littlejohn*, 795 F.3d at 311)).

**\*8** Garcia has failed to plead a prima facie case of a hostile work environment under Title VII. The Court therefore dismisses this claim.

### B. Garcia's Title VII Claim of Retaliation

Garcia next alleges that H+H, through his supervisor Wedith Pascal, retaliated against him for bringing complaints of discrimination. FAC pp. 21–22 ¶¶ 143–49. In evaluating

Title VII retaliation claims, "courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973)." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). A plaintiff must show: (1) he was engaged in protected activity under Title VII; (2) the employer was aware of that activity; (3) the employer took a materially adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and that adverse action. *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006).

Garcia alleges that he engaged in protected activity when he filed complaints of discrimination both internally and with the SDHR (which dual-filed his complaint with the EEOC). FAC p. 22 ¶ 147. He surmises that his supervisor learned of these complaints via his union, other hospital employees, and the outside agencies. *Id.* p. 22 ¶ 148. He further alleges that on at least one occasion, his supervisor stated that she was aware he had filed a complaint. *Id.* p. 5 ¶ 36. As for acts of retaliation, Garcia claims that his workspace was relocated to other departments, that H+H failed to engage in the ADA reasonable accommodation process in good faith in connection with these moves, that one of his coworkers filed a baseless complaint against him alleging that he had pushed her, and that he was subjected to hostile treatment by his superiors. *Id.* p. 22 ¶ 149. H+H responds that Garcia has failed to establish a prima facie case because he has not pled any facts supporting a finding of a materially adverse employment action. Def. Mem. at 20–21.

"[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57) (internal citation omitted). It is not, however, boundless. The Supreme Court has explained that an adverse action must be *materially* adverse, and that "normally petty slights, minor annoyances, and simple lack of good manners" will not rise to the level of an adverse action. *Burlington*, 548 U.S. at 68; *see also id.* (citing, with approval, *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)), for the proposition that "judicial standards

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 91 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

for sexual harassment must filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" (internal quotation marks omitted)). The Supreme Court has emphasized that the adverse action standard in the Title VII retaliation context is an objective one. *Id.*

**\*9** Turning first to Garcia's claim that his relocation to different workspaces was retaliatory, *see, e.g.*, FAC p. 22 ¶ 149, p. 6 ¶¶ 39–40, p. 16 ¶ 107, p. 20 ¶ 132, Garcia asserts, in a largely conclusory manner, that the new workspaces were significantly worse than the one he had occupied. While Garcia's relocation is separately germane to his ADA claims, *see infra* pp. 19–27, when measured against the objective standard applicable to Title VII claims, such a relocation, without much more, does not rise to the level of a material adverse employment action, as the case law uniformly reflects. *See Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 699 (S.D.N.Y. 2011) ("Defendants also contend that Price's move to the eighth floor does not constitute an adverse employment in the state and city law retaliation context. The Court agrees[.]"); *Cunningham v. N.Y. State Dep't of Labor*, No. 105 Civ. 1127 (DNH), 2010 WL 1781465, at \*6 (N.D.N.Y. Apr. 30, 2010) ("Even if the decision to move plaintiff to the first floor was the product of a retaliatory motive, plaintiff's complaints about his new office fall squarely within the class of trivial harms that the *Burlington* Court held Title VII was not intended to protect against."), *aff'd*, 429 F. App'x 17 (2d Cir. 2011); *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at \*11 (S.D.N.Y. Nov. 30, 2015). Garcia has not alleged any concomitant changes to other dimensions of his job, such as "a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Under these circumstances, a reasonable worker would not have been dissuaded from engaging in protected activity on the basis of a relocation within the hospital alone. *See id.* at 128 ("[T]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (citation omitted)). And, as Garcia admits in his pleading, he was informed that all of the HCIs, not just him, were being transferred out of the Managed Care Department. FAC p. 16 ¶ 108.

The other actions that Garcia alleges were retaliatory also fall well short of qualifying as material adverse actions. Garcia's

claim that his co-worker filed a formal complaint falsely accusing him of becoming irate and pushing her, *id.* p. 16 ¶ 110, does not qualify as an adverse action by his employer, *Kessler*, 461 F.3d at 206, because he has not pled that the coworker was his supervisor or had decision-making authority over him. Garcia's claim that he was subjected to "hostile behavior and treatment" by his superiors in retaliation for his protected actions, FAC p. 22 ¶ 149, is entirely unspecific. *See Iqbal*, 556 U.S. at 678. And Garcia's claim that H+H failed to engage in good faith in the reasonable accommodation process is not a freestanding basis on which to claim retaliation, but part of the inquiry for his ADA claim.

The Court accordingly dismisses Garcia's retaliation claim, for failure to allege a material adverse action in retaliation for engaging in protected activities. [10]

### C. Garcia's ADA Claims of Discrimination

Garcia appears to bring two distinct claims of discrimination under the ADA: one for failure to accommodate and another for retaliation.

### 1. Garcia's Failure to Accommodate Claim

Garcia alleges that H+H discriminated against him in violation of the ADA, 42 U.S.C. §§ 12101–12213 (as amended 2008). FAC pp. 23–24.

Pertinent here, the ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 § 12112(b)(5)(A). "Where, as in this case, a ... plaintiff [with a disability] claims that he can perform a particular job with a reasonable accommodation, the prima facie burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 92 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

**\*10**  Garcia alleges that: his mental health conditions and HIV qualify him as a person with a disability under the ADA, FAC p. 2 ¶¶ 14–15, p. 23 ¶ 112; H+H had notice of his disability as a result of (i) his regular requests for leave under the FMLA, *e.g., id.* p. 3 ¶¶ 19–20, p. 4 ¶¶ 26, 28, and (ii) his later claim that his disability prevented him from working in a different workspace, *e.g., id.* p. 6 ¶ 41, p. 8 ¶ 59 p. 24 ¶ 115; a reasonable accommodation—namely, an "open area with low patient volume and away from contagious patients"—would allow him to complete his assigned duties as an HCI, *id.* p. 12 ¶ 83; and that H+H improperly refused to make such an accommodation, *id.* p. 24 ¶¶ 118–19.

In moving to dismiss, H+H first argues that Garcia has failed to plead sufficient facts to establish that he is a person with a disability under the ADA. Def. Mem. at 23–24; Reply at 8–9. A plaintiff can establish a disability under the ADA by, *inter alia*, showing "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). [11] "The Supreme Court has prescribed a three-step process for determining whether an individual is disabled under subsection (A). First, a court must determine whether the plaintiff suffers from a physical or mental impairment. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, the court determines whether the identified impairment substantially limited that life activity." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009) (internal citations omitted) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).

As to the first step, Garcia pleads that he suffers from several mental health conditions—"panic disorder, anxiety, post traumatic stress disorder ('PSTD'), and claustrophobia," FAC p. 2 ¶ 14—as well as HIV, *id.* For the purposes of the ADA, a "mental impairment" includes "[a]ny mental or psychological disorder, such as an ... emotional or mental illness," 29 C.F.R. § 1630.2(h)(2), and a physical impairment includes, *inter alia*, a "physiological disorder or condition ... affecting one or more body systems such as ... [the] immune" system, *id.* § 1630.2(h)(1). The Court assumes *arguendo* that all of the medical conditions pled by Garcia are qualifying impairments. As to the second step, Garcia's FAC alleges that his qualifying disability substantially limits him from "working." Work is listed in the statutory text as an example

of a major life activity, 42 U.S.C. § 12102(2)(A), and H+H does not contend that it is not.

The Court agrees with H+H, however, that Garcia's FAC falters on the third step of the analysis. He has failed to plead sufficient facts to show that these conditions "substantially limit[ ] one or more major life activities." 42 U.S.C. § 12102(1)(A). H+H's argument as to this requirement is that the facts pled do not show that Garcia's disabilities "substantially limit" him from "working," within the meaning of the ADA. Def. Mem. at 23–24; Reply at 8–9. The EEOC's regulations implementing the ADA, updated after the 2008 ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), provide guidance on what it means to be "substantially limited":

> **\*11**  An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii). [12]  The regulations add that "it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." 29 C.F.R. § 1630.2(j)(4)(i).

Notably, the EEOC's updated regulations no longer include specific language, cited by many of the preceding cases in this Circuit, regarding the major life activity of working. The EEOC's interpretive guidance explains that this is because "[i]n most instances, an individual with a disability will be

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 93 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

able to establish coverage by showing substantial limitation of a major life activity other than working ... [t]his will be particularly true in light of the changes made by the ADA Amendments Act." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. pt. 1630, app. ("EEOC Interpretive Guidance"); *see Monroe v. County of Orange*, No. 14 Civ. 1957 (KMK), 2016 WL 5394745, at *9 (S.D.N.Y. Sept. 27 2016); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13 Civ. 243 (JFB), 2014 WL 3867560, at *14 n.11 (E.D.N.Y. July 29, 2014). However, even after the ADAAA, "[i]n the rare case[ ] where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." EEOC Interpretive Guidance. "A class of jobs may be determined by reference to the nature of the work that an individual is limited in performing ... or by reference to job-related requirements that an individual is limited in meeting." *Id.* Because Garcia has pled that he is substantially limited only in the major life activity of working,[13] FAC p. 2 ¶ 15, p. 23 ¶ 113, the Court applies this guidance.

Garcia nevertheless has failed to clear the low bar required at the motion to dismiss stage. Garcia has pled the following facts regarding his disability: "[H]e cannot be in confined places or places with a high volume of individuals, or near people that are ill/contagious," *id.* p. 2 ¶ 15; "small confined spaces and crowds of people automatically trigger[ ] panic and anxiety attacks," *id.* pp. 11–12 ¶ 81; and his "medical condition requires that he is in an open area with low patient volume and away from contagious patients as a result of his HIV positive status," *id.* p. 12 ¶ 83. Notwithstanding these limitations, Garcia has also pled that his role as an HCI at the hospital, where he began working after developing these impairments and continues to be employed, requires him, *inter alia*, to "conduct[ ] investigations, interviews, and counsel patients, family and other relatives in order to determine and ascertain the[ir] financial ability to pay for services rendered" and "register new patients and issue clinic cards." *id.* p. 3 ¶ 8.

**\*12** Beyond his conclusory statements that he is substantially limited in the area of working, Garcia has simply not pled any facts to support that his "impairment[s] substantially limit[ ] his ... ability to perform a class of jobs or broad range of jobs in various classes as compared to

most people having comparable training, skills, and abilities." EEOC Interpretive Guidance. Such was required of him. *See Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) ("Congress did not modify the definition of the major life activity of working [in the 2008 amendments], and a plaintiff who alleges a work-related disability is still required to show that her impairment limits her ability to 'perform a class of jobs or broad range of jobs.' " (internal quotation marks omitted)), *cert. denied*, No. 19-252, 2019 WL 5686496 (U.S. Nov. 4, 2019); *Mancini v. City of Providence*, 909 F.3d 32, 42 n.6 (1st Cir. 2018); 🚩*Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015); 🚩*Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 835 (10th Cir. 2011) ("Thus, we conclude based on our existing case law, Supreme Court case law, the applicable statute, and the regulations, that to show a disability in the major life activity of working, [plaintiff] was required, even after the enactment of the ADAAA and the modified EEOC regulations, to demonstrate that she was substantially limited in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities."). In particular, Garcia has not pled facts to establish that he is limited from working in his chosen field of healthcare, or even his chosen role of HCI. Rather, he has pled solely that he is unable to perform the duties of an HCI in particular workspace environments within the hospital. FAC p. 24 ¶ 117.

Garcia's inability to perform a particular job at a particular location, or even at several locations, within the hospital where he has long worked, does not, without more, mean that he has a substantial limitation to the major life activity of working. *See* 🚩*Murtha v. N.Y. State Gaming Comm'n*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *10 (S.D.N.Y. Sept. 17, 2019); *Krachenfels*, 2014 WL 3867560, at *14 & n.11. Perhaps facts exist that would have fortified such a claim, but Garcia has not pled them. Because Garcia has failed to plead facts supporting that he is substantially limited in the major life activity of working, he has failed to adequately plead that he is a person with a disability under the ADA. 🚩*Rodal*, 369 F.3d at 118. The Court must deny his ADA discrimination claim for failure to state a claim.

## 2. Garcia's Retaliation Claim

Garcia also appears to claim that he was retaliated against in violation of the ADA. Opp'n. at 17, 18; FAC p. 6 ¶

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 94 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

40, p. 7 ¶ 54, p. 15 ¶ 105, p. 20 ¶ 132. Courts in this Circuit apply the Title VII retaliation test to ADA claims of retaliation. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir. 1999) ("[W]e conclude that it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA."). Thus, "[t]o establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Id.*

As an initial matter, the Court's conclusion that Garcia has not pled sufficient facts to establish that he is disabled within the meaning of the ADA does not preclude him from bringing an ADA claim of retaliation. *See Muller v. Costello,* 187 F.3d 298, 311 (2d Cir. 1999). "[A] plaintiff need not establish that the conduct he opposed was actually a violation of the statute," because, for example, he is not disabled within the meaning of the ADA, "so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." *Id.*

Read in the light most favorable to him, Garcia appears to claim that H+H relocated him to workstations that exacerbated his disabilities in retaliation for filing a complaint with his union alleging H+H's decision to promote a coworker reflected discrimination against him. However, Garcia has failed to plead sufficient facts to support a prima facie claim of ADA retaliation because he has failed to allege that his complaint about the promotion decision "engaged in an activity protected *by the ADA.*" *Sarno,* 183 F.3d at 159 (emphasis added).

**\*13**  "An employee's complaint may qualify as protected activity, satisfying the first element of this test, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. And not just any law—the plaintiff is required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by" the ADA. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs,* 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks and citation omitted) (analyzing first prong of the retaliation test in the identical context of Title VII); *see also Gregory v.*

*Daly,* 243 F.3d 687, 700–01 (2d Cir. 2001) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and citation omitted)) (Title VII retaliation); *McMenemy v. City of Rochester,* 241 F.3d 279, 283 (2d Cir. 2001) ("[T]he employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and citation omitted)) (Title VII retaliation); *Muller,* 187 F.3d at 311 (same) (ADA retaliation).

Here, Garcia has not pled any facts to suggest that H+H's decision to promote his coworker instead of him violated the ADA or that he ever complained to his union that it did. Rather, as alleged, Garcia challenged the promotion decision as unlawful on other grounds: that H+H's failure to post the position on its website breached its internal policies, FAC p. 5 ¶ 31, p. 17 ¶ 107, p. 21 ¶ 141, p. 25 ¶ 162, p. 28 ¶ 178, p. 29 ¶ 135, and that H+H "discriminate[d] against [him] on the basis of his race [by] failing to provide [him with] the opportunity to apply for the position [to which] it promoted" his coworker, *id.* p. 29 ¶ 134; *see also id.* p. 21 ¶ 140, p. 25 ¶ 161, p. 28 ¶ 177. Although this complaint, sounding as it does in Title VII, could have (if otherwise well-pled) supported a Title VII retaliation claim, it does not describe protected activity *under the ADA.* And Garcia's FAC does not plead that Garcia had a good faith belief that in filing his complaints, he was engaging in protected activity under the ADA. *See Muller,* 187 F.3d at 311 (retaliation claim sufficient if plaintiff had "a good faith, reasonable belief that the underlying challenged actions of the employer violated" ADA).

The Court therefore dismisses Garcia's ADA retaliation claim for failure to plead a prima facie case.

**D. Garcia's § 1981 Claim of Discrimination**

Garcia also claims discrimination in violation of 42 U.S.C. § 1981. Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* § 1981(a). "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

Garcia's § 1981 claim relates to the promotion he did not receive. He alleges that H+H "interfered with [his] right to contract the sale of his labor by denying him the equal opportunity to apply for a position and advance within his employment." FAC p. 28 ¶ 179. H+H responds that Garcia is precluded from bringing this claim because the SDHR considered and rejected this claim on the merits, Def. Mem. at 9; Reply at 2, and that his claim fails on the merits.

The Court rejects H+H's claim of issue preclusion. Under New York law, which governs issue preclusion, *see Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 730 n.7 (2d Cir. 2001) (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)), issue preclusion occurs if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding," *see Vargas v. City of New York*, 377 F.3d 200, 205–06 (2d Cir. 2004). "The burden of proving identity of the issue rests on the proponent of collateral estoppel [here, H+H], while the opponent bears the burden of proving that he or she did not have a full and fair opportunity to litigate the issue." *Kosakow*, 274 F.3d at 730.

**\*14** H+H has failed to show an identity of issue between Garcia's SDHR complaint and the FAC. Garcia's § 1981 claim is based on H+H's failure to promote him. FAC p. 28 ¶ 179. But as explained earlier, his SDHR complaint did not allege this as an instance of discrimination. There is thus no identity of issue between the SDHR complaint and the § 1981 claim here.

In any event, H+H's preclusion argument would fail because Garcia did not have a full and fair opportunity to litigate this claim in the SDHR proceeding. "In determining whether a party had a full and fair opportunity to litigate the issue, the New York Court of Appeals has instructed that 'the various elements which make up the realities of litigation,' should be explored, including 'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.' " *Kosakow*, 274 F.3d at 734 (quoting *Schwartz v. Pub. Adm'r*, 24 N.Y.2d 65, 72 (1969)). In *Kosakow*, the Second Circuit held that a plaintiff, whose FMLA claim the SDHR had rejected for lack of probable cause and who did not appeal that decision to the New York Supreme Court, lacked a full and fair opportunity to litigate her claim, and therefore was not precluded from bringing it in federal court. *Id.* at 736. The Circuit noted, among other factors, that no discovery had been taken in the SDHR proceeding, and that no hearing had been held at which plaintiff could call and cross-examine witnesses and submit evidence. *Id.* at 734–36. Rather, the determination appeared to have been made on the papers. *Id.* The Circuit further noted that plaintiff had proceeded *pro se* before the SDHR. *Id.* Applying the *Schwartz* factors, 24 N.Y.2d at 72, the Circuit in *Kosakow* found that issue preclusion could not fairly apply. *Kosakow*, 274 F.3d at 736; *see also Elliott*, 478 U.S. at 797–98; *Allied Chem. v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 276–77 (1988).

This reasoning yields the same conclusion here. As in *Kosakow*, 274 F.3d at 734, the SDHR's decision in

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 96 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

Garcia's case states that it found "no probable cause" "after investigation," but it does not indicate that any discovery was taken or any hearing held, and Garcia also appears to have proceeded before the SDHR *pro se*. Consistent with *Kosakow*, and cases applying it, [14] the Court finds Garcia is not barred by issue preclusion from bringing his § 1981 claim challenging H+H's failure to promote him.

H+H's challenge to the substance of Garcia's § 1981 claim, however, presents a different question. *See* Def. Mem. at 9–11; Reply at 2–3. The Court agrees that Garcia has not pled a prima facie case. "[T]he express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for [a] violation of the rights guaranteed in § 1981 by state governmental units." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Here, Garcia has sued only H+H, an arm of the city. Therefore, to successfully make out a prima facie case under § 1981, he must plead facts sufficient to support a claim of § 1983 municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 692–94 (1978), *i.e.*, that the "challenged acts were performed pursuant to a municipal policy or custom." *Duplan*, 888 F.3d at 621 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)). To show a municipal policy, custom, or practice,

> **\*15** the plaintiff need not identify an express rule or regulation. It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials. A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. Liability of a municipal

defendant or an individual sued in his official capacity under § 1981 and § 1983 cannot, however, be premised on a theory of *respondeat superior*.

*Patterson*, 375 F.3d at 226 (internal citations and quotation marks omitted). A plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must also show that the discrimination was intentional. *Id.*

Garcia's FAC falls far short of this standard. It does not plead any facts to support his claim that H+H's decision not to promote him was the result of racial discrimination, let alone that this was pursuant to a policy, custom, or practice. To the contrary, Garcia alleges that his supervisor Pascal breached required policies by promoting Louissant without posting the position. FAC p. 5 ¶ 31, p. 29 ¶ 135. The FAC also does not plead facts suggesting that Pascal was an official with final policymaking authority for the purposes of municipal liability, *see Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000), that any other such policymaker ordered or ratified Pascal's decision, *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004), or that a policymaker "exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice[ ] [and] that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983," *id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

The Court therefore dismisses Garcia's § 1981 claim.

### E. Garcia's § 1983 Claim of Discrimination

Garcia's final federal law claim, under 42 U.S.C. § 1983, FAC pp. 28–29 ¶¶ 128–38, embraces both his claim of a discriminatory failure to promote and his claim of discriminatory retaliation.

Garcia's § 1983 failure to promote claim fails for the same reasons as his § 1981 claim. His FAC does not, *inter alia*, plead facts to establish *Monell* liability.

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 97 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

Garcia's 🚩 § 1983 retaliation claim fails for the same reasons as his Title VII claim. "[T]he elements of a retaliation claim based on an equal protection violation under 🚩 § 1983 mirror those under Title VII." *Vega*, 801 F.3d at 91. "[F]or a retaliation claim under 🚩 § 1983 to survive ... a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination." *Id.* Garcia's 🚩 § 1983 claim alleges that, in retaliation for his complaints about the allegedly improper promotion of his colleague, H+H "thereafter retaliate[ed] against [him] by relocating him in direct conflict with his medical restrictions." FAC p. 29 ¶ 137. But, as reviewed earlier, Garcia's relocation within the hospital did not rise to the level of an adverse employment action under Title VII. It therefore cannot constitute an adverse employment action for the purposes of 🚩 § 1983. *Vega*, 801 F.3d at 91. Further, as noted earlier, Garcia has not pled sufficient facts to support a claim of retaliation under the ADA. His FAC, in any event, does not claim that the retaliatory conduct at issue was pursuant to a municipal policy or custom.

**\*16** For all these reasons, the Court dismisses Garcia's 🚩 § 1983 claim.

### F. Garcia's Claims Under the NYCHRL

The Court now turns to Garcia's two claims under the New York City Human Rights Law ("NYCHRL"), for discrimination, N.Y.C. Admin. Law § 8-107(1); FAC pp. 26–27 ¶¶ 165–70, and retaliation, N.Y.C. Admin. Law § 8-107(7); FAC pp. 27–28 ¶¶ 171–79. The conduct underlying these claims tracks that alleged in Garcia's federal claims.

H+H argues that these claims are almost entirely barred by the doctrine of election of remedies. Def. Mem. at 11–12; Reply at 3. The election of remedies bar is jurisdictional, such that claims dismissed pursuant to it must be dismissed under Fed. R. Civ. P. 12(b)(1) rather than Rule 12(b)(6). *Moodie v. Fed. Reserve Bank*, 58 F.3d 879, 882 (2d Cir. 1995).

Section 8-502 of the NYCHRL provides that an individual will not have "a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate" if they "filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence." N.Y.C. Admin. Law § 8-502(a). H+H argues that this bars Garcia from bringing a cause of action in this court for any claim he raised, or could have raised, with the SDHR when he filed his complaint on January 4, 2018. Def. Mem. at 12; Reply at 3.

The Court, mostly, agrees with H+H. "[B]y the terms of the ... code ... [NY]CHRL claims, once brought before the [SDHR], may not be brought again as a plenary action in another court. Furthermore, once a plaintiff brings a case before the [SDHR], he or she may appeal only to the Supreme Court of State of New York. [Garcia] failed to appeal the adverse rulings by the [SDHR] to the Supreme Court of the State of New York, and [has] instead attempted to relitigate [his] claims in the United States District Court, in contravention of the ... code scheme[ ] detailed above." *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002). Thus, the election of remedies provision in the NYCHRL provides a "direct bar" to the alleged claims of discrimination and retaliation brought in the FAC to the extent that "(1) [Garcia]'s complaint to the SDHR expressly included these claims, [and] (2) the SDHR concluded after an investigation that there was 'no probable cause' to believe such prohibited conduct occurred" because "when the SDHR has issued a finding of no probable cause[,] ... [a] plaintiff has already litigated the claims before the SDHR." *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 188 (S.D.N.Y. 2011) (alterations omitted); *accord Williams v. City of New York*, 916 F. Supp. 2d 517, 522 (S.D.N.Y. 2013).

The election of remedies provision in the NYCHRL also bars Garcia from bringing a NYCHRL claim in this Court to the extent that the claim "aris[es] out of the same incident," 🚩 *Higgins*, 836 F. Supp. 2d at 188, or is "based on the same operative events he presented to the SDHR," 🚩 *id.* at 189; *see also Williams*, 916 F. Supp. 2d at 521–22; *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 225 n.3 (S.D.N.Y. 2010). "That is because the New York Court of Appeals has interpreted the State Human Rights Law as precluding an action in court that is based upon the same incident as the Agency complaint." 🚩 *Higgins*, 836 F. Supp. 2d at 188 (internal quotation marks omitted); *see also id.* ("The election

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 98 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

of remedies bar also precludes consideration of any claim —whether brought under the NYSHRL or the NYCHRL— arising out of the same incident on which [plaintiff]'s SDHR complaint was based."); *Moodie*, 58 F.3d at 883 (citing *Emil v. Dewey*, 49 N.Y.2d 968, 969 (1980)).

**\*17** This doctrine precludes the majority of Garcia's NYCHRL claims. But not all. As noted, Garcia's SDHR complaint did not mention H+H's discriminatory failure to promote him. Garcia raises that claim for the first time in this Court. The Court therefore has jurisdiction to hear Garcia's failure to promote claim under the NYCHRL. FAC p. 25 ¶¶ 158–62. The Court similarly has jurisdiction to hear Garcia's NYCHRL claims relating to incidents which occurred after he filed his SDHR complaint on January 4, 2018. These include, *inter alia*, his claims that a co-worker "placed her hand on [Garcia's] rear end" and allegedly stated, "I've never seen a man with a butt so big," FAC p. 17 ¶ 109, a claim which H+H concedes is not precluded by the election of remedies doctrine, Def. Mem. at 13; Reply at 8, and his claim that he was called "Skittles" by a coworker and that coworkers left Skittle wrappers around his workstation, FAC p. 18 ¶ 118, p. 20 ¶¶ 130–31. The remainder of Garcia's claims under the NYCHRL, however, are precluded by the election of remedies doctrine. The Court dismisses them pursuant to Rule 12(b)(1).

As to Garcia's NYCHRL claims that are not dismissed, the Court must determine whether to exercise supplemental jurisdiction over them. Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may, at its discretion, "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (3). The Supreme Court has instructed that, in deciding whether to exercise supplemental jurisdiction, a district court should balance the traditional "values of judicial economy, convenience, fairness, and comity," *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and that, as a general rule, "when the federal claims are dismissed the

'state claims should be dismissed as well,' " *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

Here, no circumstances counsel in favor of exercising supplemental jurisdiction over Garcia's remaining municipal law claims, given the Court's dismissal of all of Garcia's federal claims. The Court has not invested the judicial resources necessary to resolve these non-federal claims or even determine if Garcia has pled sufficient facts to make out a prima facie case. Nor do convenience, fairness, or comity require the Court to exercise supplemental jurisdiction. Finally, dismissing the municipal-law claims now, at the motion to dismiss stage, would not cause substantial delay, because the parties have not yet engaged in discovery. The Court accordingly declines to exercise supplemental jurisdiction over Garcia's remaining NYCHRL claims. These claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants H+H's motion to dismiss all of Garcia's federal claims, with prejudice. The Court also grants H+H's motion to dismiss, with prejudice, Garcia's claims under the NYCHRL, with the exception of his claims challenging H+H's failure to promote him and his claims arising out of incidents that occurred after he filed his SDHR complaint on January 4, 2018. As to these NYCHRL claims, the Court declines to exercise supplemental jurisdiction and therefore dismisses them without prejudice.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 18 and to close this case.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 6878729

Case 5:23-cv-00490-GTS-ML   Document 6   Filed 08/14/23   Page 99 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

## Footnotes

1    Although the initial complaint asserted claims under the New York State Human Rights Law ("NYSHRL"), the First Amended Complaint ("FAC") does not. The Court assumes that Garcia has dropped these claims.

2    The Court draws the facts in this opinion principally from the FAC. Dkt. 17 ("FAC"). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in Garcia's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

3    The paragraphs in the FAC are not numbered consistently, and repeat themselves in several places. *See* FAC pp. 16, 23, 24, 25, 26, 28. The Court will therefore cite the FAC by both page and paragraph number.

4    The FAC asserts that Garcia filed an EEOC complaint on March 8, 2018, FAC p. 15 ¶ 101, but this was the date of the EEOC notice informing H+H of its investigation. Brown Dec., Ex. B. Garcia's SDHR complaint was filed on January 4, 2018. SDHR Complaint at 5.

5    Garcia's narrative description, in its entirety, stated: "Since September 2017 I have undergone retaliation, discrimination, and been refused accommodations. A fellow peer had been monitoring my time and I reported it to my union. My manager Wedith Pascal approached me in regards to my report and since then has done everything in her power to make work unbearable. I have written multiple statements reporting such behavior to the union to no avail. I have consistently [illegible] of harassment by Wedith Pascal and David Smart (acting EEO) who[ ] denied my reasonable accommodation. I was reassigned to a location that all members of management were aware would affect my conditions. I can provide any necessary paperwork to affirm my allegations. Also disclosure of my health conditions violating HIPAA rights and laws." SDHR Complaint at 3.

6    In light of the dismissal on this ground, the Court need not reach H+H's additional arguments for dismissal, including that Garcia has failed to plead that his credentials were superior to Louissant's, Def. Mem. at 16, or to identify the specific promotion he applied for but did not receive, *id.* at 15–16, Reply at 5.

7    Much more than a "dialect," Haitian Creole is one of two official languages of Haiti and is spoken by an estimated eight million people worldwide. Albert Valdman, *Creole: The National Language of Haiti*, INDIANA UNIVERSITY CREOLE INSTITUTE, http://www.indiana.edu/~creole/creolenatllangofhaiti.shtml.

8    Specifically, Garcia alleges: an incident in which his supervisor began "berating [him] while slamming her hands on the table in an aggressive manner towards" him, FAC p. 6 ¶ 44; an incident in which his supervisor "showed signs of physical aggression and slammed her hand on her desk," *id.* p. 7 ¶ 51; an incident in which, after Garcia refused to relocate to a different workstation, his supervisor "abruptly approached [his] desk and started screaming, 'Move now! As I say, I am the Boss and you must do what I say!' " *id.* p. 9 ¶ 66; and an incident in which his supervisor "verbally berate[d] [Garcia] and then aggressively slam[med] her hands on the desk in an effort to intimidate" him, *id.* p. 10 ¶ 68.

9    *See, e.g., Littlejohn*, 795 F.3d at 321 (holding allegations that the employer made negative statements about plaintiff, was impatient and used harsh tones, distanced herself and declined to meet with plaintiff, required plaintiff to recreate work, wrongfully reprimanded plaintiff, increased plaintiff's schedule, and was sarcastic to plaintiff insufficient to support a finding of a severe or pervasive hostile work environment); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (holding that no hostile work environment existed even though "defendants wrongly excluded [plaintiff] from meetings, excessively

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 100 of 134

Garcia v. NYC Health & Hospitals Corporation, Not Reported in Fed. Supp. (2019)

criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Mathirampuzha v. Potter*, 548 F.3d 70, 73, 79 (2d Cir. 2008) (holding that incident in which the plaintiff's supervisor "grabbed the plaintiff's arm, punched him in the shoulder and chest, spit in his face, and poked him in the eye" was "not so severe as to alter materially the plaintiff's working conditions"); *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (holding that derogatory language from supervisor, dismissive comments from management, and intense scrutiny of plaintiff were together "insufficiently severe and pervasive" to create hostile work environment); *Brown*, 163 F.3d at 713 (2d Cir. 1998) (holding that supervisor's occasional racist remarks "fail[ed] to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment"); *Kearse v. ATC Healthcare Servs.*, No. 12 Civ. 233 (NRB), 2014 WL 958738, at *8–9 (S.D.N.Y. Mar. 11, 2014) (finding that supervisor's repeated reprimands in front of other coworkers, keeping plaintiff at work past end of shift, ignoring plaintiff's questions about his paychecks, restricting plaintiff's use of his paid time off, and comment that plaintiff was getting married to avoid paying child support did not together amount to hostile work environment); *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011) (finding that allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and a supervisor's stray remarks were insufficient to establish hostile work environment); *Gibson v. Wyeth Pharms., Inc.*, No. 07 Civ. 946 (LTS), 2011 WL 830671, at *11 (S.D.N.Y. Mar. 9, 2011) (finding that allegations of explicitly racial comments, three-day suspension, forced overtime, and written warning were insufficient to establish hostile work environment); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 Civ. 7586 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd*, 488 F. App'x 530, 531–32 (2d Cir. 2012); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *1 (S.D.N.Y. Apr. 3, 2009) (finding conduct not sufficiently severe or pervasive to support a hostile work environment claim where plaintiff alleged that supervisor ignored and spoke to her harshly at meetings; scolded her for not following the chain of command in seeking consent to attend a conference; threatened to transfer her to another department; denied a transfer to the supervisor of her choice; gave her extra duties; stripped her of other duties; referred to her as "black ass" on three occasions; closely monitored her; gave unrealistic time periods to complete tasks; eliminated programs that plaintiff had implemented; and ultimately terminated plaintiff and replaced her with a white female), *aff'd*, 372 F. App'x 137, 139–40 (2d Cir. 2010); *Green v. Harris Publ'ns, Inc.*, 331 F. Supp. 2d 180, 192, 194 (S.D.N.Y. 2004) (granting summary judgment to defendant on hostile work environment claim and finding that two racially discriminatory comments overheard by the plaintiff "were stray remarks at best").

10    In light of this ruling, the Court need not reach H+H's alternative argument, Def. Mem. at 21–22, that Garcia has failed to plead sufficient facts to establish that such actions would not have occurred but for his supervisor's allegedly retaliatory motive. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (to establish prima facie case of retaliation under Title VII, plaintiff must plausibly plead "that the desire to retaliate was the but-for cause of the challenged employment action").

11    Garcia has not pled facts to establish a disability on the alternative bases of having "a record of such an impairment," 42 U.S.C. § 12102(1)(B), or "being regarded as having such an impairment," *id.* § 12102(1)(C). His conclusory statement that he "is regarded as having such mental impairment by his treatment providers," FAC p. 23 ¶114, even if supported by factual allegations, would be insufficient to establish that he is a person with a disability within the meaning of § 12102(1)(C), because this section applies when an individual "establishes that he or she has been subjected to an action prohibited under this chapter because of an

actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

12    *See* Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms.")

13    Garcia states in his opposition to the motion to dismiss that he also has an impaired ability to concentrate, Opp'n. at 16, but the FAC does not contain any such factual allegation.

14    *See, e.g.*, Scarborough v. U.S. Sec. Assocs., No. 19 Civ. 2037 (DLC), 2019 WL 3369456, at *2–3 (S.D.N.Y. July 26, 2019); *Saudagar v. Walgreens Co.*, No. 18 Civ. 437 (KPF), 2019 WL 498349, at *9–10 (S.D.N.Y. Feb. 8, 2019); *Basak v. N.Y. State Dep't of Health*, 9 F. Supp. 3d 383, 398–99 (S.D.N.Y. 2014).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 814289

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Evan HARRIS, Plaintiff,

v.

State of New York, OFFICE OF NEW YORK STATE COMPTROLLER, Lawrence Schantz, and Robert Tambini, Defendants.

No. 20-CV-8827 (LAP)
|
Signed 03/17/2022

**Attorneys and Law Firms**

Daniela Elisabeth Nanau, Law Offices of Daniela Nanau, P.C., Glendale, NY, for Plaintiff.

Anjali Bhat, New York Attorney General, New York, NY, for Defendant State of New York.

Meredith Haver Savitt, O'Connell and Aronowitz, P.C., Albany, NY, for Defendant Office of New York State Comptroller.

Oscar Michelen, Konstantinos Kapatos, Cuomo LLC, Mineola, NY, for Defendant Lawrence Schantz.

Amanda M. Fugazy, Paul Patrick Rooney, Ellenoff Grossman & Schole LLP, New York, NY, for Defendant Robert Tambini.

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

**\*1** Before the Court are Defendant New York State Office of the State Comptroller's [1] ("OSC"), Defendant Lawrence Schantz's [2] ("Schantz"), and Defendant Robert Tambini's [3] ("Tambini") motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [4] Plaintiff Evan Harris ("Harris") opposes each motion. [5] The Court assumes the parties' familiarity with the facts of the case. [6] For the reasons set forth below, OSC's motion to dismiss is GRANTED in part and DENIED in part, Schantz's motion to dismiss is GRANTED in part and DENIED in part, and Tambini's motion to dismiss is GRANTED in part and DENIED in part.

**I. Procedural Background**

Plaintiff allegedly filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 23, 2019. [7] On or about July 27, 2020, Plaintiff received a Notice of Right to Sue letter from the EEOC. (Compl. ¶ 12.) Plaintiff then commenced the instant action against the State, OSC, Schantz, and Tambini on October 22, 2020. [8] (See Compl.) Schantz, OSC, and Tambini moved to dismiss the Complaint on April 14, 15, and 16, 2021, respectively. (See Schantz MTD; Schantz Br.; Tambini MTD; Tambini Br.; OSC MTD; OSC Br.) Plaintiff opposes Defendants' motions. (See Pl's. Opp. at 1.)

**II. Legal Standards**

**\*2** In this case, the Court is presented with three grounds which may warrant dismissal of the Complaint: (1) insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(5); (2) lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2); and (3) failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). The Court addresses the standard for each section of Rule 12(b) in turn.

a. **Rule 12(b)(5)**

"Federal Rule of Civil Procedure Rule 12(b)(5) provides for dismissal of an action if service of process was not timely effected in accordance with Federal Rule of Civil Procedure 4(m)." AIG Managed Mkt. Neutral Fund v. Askin Cap. Mgmt., L.P., 197 F.R.D. 104, 107 (S.D.N.Y. 2000). In considering a Rule 12(b)(5) motion, "a court must look[ ] to matters outside the complaint to determine whether it has jurisdiction." George v. Pro. Disposables Int'l, Inc. 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016) (quoting Cassano v. Altshuler, 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016)). Once a defendant moves to dismiss under Rule 12(b)(5), "the plaintiff bears the burden of establishing that service was sufficient."

Khan v. Khan, 360 F. App'x 202, 203 (2d Cir. 2010) (citing Burda Media, Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005)) (citation omitted). "A court analyzes a Rule 12(b)(5) motion to dismiss for insufficient service of process by looking to Rule 4, which 'governs the content, issuance, and service of a summons.' " United States ex rel. Weiner v. Siemens AG, No. 1:12-CV-01466-ALC, 2021 WL 3544718, at \*2 (S.D.N.Y. Aug. 10, 2021)(quoting DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010)). "Federal

Rule of Civil Procedure 4(m) governs both (1) the dismissal of actions for untimely service of process and (2) extensions of the time in which service may be effected. 🔖 Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir. 2007), cert. denied, 552 U.S. 1243 (2008). Rule 4(m) provides in relevant part that:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service of an appropriate period.

Fed. R. Civ. P. 4(m).

If a plaintiff cannot establish that service was timely, the court must dismiss the action without prejudice unless the plaintiff shows "that it had good cause in not timely serving the defendant." 🔖 AIG Managed Mkt. Neutral Fund, 197 F.R.D. at 108.

### b. **Rule 12(b)(2)**

"Under the Federal Rules of Civil Procedure, lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), and insufficient service of process, Fed. R. Civ. P. 12(b)(5), are separate defenses and separate grounds upon which a court may rely in dismissing a complaint." Prokopiou v. Long Island R.R. Co., No. 06 Civ 2558, 2007 WL 1098696, at *5 (S.D.N.Y. Apr. 9, 2007); see also Albert Levine Assocs., Inc. v. E.H. Hudson, 43 F.R.D. 392, 393 (S.D.N.Y. 1967) ("[O]btaining personal jurisdiction and making service of process, although closely related, are not synonymous.").

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Prokopiou, 2007 WL 1098696, at *5 (quoting 🔖 Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987)). "[T]he proper provision to

challenge 'the mode of delivery or the lack of delivery of the summons and complaint' is Fed. R. Civ. P. 12(b)(5)." Prokopiou, 2007 WL 1098696, at *5 (citing Bellis v. Tokio Marine and Fire Ins. Co., No. 93 CIV. 6549, 2002 WL 193149, at *15 (S.D.N.Y. Feb. 7, 2002)).

### c. **Rule 12(b)(6)**

**\*3**  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." 🔖 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 🔖 Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019) (quoting 🔖 Iqbal, 556 U.S. at 678). Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 🔖 Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020). It is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted) (quoting 🔖⚠ Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014)). "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 🔖⚠ Nielsen, 746 F.3d at 62 (cleaned up). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." 🔖 Iqbal, 556 U.S. at 679.

A complaint should be dismissed without prejudice if the pleading, " 'liberally read,' suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (alterations and citation omitted) (quoting 🔖 Gomez v. USAA Fed. Sav.

Bank, 171 F.3d 794, 795 (2d Cir. 1999)). If a complaint, however, has substantive problems and a "better pleading will not cure [them,]" repleading may be "futile." Id.

### III. **Discussion**

#### a. **Subject Matter Jurisdiction and Exhaustion of Administrative Remedies**

Defendant OSC argues that this Court should dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6) because Plaintiff did not attach a copy of the EEOC's Notice of Right to Sue letter to the Complaint. (OSC Br. at 16.) OSC claims that "Title VII requires that the EEOC Right To Sue Letter be filed with the complaint showing that plaintiff exhausted his administrative remedies." (Id.) Plaintiff opposes OSC's position, arguing that neither the statutory language of Title VII nor guidance from the EEOC supports this requirement. (Pl.'s Opp. at 33.) The Court first analyzes Plaintiff's argument as a lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and then as a failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

It is well established that "[a]s a condition precedent to a federal claim under Title VII, a plaintiff must show that he exhausted his administrative remedies provided by the EEOC." Guy v. MTA N.Y.C. Transit, 407 F. Supp. 3d 183, 192 (E.D.N.Y. 2016). "The weight of precedent demonstrates that administrative exhaustion is not a jurisdictional requirement; rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses." Fowlkes v. Ironworkers Loc. 40, 790 F.3d 378, 384 (2d Cir. 2015). "The administrative exhaustion requirement applies to pro se and counseled plaintiffs alike." Id.

Plaintiff's interpretation of Coleman v. Olinski, No. 5:16-CV-0838, 2016 WL 11265984, at *4 (N.D.N.Y July 29, 2016), report and recommendation adopted, 2017 WL 752182 (N.D.N.Y. Feb. 27, 2017) is misplaced. See Coleman, 2016 WL 11265984, at *4. In Coleman, the court merely restated established precedent that a plaintiff must plead or provide evidence in a Title VII complaint that he or she received a Right to Sue letter from the EEOC. Id. at *4 n.5. Because the plaintiff neither pled nor attached the EEOC's Right to Sue letter to the complaint, among other reasons, the court in Coleman dismissed the plaintiff's Title VII complaint. [9] Id.

Here, Plaintiff alleged in the "Exhaustion of Administrative Remedies" section of the Complaint that "[t]he EEOC issued Right-To-Sue letters to each Plaintiff on or about July 27, 2020." (Compl. ¶ 12.) As Plaintiff filed the Complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter, (id. ¶ 13.), the Court finds that, at this stage, that Plaintiff exhausted his administrative remedies.

**\*4** OSC's argument that Plaintiff failed to state a claim of exhaustion of administrative remedies because Plaintiff did not attach a copy of the EEOC Notice of Right to Sue letter to the Complaint similarly fails. (See OSC Br. at 16–17.) OSC does not carry its burden of proof to show that Plaintiff failed to plead sufficient facts that he exhausted his administrative remedies. See Hardaway v. Hartford Pub. Works Dep't, 879 F.3d 486, 491 (2d Cir. 2018) ("[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense."). OSC only cites to Coleman in support of its position. (See OSC Br. at 16.) However, for the reasons stated above, the Court disagrees with Plaintiff's interpretation of Coleman. OSC acknowledges that (1) "on October 22, 2020, plaintiff filed a formal Charge of Discrimination with the [EEOC] that the EEOC stamped 'DATE RECEIVED' on December 23, 2019;" (2) in the Charge of Discrimination, "[P]laintiff alleged that "in violation of Title VII, he had been subjected to sexual discrimination and retaliation during his employment with OSC;" and (3) on July 27, 2020, "Plaintiff received his Notice of Right To Sue Letter from the EEOC." (OSC Br. at 1-2.) Plaintiff argues that "[t]here is no bootstrapping of additional claims" to support a failure to exhaust administrative remedies because Plaintiff's complaint alleged claims identical to those in the Charge of Discrimination. (See Pl.'s Opp. at 35.) The Court agrees. Because Plaintiff need only plead or provide evidence in the complaint that he received a Right to Sue letter from the EEOC, the Court finds that, at this stage, Plaintiff adequately pled that he exhausted his administrative remedies.

Accordingly, Defendant OSC's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) is denied. OSC's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim of exhaustion of administrative remedies is similarly denied.

#### b. **Service of Process on OSC**

Defendant OSC's motion to dismiss the complaint for insufficient service of process pursuant to Rule 12(b)(5) presents two questions: (1) Did Plaintiff timely effect service on OSC when it delivered a summons for OSC, a copy of the complaint, and this Court's individual rules to the New York State Attorney General's Office on December 4, 2020 in compliance with C.P.L.R. § 307(1); and (2) if Plaintiff's service of process was defective, do the circumstances warrant excusing the defective service and extending Plaintiff's time to serve OSC properly such that Plaintiff's service on OSC by certified mail pursuant to C.P.L.R. § 307(2) on February 11, 2021 is considered timely? The Court addresses each argument in turn.

### i. **Timeliness of Service.**

The parties do not dispute the timeline of events. On October 22, 2020, Plaintiff commenced the instant action by filing the complaint. (See Compl. at 24.) Plaintiff served a summons for the "Office of the New York State Comptroller," among other items, that was delivered to the New York State Attorney General's Office on December 4, 2020. (See dkt. no. 12; Pl.'s Opp. at 38.) Plaintiff alleges that OSC first notified Plaintiff of alleged deficient service on February 9, 2021. (See dkt. no. 16 at 1; Pl.'s Opp. at 41.) Three days later, on February 11, 2021, Plaintiff served OSC pursuant to C.P.L.R. § 307(2) via certified mail. (See dkt. no. 48 at 1; OSC Br. at 5; Pl.'s Opp. at 41.) OSC received a copy of the summons and complaint on February 17, 2021. (See dkt. no. 39 ¶ 3, Ex. A; OSC Br. at 5; Pl.'s Opp. at 41.)

The parties dispute whether Plaintiff timely served OSC. Rule 4(m) required Plaintiff to effect service on OSC by January 20, 2021. See Fed. R. Civ. P. 4(m). Plaintiff argues that he complied with Rule 4(m) by serving OSC on December 4, 2020, in accordance with C.P.L.R. § 307(1). (Pl.'s Opp. at 38.) Section 307(1) of the New York Civil Practice Law and Rules provides that "[p]ersonal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." N.Y. C.P.L.R. § 307(1) (McKinney 2012). In opposition, OSC argues that because it is a state agency, Plaintiff was required to effect service in accordance with C.P.L.R. § 307(2). (See OSC Br. at 6 n.4; OSC Reply at 4.) Section 307(2) of the New York Civil Practice Law and Rules provides two methods to effect service upon a state agency: (1) by "delivering the summons to such officer or to the chief executive officer of such agency or to a person

designated by such chief executive office to receive service;" or (2) "by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by [C.P.L.R. § 307(1)]." N.Y. C.P.L.R. § 307(2).

**\*5** Plaintiff argues that OSC's position "is undermined by assertions made by the New York State Attorney General's Office in this case on behalf of Defendant State of New York." (Pl.'s Opp. at 39.) The Court disagrees. In a letter to the Court dated December 21, 2020, the Attorney General's Office explicitly stated that it "represents the State of New York" before requesting an extension to respond to the complaint. (See dkt. no. 10.) In the same letter, the Attorney General's Office requested "additional time to resolve potential issues of representation among the named defendants." (Id.) As OSC contends, this request was solely for the purpose of determining potential issues of representation among the named defendants, not regarding the propriety of service of each defendant. (See OSC Reply at 5.) Plaintiff's reference to the Office of the Attorney General's letter dated February 11, 2021, is similarly unpersuasive. (See Pl.'s Opp. at 38.) Although the letter states that the Attorney General's Office "requests additional time for defendants to respond to the Complaint since we are sorting out further issues relating to representation of defendants," the sentence also contains a footnote stating that "[b]ased on information we have received, Defendant the Office of the State Comptroller was not properly served as of the time this letter is filed." (Dkt. no. 14.) Thus, the Attorney General's Office acknowledged to the Court that OSC required separate service of process. Finally, Plaintiff includes the Office of the Attorney General's argument that the State of New York (the "State") is redundant of OSC as support for why Plaintiff's service under C.P.L.R. § 307(1) is sufficient. (See Pl.'s Opp. at 39.) The Court disagrees with Plaintiff's interpretation. Whether or not the State is redundant of OSC for purposes of relief does not alter Plaintiff's service obligations on OSC.

The Court agrees with OSC that OSC is a state agency requiring service in accordance with C.P.L.R. § 307(2). 🔖 Blasio v. N.Y. State Dep't of Corr. Servs., No. 04-CV-653S, 2005 WL 2133601 (W.D.N.Y. Aug. 31, 2005) is comparable. In Blasio, the plaintiff personally delivered the complaint against the defendant state agencies (the New York State Department of Correctional Services, the New York State Department of Civil Service, and OSC) to the Office of the New York State Attorney General in Buffalo, New

York. Id. at *5. In Blasio, the court granted defendants' motion to dismiss the complaint without prejudice for insufficient service of process because plaintiff "failed to properly serve Defendants in the manner prescribed for service on a state agency as specified in N.Y. C.P.L.R. § 307(2)." Id. Thus, to comply with Rule 4(m) and C.P.L.R. § 307(2), Plaintiff was required to effect service by January 20, 2021, on both the Attorney General and OSC. Plaintiff timely served the Attorney General. Unlike in Blasio, Plaintiff here served OSC in accordance with C.P.L.R. § 307(2) on February 11, 2021. (See dkt. no. 48 at 1; OSC Br. at 5; Pl.'s Opp. at 41.) However, Plaintiff's proper service occurred 22 days after the expiration of Rule 4(m)'s service deadline on January 20, 2021. (See OSC Br. at 7.)

Accordingly, Plaintiff's service of process on OSC was untimely. The Court now assesses whether circumstances warrant excusing Plaintiff's defective service.

### ii. **Good Cause Exception.**

Having determined that Plaintiff's service of process on OSC was untimely, the Court must dismiss the complaint against OSC without prejudice unless Plaintiff demonstrates that he had good cause for failing to serve OSC within the 90-day period pursuant to Rule 4(m) and C.P.L.R. § 307(2). Plaintiff's arguments for why good cause exists largely mirror his arguments for why service on OSC was timely. Plaintiff contends that good cause exists because he timely served the State pursuant to C.P.L.R. § 307(1) and that until OSC objected to improper service on February 9, 2021, the State provisionally represented Defendants. (See Pl.'s Opp. at 40-41; dkt. no. 14.) In opposition, OSC argues that Plaintiff's erroneous attempt to serve OSC by properly serving the State is insufficient to establish good cause as Plaintiff's reliance upon the State's statements to the Court regarding named defendants other than the State prior to February 11, 2021. (See OSC Br. at 7.)

Good cause is "found only in exceptional circumstances where plaintiff's failure to serve process in a timely manner was the result of circumstances beyond his control." Siemens AG, 2021 WL 3544718, at *2. "In determining whether a plaintiff has shown good cause, courts weigh the plaintiff's reasonable efforts and diligence against the prejudice to the defendant resulting from the delay. DeLuca, 695 F. Supp. 2d at 66.

Plaintiff's mistaken reliance on serving OSC by serving the State alone is insufficient to demonstrate good cause. See Siemens AG, 2021 WL 3544718, at *5 ("An attorney's inadvertence, neglect, mistake or misplaced reliance does not constitute good cause.") (quoting E. Refractories Co. v. Forty Eight Insulations, Inc., 187 F.R.D. 503, 505 (S.D.N.Y. 1999)) Based on the undisputed facts, the Court is not persuaded that Plaintiff exercised "reasonable efforts and diligence" to ensure timely service on OSC pursuant to C.P.L.R. § 307(2). See id. at *5. In reaching this determination, the Court considered the following facts: (1) Plaintiff is represented by counsel who demonstrated proper service under C.P.L.R. § 307(2) when Plaintiff sent the summons and complaint via certified mail to the Comptroller on February 11, 2021, (see OSC Br. at 7); (2) OSC neither waived service of process nor authorized the Attorney General to accept service on its behalf in this action, (see id. at 8; dkt. no. 16); (3) After learning of OSC's objections to service, Plaintiff did not ask OSC for an extension pursuant to Rule 4(d)(1), [10] (OSC Br. at 8); and (4) Plaintiff did not apply to the Court for an extension to serve OSC according to C.P.L.R. § 307(2). (Id.)

**\*6** Accordingly, good cause does not exist for this Court to excuse Plaintiff's defective service.

### iii. **Judicial Discretionary Extension.**

Even in the absence of good cause, the Court may grant a discretionary extension so that Plaintiff's service on OSC by certified mail on February 11, 2021, was timely. See Esqueda v. NYU Langone Hosps., No. 20-CV-6697 (VSB), 2021 WL 4340731, at *2 (S.D.N.Y. Sept. 23, 2021) (quoting Zapata v. City of New York, 502 F.3d 192, 197-98 (2d Cir. 2007)) ("[A] district court may grant an extension in the absence of good cause, but it is not required to do so."); Vaher v. Town of Orangetown, 916 F. Supp. 2d 404, at *420 (S.D.N.Y. 2013) ("Where a plaintiff has not shown good cause for his failure to effect service within the [90] day-period provided by Rule 4(m), the decision of whether to grant an extension, and the criteria for that decision, are left to the sound discretion of the district court." (citation omitted)). Where "good cause is lacking, but the dismissal without prejudice in combination with the statute of limitations would result in a dismissal with prejudice, ... the district court [should] weigh[ ] the impact

that a dismissal or extension would have on the parties." *Zapata*, 502 F.3d at 197.

"In determining whether a discretionary extension is appropriate in the absence of good cause, a court considers the following four factors: (1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service." *DeLuca*, 695 F. Supp. 2d at 66.

The parties primarily dispute the first factor. With respect to this factor, "courts often consider the fact that the statute of limitations has run on a claim as favoring the plaintiff." *Vaher*, 916 F. Supp. 2d at 420. As previously discussed, a plaintiff must file a Title VII complaint within 90 days of receiving the EEOC's Right to Sue Letter. See 42 U.S.C. § 2000e-5(f)(1). Although filing a complaint tolls Title VII's statute of limitations, failing to effect service of the summons within 90 days in accordance with Rule 4(m) ends the tolling period and resumes Title VII's statute of limitations. See *Frasca v. United States*, 921 F.2d 450, 453 (2d Cir. 1990); *Clyburne v. Center for Comprehensive Health Practice, Inc.*, No. 04 Civ. 6695 (LTS) (DFE), 2006 WL 1559238, at *3 (S.D.N.Y. June 5, 2006).

OSC argues that it would be futile for this Court to extend Plaintiff's time to serve the summons and complaint "because the complaint as against defendant OSC is time-barred under 42 U.S.C. § 2000e-5(f)(1) and must be dismissed." (OSC Br. at 9.) Plaintiff does not dispute that "if he is required to re-serve Defendant OSC, that effort would be futile because his claims would be time-barred." (Pl.'s Opp. at 43.) However, Plaintiff argues that the fact that the statute of limitations has run on Plaintiff's claim favors a discretionary extension. (See id. at 42-43.)

**\*7** Here, Plaintiff received a Notice of Right to Sue letter from the EEOC on July 27, 2020. (Compl. ¶ 12.) Plaintiff filed his complaint against the State, OSC, Schantz, and Tambini on October 22, 2020, six days short of the statutory deadline. (See Compl.) Once Plaintiff filed his complaint, Title VII's statute of limitations was tolled on October 22, 2020, for 90 days. However, the statute of limitations resumed running on January 20, 2021, with six days before it expired on January

26, 2021. (See OSC Br. at 10.) Plaintiff did not properly serve OSC until February 11, 2021, sixteen days after Plaintiff's Title VII statute of limitations expired. (See dkt. no. 48 at 1.) OSC argues that once Plaintiff failed to serve OSC by January 26, 2021, Plaintiff is time barred from further suit against OSC. (See OSC Br. at 10.) However, given the fact that the statute of limitations has run on Plaintiff's claim, the Court finds that the first factor favors Plaintiff.

The Court also finds that the second factor favors Plaintiff. The Court agrees with Plaintiff that OSC had actual notice of the claims asserted in the complaint once Plaintiff served a summons and complaint on OSC by certified mail on February 11, 2021. (See Pl.'s Opp. at 43; dkt. no. 48.) For purposes of this analysis, the Court need not determine whether OSC had actual notice when Plaintiff served OSC through the Attorney General's Office on December 4, 2020.

The third factor weighs against Plaintiff as the Court is not persuaded that OSC attempted to conceal Plaintiff's defective service. First, the requirements of C.P.L.R. § 307(2) are unambiguous and Plaintiff's mistaken reliance on C.P.L.R. § 307(1) does not mean that OSC attempted to conceal Plaintiff's defective service. Nor is the fact that OSC did not notify Plaintiff of its objection to service until February 9, 2021, evidence that OSC attempted to conceal Plaintiff's defective service, as prior to February 2021, the State communicated to the Court that it was resolving potential issues of representation.

Finally, with respect to the final factor, "extending the service period beyond the statute of limitations period for the action imposes a corresponding prejudice on" OSC. *Vaher*, 916 F. Supp. 2d at 421. However, unlike in *Vaher* where the delay was lengthy and prolonged by Plaintiff's lack of diligence, see id., here the Court need only extend the statute of limitations period sixteen days after Plaintiff's Title VII statute of limitations expired and Plaintiff served OSC pursuant to C.P.L.R. § 307(2) three days after receiving OSC's objection to service. (See Pl's. Opp. at 43.) The Court further finds that prejudice against OSC is lessened as OSC received actual notice of Plaintiff's claims on February 11, 2021. See *Vaher*, 916 F. Supp. 2d at 421. Thus, the fourth factor favors Plaintiff.

Accordingly, the Court finds that three factors favor Plaintiff and one factor favors OSC. The Second Circuit has stated that "even if the balance of hardships favors the plaintiff a district

court may still decline to excuse a failure to timely serve the summons and complaint where the plaintiff fails to advance some colorable excuse for neglect." Vaher, 916 F. Supp. 2d at 421; see also Esqueda, 2021 WL 4340731, at *2 (quoting Zapata, 502 F.3d at 197-98). This is such a case.

However, unlike the plaintiff in Vaher who failed to offer an explanation for untimely service, Plaintiff offered the following explanation: he believed that his service on the Office of the Attorney General for OSC on December 4, 2020 pursuant to C.P.L.R. § 307(1) constituted timely service of process. (Pl.'s Opp. at 40.) Although insufficient to demonstrate good cause, the Court finds that this is a cognizable excuse for neglect. Moreover, despite Plaintiff's neglect to ask for an extension of service from either OSC or the Court, the Court finds that OSC has suffered minimal prejudice as Plaintiff properly served OSC three days after receiving OSC's objection to service.

**\*8** Accordingly, Defendant OSC's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(5) is denied.

### c. **Personal Jurisdiction Over OSC.**

Defendant OSC also moves to dismiss the complaint as against OSC for lack of personal jurisdiction pursuant to Rule 12(b)(2). (See OSC Br. at 10.) "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Felix v. City of Poughkeepsie, No. 16-cv-1131, 2019 WL 5306981, at *4 (S.D.N.Y. Oct. 18, 2019). One precondition to asserting personal jurisdiction over a defendant is satisfying the procedural requirement of service of summons. See id.

OSC does not raise new arguments demonstrating how the Court lacks personal jurisdiction over OSC; rather, OSC relies upon the arguments it raised in moving to dismiss the complaint for improper service of process pursuant to Rule 12(b)(5). (See OSC Br. at 10-11.) OSC cites to Felix for the proposition that the court lacked personal jurisdiction over the defendant because the plaintiff did not properly serve the defendant with the summons. (Id.; Felix, 2019 WL 5306981, at *5.) Plaintiff counters, arguing that the Court obtained jurisdiction over OSC when Plaintiff served by certified mail a copy of the summons and complaint on the Comptroller. (See Pl.'s Opp. at 47.) The Court agrees with

Plaintiff. Plaintiff properly served a summons and complaint on OSC by certified mail on February 11, 2021. (See dkt. no. 48.) Thus, the Court, at this stage, has personal jurisdiction over OSC.

Accordingly, OSC's motion to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) is denied.

### d. **Plaintiff's Hostile Work Environment Claims**

#### i. **Against OSC Under Title VII**

Defendant OSC argues that this Court should dismiss the complaint as against OSC because Plaintiff failed to file a timely charge of discrimination with the EEOC. (See OSC Br. at 11-12.) Plaintiff contends that it has pled sufficient facts within Title VII's statute of limitations to survive OSC's motion. (See Pl.'s Opp. at 25.) The Court finds that Plaintiff's Title VII claims against OSC are time-barred.

"A Title VII plaintiff must file a charge of discrimination with the EEOC either 180 or 300 days after an 'alleged unlawful employment practice occurred.' " Maynard v. Montefiore Med. Ctr., No. 18-CV-8877 (LAP), 2021 WL 396700, at *9 (S.D.N.Y. Feb. 4, 2021) (quoting 42 U.S.C. § 2000e-5(e)(1)). "[I]n states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the [EEOC] is 300 days." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010) (quoting Butts v. City of New York Dep't of Hous. Pres. and Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). While the statute of limitations is "an affirmative defense that a defendant must plead and prove[,] ... a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

**\*9** In this case, Plaintiff filed a Charge of Discrimination with the EEOC on December 23, 2019. (See Compl. ¶ 11.) Thus, Plaintiff may only pursue acts that occurred between February 26 and December 23, 2019. However, it is plain on the face of the complaint that Plaintiff's hostile work

environment allegations against OSC employees Tambini [11] and Schantz [12] occurred over 300 days before December 23, 2019. [13]

In opposition, Plaintiff argues that OSC Human Resources manager Rae Ellen Burke's ("Burke") conversation with Plaintiff on March 4, 2019, was a timely hostile work environment event sufficient to support a continuing violation claim. (See Pl.'s Opp. at 25.) The Court first analyzes whether Burke's March 4, 2019 statements relate to Plaintiff's hostile work environment claim; then, the Court analyzes whether Plaintiff's claim of hostile work environment is timely under the continuing violation doctrine.

Plaintiff argues that "a reasonable person could infer that Burke's view of Plaintiff [on March 4, 2019] was informed by an illegal gender stereotype and thus part of the hostile work environment Harris was subjected to at OSC." [14] (Pl.'s Opp. at 25.) OSC contends that Burke's alleged statements to Plaintiff on March 4, 2019, pertain only to Plaintiff's claim of retaliation. (See OSC Reply at 9.)

**\*10** The Court agrees with OSC. Taking Plaintiff's claims as true, Plaintiff does not allege that on March 4, 2019, Burke made any statements as to his gender or gender stereotyping. Rather, Plaintiff describes that conversation in a generalized manner, stating, "Burke's demeanor did not demonstrate any concern about Plaintiff's allegations regarding Schantz's mistreatment. She made Harris feel like he was blowing the situation up and out of proportion." [15] (Compl. ¶ 73.) The only specific statement Plaintiff attributes to Burke in that conversation is "Good, then [Tambini's] harassment stopped." (Id. ¶ 77.) Because that statement relates to neither Plaintiff's gender nor gender stereotypes, the Court finds that Burke's March 4, 2019 statements do not constitute a timely hostile work environment event.

The only remaining event that could implicate the continuing violation doctrine is Plaintiff's alleged termination on March 4, 2019. [16] "[C]ourts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances." Percy v. New York (Hudson Valley DDSO), 264 F. Supp. 3d 574, 582 (S.D.N.Y. 2017) (quoting Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 366 (S.D.N.Y 2002)). Given this limited approach, the continuing violation exception

generally applies only when a plaintiff shows an ongoing discriminatory policy or practice.

Under the continuing violation exception, hostile work environment claims may be "based on events outside the statute of limitations period as long as (1) the acts occurring before the ... cutoff constitute part of the same actionable hostile work environment practice, and (2) at least one act contributing to the claim occurs within the filing period." Percy, 264 F. Supp. 3d at 582 (citation omitted). However, it "is well established that termination, whether through discharge or resignation, is a single act, discrete in nature" to which the continuing violation doctrine does not apply. Id. Discrete instances cannot extend Title VII's statute of limitations and revive his otherwise untimely acts. See Velez v. New York City Police Pension Fund Article II, 18 Civ. 1366, 2019 WL 1382884, at \*7 (S.D.N.Y. Mar. 27, 2019) ("[T]he continuing violation doctrine does not apply to discrete unlawful acts, even if the discrete acts were undertaken 'pursuant to a general policy that results in other discrete acts occurring within the limitations period.' " (citation omitted)); see also Patterson, 375 F.3d at 220 ("[T]he mere fact that an employee was dismissed within [Title VII's] statutory period cannot be used to pull in [to the statutory period] a time-barred discriminatory act." (cleaned up)). Because Plaintiff's alleged termination is a discrete act, it cannot be considered a continuation of the alleged gender discrimination Plaintiff contends he experienced at OSC. Thus, the continuing violation doctrine cannot salvage Plaintiff's untimely claims. Accordingly, OSC's motion to dismiss Count I of the complaint—hostile work environment based on gender in violation of Title VII as against OSC—is granted without prejudice.

ii. **Against Tambini Under Section 1983 and NYSHRL**

**\*11** At the outset, the Court notes that in determining whether Plaintiff adequately stated claims under § 1983 and the New York State Human Rights Law ("NYSHRL") against Defendant Tambini, the Court only considers Plaintiff's allegations concerning Tambini. The Court agrees with Defendants Tambini and Schantz that "when a plaintiff alleges that multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment." Raspardo v. Carlone, 770 F.3d 97, 115 (2d

Cir. 2014); (see also Tambini Reply at 2; Schantz Reply at 5.) Plaintiff does not allege that Tambini and Schantz engaged in jointly planned or perpetrated acts of harassment against him. [17] Thus, the Court analyzes Plaintiff's allegations against Tambini separately from Schantz. [18]

To plead adequately a claim for a hostile work environment under Title VII, § 1983, [19] and the New York State Human Rights Law ("NYSHRL") [20], a plaintiff must include facts plausibly demonstrating that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). [21] The hostile work environment test has both objective and subjective elements. "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Raspardo, 770 F.3d at 114; see also McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 65 (S.D.N.Y. 2020) ("To survive a motion to dismiss, a plaintiff must allege facts showing she was faced with harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." (internal quotation marks and citations omitted)). In adjudicating a defendant's motion under Rule 12(b)(6), "courts must distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." Lenart v. Coach, Inc., 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015) (citation omitted).

*12 "In determining whether a plaintiff suffered a hostile work environment, [the court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Littlejohn, 795 F.3d at 321 (citation omitted). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (quoting Alfano v. Costello,

294 F.3d 365, 374 (2d Cir. 2002)). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted). Finally, a plaintiff must also plausibly allege "that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." Id. at 578 (citation omitted).

In his Complaint, Plaintiff alleges three instances of harassment by Tambini over the course of 15 months: (1) in September 2017, [22] when Tambini arranged balloons in the shape of a penis at a co-worker's retirement party; (2) at an undated office birthday party, when Tambini almost poked a co-worker with a fork and stated, "I don't want to fork you;" and (3) in January 2019, when Tambini asked Plaintiff if he intended to use a lactation room for OSC employees to masturbate. (See Compl. ¶¶ 22-33; Tambini Reply at 2.)

The facts alleged by Plaintiff against Tambini fall short of a claim for a hostile work environment under § 1983 and NYSHRL. The first two instances of alleged harassment were directed at other OSC employees, not Plaintiff. Although "[d]iscriminatory conduct need not be directed at Plaintiff —derogatory comments and actions directed at others may contribute to a hostile work environment experienced by an employee," Holt v. Dynaserv Indus., Inc., 14 Civ. 8299, 2016 WL 5108205, at *8 (S.D.N.Y. Sept. 19, 2016), the Court finds that these are two isolated instances that are neither sufficiently severe nor pervasive to alter the terms of Plaintiff's employment.

While "it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace," the Court finds that the third alleged instance of harassment by Tambini, while inappropriate, is closer to what would be described as isolated, "boorish" behavior than a "severe" incident which has been found to create a hostile work environment. Alfano, 294 F.3d at 374. Thus, the Court finds that this isolated instance of offensive conduct does not support a claim of gender-based harassment by Tambini.

Finally, the Court considers Plaintiff's allegation that "Tambini had a habit of slipping inappropriate comments into conversation by making plays on words." (Compl. ¶ 31.) This unspecified, vague allegation is insufficient to state a

claim of hostile work environment against Tambini because the Court cannot determine the severity or frequency of these alleged comments. See Boza-Meade v. Rochester Housing Auth., 170 F. Supp.3d 535, 547 (W.D.N.Y. 2016) ("Vague allegations that co-workers made fun of her accent in connection with Plaintiff's pronunciation of streets, with no additional supporting factual information as to the context and frequency of this conduct, ... do not plausibly allege conduct that is sufficiently severe so as to alter the terms and conditions of Plaintiff's employment.").

**\*13** Accordingly, Tambini's motion to dismiss Counts III and V of the complaint—hostile work environment based on gender in violation of Section 1983 and NYSHRL as against Tambini—is granted without prejudice.

### iii. **Against Tambini Under NYCHRL.**

The Court now analyzes Tambini's motion to dismiss Plaintiff's hostile work environment claim against him under the New York City Human Rights Law ("NYCHRL"). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, ... construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' " Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." Id. "The NYCHRL imposes liability for harassing conduct that does not qualify as 'severe or pervasive,' and 'questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." Bermudez, 783 F. Supp. 2d at 579 (quoting Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 38 (N.Y. App. Div. 2009)).

To survive a motion to dismiss under the more lenient standard in the NYCHRL, Plaintiff is required to allege "the existence of unwanted gender-based conduct" because liability under the NYCHRL is "determined by the existence of unequal treatment." Williams, 872 N.Y.S.2d at 38-39. [23] However, courts must be mindful that NYCHRL

is not a "general civility code." Id. at 40 (citation omitted); see also Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) ("[E]ven under the NYCHRL, petty, slight, or trivial inconvenience[s] are not actionable." (cleaned up)).

Plaintiff argues that while employed at OSC he "was subjected to a constant stream of comments, jokes and other misconduct that signaled he was not a 'real man' in the eyes of his supervisors because he did not engage in sexual misconduct like they did." (Pl.'s Opp. at 24.) While Plaintiff's allegation that Tambini asked Plaintiff if he planned to use OSC's lactation room to masturbate is offensive, the Court finds that it is a petty slight and inconvenience insufficient to sustain a hostile work environment claim under the NYCHRL. (See Compl. ¶ 33.) The Court agrees with Tambini that the facts in Bermudez, 783 F. Supp. 2d 560 and Wilson v. N.Y.P. Holdings, Inc., No. 05 Civ. 10355, 2009 WL 873206 (S.D.N.Y. Mar. 31, 2009) are comparable. In opposition, Plaintiff references dicta from Williams that "[o]ne can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable [under NYCHRL]." Williams, 872 N.Y.S.2d at 41 n.30. However, taking Tambini's lactation comment as true, the Court does not find that this comment signals a view about Tambini's role in the workplace based on his gender. Although Plaintiff alleges that Tambini slipped inappropriate comments into conversation by making plays on words, this allegation lacks dates and specifics from which the Court could determine whether it was unwanted gender-based conduct directed at Plaintiff.

**\*14** Accordingly, Tambini's motion to dismiss Count VII of the Complaint—hostile work environment based on gender in violation of NYCHRL against Tambini—is granted without prejudice.

### iv. **Against Schantz Under Section 1983 and NYSHRL.**

As a threshold issue, the Court must address whether it may consider the exhibits attached to Defendant Schantz's affirmation in adjudicating Schantz's motion under Rule 12(b)(6). (See dkt. no. 36.) Schantz argues that the Court may take judicial notice of the text strings attached as

exhibits to Schantz's affirmation [dkt. no. 36 Exs. B-E] because they are incorporated by reference in the Complaint. (See Schantz Reply at 1.) In opposition, Plaintiff argues that Schantz's counsel, Oscar Michelen, "proffers his own testimony regarding the alleged context and content of the problematic text conversations between his client and Plaintiff that are included in the Complaint." (Pl.'s Opp. at 8.) The Court agrees with Schantz.

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (quoting In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013)). The Court may take judicial notice of documents that are "integral to the complaint," such that the complaint "relies heavily upon [the documents'] terms and effect." Palin v. N.Y. Times Co., 940 F.3d 804, 811 (2d Cir. 2019) (citation omitted).[24] "Courts have also taken judicial notice of materials in the public record, such as federal copyright registrations, newspaper articles, and regulatory filings—all for the limited purpose of noting what the documents state, rather than to prove the truth of their contents." Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) (internal quotation marks and citation omitted).

Applying these principles, the Court finds that the copies of Schantz's and Plaintiff's text strings fall within the recognized categories of documents that the Court may consider on a Rule 12(b)(6) motion. Plaintiff quoted various portions of these text messages in the Complaint. (See Compl. ¶¶ 56-59, 62.) In fact, the alleged contents of these messages form the basis of Plaintiff's claims against Schantz for hostile work environment and retaliation under § 1983, NYSHRL, and NYCHRL. Despite opposing their consideration, Plaintiff does not challenge the authenticity or accuracy of the text strings. (See Schantz Reply at 1.) Accordingly, the Court finds it reasonable to conclude that the text strings [dkt. no. 36, Exs. B-E] are incorporated by reference in and integral to the Complaint. See Lopez-Serrano v. Rockmore, 132 F. Supp. 3d 390, 400 (E.D.N.Y. 2015) (finding a copy of the parties' text messages submitted in support of defendant's motion to dismiss incorporated by reference and integral to the complaint).

**\*15** Turning to Plaintiff's claims against Schantz, the Court finds that Plaintiff has plausibly alleged that he suffered "harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." McHenry, 510 F. Supp. at 65 (citation omitted). The question is whether Plaintiff has sufficiently pled that Schantz's conduct is connected to Plaintiff's membership in a protected class. Plaintiff's allegations related to gender rely on Schantz's alleged offensive sexual text messages. The Court finds that the contents of these text messages is sufficient to survive Schantz's motion to dismiss.

Plaintiff alleges that Schantz circulated numerous text messages containing graphic sexual jokes and comments regarding Plaintiff's sexual relationship with his girlfriend. (See Compl. ¶¶ 56-59.) Courts have held that a defendant's dissemination of sexually explicit content to co-workers meets the pleading standards of Title VII, § 1983, and the NYSHRL. See Ruiz v. City of New York, No. 14-CV-5231, 2015 WL 5146629, at \*9 (S.D.N.Y. Sept. 2, 2015) (holding that plaintiffs' allegations that defendant sent them and other employees a photo with the female plaintiff's face " 'photoshopped' onto a naked woman's body" adequately stated a hostile work environment claim under Title VII, § 1983, and NYSHRL); Gallagher v. AEG Mgmt. Brooklyn, LLC, No. 16-CV-4779, 2017 WL 2345658, at \*6 (E.D.N.Y. May 30, 2017) (noting that "this Circuit has held that displays of obscene photographs and sexually offensive remarks can constitute a gender-based hostile work environment").

Accordingly, Schantz's motion to dismiss Counts III and V of the complaint—hostile work environment based on gender in violation of Section 1983 and NYSHRL as against Schantz —is denied.

### v. **Against Schantz Under NYCHRL.**

As set forth above, the "pleading standard for hostile work environment claims under the NYCHRL is more liberal than the federal and state standard, because under the NYCHRL conduct need not qualify as 'severe or pervasive' to be actionable." Ruiz, 2015 WL 5146629, at \*11 (citation omitted). For the reasons discussed above, Plaintiff has adequately pled conduct by Schantz that exceeds "petty slights and trivial inconveniences." Williams, 872 N.Y.S.2d at 41; see also McHenry, 510 F. Supp. 3d at 70 ("[T]he allegations that [defendant] sent [plaintiff] doctored

messages with an explicit photo purporting to be of her and numerous sexually explicit text messages state a claim under the NYCHRL."). Moreover, given the sexual overtone of Schantz's text messages to Plaintiff and explicit references to sexual acts with Plaintiff's girlfriend, Plaintiff has adequately alleged that his mistreatment by Schantz was the result of his gender.

Accordingly, Schantz's motion to dismiss Count VII of the Complaint—hostile work environment based on gender in violation of NYCHRL against Schantz—is denied.

### e. **Plaintiff's Retaliation Claims**

### i. Against OSC Under Title VII.

#### 1. **Timeliness of Claim.**

For the same reasons as discussed above, Defendant OSC argues that Count II of the complaint-retaliation in violation of Title VII as against OSC-is limited to acts of alleged retaliation that occurred between February 26 and December 23, 2019. (See OSC Br. at 15-16; Carter v. New York City Dep't of Corr., 7 F. App'x 99, 102-03 (2d Cir. 2001) ("Under Title VII, a plaintiff must file an administrative claim within 300 days of the retaliatory conduct.... The 300 day limit functions as a statute of limitations, precluding consideration of events that occurred more than 300 days prior to filing an administrative complaint.").) The Court agrees. Therefore, the Court may only consider adverse actions that occurred after February 26, 2019.

**\*16** OSC argues that Plaintiff only raises a single allegation of retaliation in the complaint—his termination on March 4, 2019. (See OSC Br. at 16.) Because Plaintiff's alleged termination on March 4, 2019, occurred within Title VII's 300-day filing period, it is timely; however, as stated above, alleged termination is a discrete instance that cannot extend Title VII's statute of limitations and revive Plaintiff's otherwise untimely acts of retaliation.

Although Plaintiff does not directly address OSC's timeliness argument, Plaintiff alleges that he suffered retaliation for participating in protected activities on three occasions: (1) in September 2018 when Plaintiff complained to Tambini about his inappropriate sexual comments; (2) in late 2018 when Plaintiff complained to Schantz about Tambini's inappropriate

sexual comments and retaliation; and (3) on March 4, 2019, when Plaintiff complained to Burke about harassment and retaliation by Tambini and Schantz and was subsequently terminated. (See Pl.'s Opp. at 26-27.) Taking Plaintiff's claims of retaliation in January [25] and February 2019 [26] (prior to February 26) as true, the Court agrees with OSC that those claims are untimely. Despite finding that Plaintiff's claims of retaliation in 2018 are untimely, the Court may still consider Plaintiff's participation in protected activities that predate February 26, 2019. Thus, Plaintiff's retaliation claim must stand, if at all, on his termination on March 4, 2019.

Accordingly, OSC's motion to dismiss Plaintiff's retaliation claims as against OSC, except for Plaintiff's claim that OSC retaliated against him on March 4, 2019, is granted without prejudice.

#### 2. **Stating a Cause of Action.**

OSC argues that Plaintiff cannot state a claim of retaliation because he cannot establish a causal connection between his alleged protected activity in September 2017 [27] and his termination on March 4, 2019. (See OSC Br. at 17-18.) In response, Plaintiff argues that "after he engaged in protected activity each time, alleged retaliatory conduct immediately followed, with the last complaint resulting in his termination of employment the same day." (Pl.'s Opp. at 30.) The Court first addresses whether Plaintiff's allegations regarding his complaint to Schantz on December 20, 2018, is a protected activity under Title VII. Then, the Court analyzes whether Plaintiff plausibly pled a causal connection between his termination on March 4, 2019, and his participation in a protected activity on September 2017. [28]

**\*17** "Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas." Villar v. City of New York, 135 F. Supp. 3d 105, 135 (S.D.N.Y. 2015) (quoting Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)). "To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " Littlejohn, 795 F.3d at 315-16 (citation omitted); see also Vega v. Hempstead

Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) ("[F]or a [Title VII] retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated-or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." (citation omitted))

OSC argues that Plaintiff's alleged complaint to Schantz on December 20, 2018 about Tambini's inappropriate comments and retaliatory treatment is not protected activity. (See OSC Reply at 12.) Protected activity consists of "action taken to protest or oppose discrimination prohibited by [Title VII]." Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007); Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014); see also 42 U.S.C. § 2000e-3(a). "It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" La Grande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 212 (2d Cir. 2010) (quoting Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)); see also Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 281 (E.D.N.Y. 2013) ("In order to oppose sexual harassment, Plaintiff need not have filed a formal complaint as long as she complained of activity that she had a good faith, reasonable belief violated the law."). However, "[w]hen making the complaint, a plaintiff must do so in 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin." Id. at 280-81; Int'l Healthcare Exch., Inc., 470 F. Supp. 2d at 357 ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.").

Plaintiff has failed to allege that he engaged in protected activity on December 20, 2018. (See Compl. ¶ 62; Schantz Reply at 10.) Plaintiff does not allege that he ever explicitly raised the issue of gender discrimination when he complained about his work to Schantz via text message on December 20, 2018. Like the plaintiff in International Healthcare Exchange, Inc., Plaintiff asserts that his complaint about having to perform secretarial work, such as setting up the office holiday party, implied that Tambini was discriminating him based

on sex. See Int'l Healthcare Exch., Inc., 470 F. Supp. 2d at 357. However, taking Plaintiff's allegations as true, the Court does not find that Plaintiff alleged that Schantz was on notice that Plaintiff felt discriminated against by Tambini based on sex. Accordingly, Plaintiff's complaint to Schantz on December 20, 2018, is not protected activity.

**\*18**  OSC argues that Plaintiff did not plausibly plead a connection between his termination on March 4, 2019, and his complaint to Tambini in September 2017. (OSC Br. at 17–18.) The Court agrees. "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.' " Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)); see also Vega, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."). Plaintiff relies on showing the causal connection between his protected activity in September 2017 and his termination on March 4, 2019, indirectly, as the Complaint does not contain allegations that Tambini (or Schantz) participated in discussions regarding Plaintiff's termination.[30] Plaintiff alleges that on March 4, 2019, Burke told Plaintiff that she wanted to discuss Plaintiff's solutions to the alleged harassment with "John Traylor and Chris Gorka, Defendant Schantz's supervisors." (Compl. ¶ 80.)

Plaintiff fails to show a causal connection indirectly because the protected activity in September 2017 was not followed "closely" by an adverse employment action. The 18 months between Plaintiff's alleged protected activity and his termination date exceeds time frames supported by this Court to show causal connection. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (finding no causality for adverse action 20 months after protected activity and citing cases finding 3 and 4-month periods insufficient). Thus, Plaintiff's claim for retaliation based on Plaintiff's September 2017 complaint fails.

Accordingly, only Plaintiff's claim for retaliation based on Plaintiff's complaints to Burke on March 4, 2019, and his subsequent termination survive OSC's motion to dismiss. The

Court grants OSC's motion to dismiss Plaintiff's claim for retaliation against OSC for Plaintiff's complaint in September 2017 to Tambini and on December 20, 2018, to Schantz.

### ii. **Against Tambini and Schantz Under Section 1983 and NYSHRL**

The Court now turns to whether Plaintiff plausibly alleged claims of retaliation against Tambini and Schantz under § 1983 and NYSHRL. The same pleading standard applies to retaliation claims under Title VII, § 1983, and the NYSHRL.

See 🚩 Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013); Ruiz, 2015 WL 5146629, at *6. Tambini and Schantz argue that Plaintiff's retaliation claims fail because Plaintiff cannot demonstrate a causal connection between Plaintiff's complaint to Tambini in September 2017 and Plaintiff's termination on March 4, 2019. (See Tambini Br. at 6-7; Schantz Br. at 18-19.) For the reasons stated above, the Court agrees with Tambini and Schantz that (1) Plaintiff fails to show a causal connection between Plaintiff's complaint to Tambini in September 2017 and his termination on March 4, 2019; and (2) Plaintiff's alleged complaint to Schantz on December 20, 2018 is not protected activity under § 1983 or NYSHRL.

Plaintiff's complaint to Burke on March 4, 2019, cannot save Plaintiff's retaliation claims against Tambini and Schantz. Plaintiff alleges that he "alleged sufficient facts to survive a motion to dismiss by pleading that 'the decision-maker [here, OSC] was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity.' " (Pl.'s Opp. at 32) (quoting Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med., No. 11 Civ. 8934, 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014).) However, the Complaint is devoid of allegations that Schantz or Tambini played a role in Plaintiff's termination. The Complaint only alleges that "Burke said she wanted to discuss Plaintiff's proposals with John Traylor and Chris

Gorka, Defendant Schantz's supervisors." (Compl. ¶ 80.) Accordingly, Tambini's and Schantz's motions to dismiss Counts IV and VI of the Complaint—retaliation in violation of § 1983 and NYSHRL—are granted without prejudice. [31]

### iii. **Against Tambini and Schantz Under NYCHRL**

**\*19** Finally, the Court determines whether Plaintiff plausibly alleged claims of retaliation against Tambini and Schantz under the NYCHRL. A prima facie case of retaliation under the NYCHRL is analogous to Title VII, § 1983, and the NYSHRL "except that the plaintiff need not prove any 'adverse' employment action; instead, he [or she] must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." Leon v. Columbia Univ. Med. Ctr., No. 11-cv-08559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted). For the reasons stated above, the Court finds that Plaintiff's retaliation claims against Tambini and Schantz similarly fail under the NYCHRL. Accordingly, Tambini's and Schantz's motions to dismiss Count VII of the Complaint—retaliation in violation of NYCHRL—are granted without prejudice.

### IV. **Conclusion**

For the reasons stated above, OSC's motion to dismiss [dkt. no. 38] is granted in part and denied in part; Schantz's motion to dismiss [dkt. no. 35] is granted in part and denied in part; and Tambini's motion to dismiss [dkt. no. 41] is granted in part and denied in part. Plaintiff may file an amended complaint within 30 days of this order. The Clerk of the Court shall close the open motions [dkt. nos. 35, 38, 41].

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 814289

## Footnotes

1    (See Notice of Mot. to Dismiss Compl. as Against Def. N.Y. State Office of the State Comptroller ("OSC MTD"), dated Apr. 15, 2021 [dkt. no. 38]; Def. N.Y. State Office of the State Comptroller's Mem. of Law in Supp. of Its Mot. to Dismiss Compl. ("OSC Br."), dated Apr. 15, 2021 [dkt. no. 40]; Def. N.Y. State Office

of the State Comptroller's Reply Mem. of Law in Supp. of Its Mot. to Dismiss Compl. ("OSC Reply"), dated June 10, 2021 [dkt. no. 54].)

2    (See Notice of Mot. ("Schantz MTD"), dated Apr. 14, 2021 [dkt. no. 35]; Def. Schantz's Mem. of Law in Supp. of His Mot. for Dismissal of Compl. ("Schantz Br."), dated Apr. 14, 2021 [dkt. no. 37]; Def. Schantz's Reply Mem. of Law in Supp. of His Mot. to Dismiss Compl. ("Schantz Reply"), dated June 11, 2021 [dkt. no. 56].)

3    (See Def. Robert Tambini's Notice of Mot. to Dismiss Compl. ("Tambini MTD"), dated Apr. 16, 2021 [dkt. no. 41]; Def. Robert Tambini's Mem. of Law in Supp. of His Mot. to Dismiss Compl. ("Tambini Br."), dated Apr. 16, 2021 [dkt. no. 42]; Def. Robert Tambini's Reply Mem. of Law in Further Supp. of His Mot. to Dismiss ("Tambini Reply"), dated June 11, 2021 [dkt. no. 55].)

4    OSC also moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(5). (See OSC MTD.)

5    (See Pl.'s Mem. of Law in Opp'n to Mots. to Dismiss Pursuant to Fed. R. Civ. P. 12 Submitted by Defs. Office of N.Y. State Comptroller, Lawrence Schantz, and Robert Tambini ("Pl.'s Opp."), dated May 21, 2021 [dkt. no. 49].)

6    (See Opinion and Order, dated February 14, 2022 [dkt. no. 57].)

7    (Complaint ("Compl."), dated Oct. 22, 2020 [dkt. no. 1] ¶ 11.)

8    Plaintiff alleges that the instant action commenced within 90 days of receipt of the EEOC's Notice of the Right to Sue letter, as required by law. See Williams v. Salvation Army, 108 F. Supp.2d 303, 307 (S.D.N.Y. 2000) ("Title VII actions must be commenced within 90 days of receipt of a Notice of the Right to Sue from the EEOC.").

9    Plaintiff's interpretation of Briggs v. Women in Need, Inc., No. 10-CV-02265, 2010 WL 2076981 (E.D.N.Y. May 24, 2010) is similarly misplaced. (See OSC Reply at 14.) In Briggs, the court directed plaintiff to provide "a copy of the 'right to sue' notice from the EEOC" because plaintiff had only pled when she filed her administrative charge with the EEOC. Briggs, 2010 WL 2076981, at *2-*3. For the same reasons, Johnson v. Xylem Inc., 1:19-CV-00130, 2020 WL 1963125 (W.D.N.Y. Apr. 16, 2020) is unpersuasive as the court dismissed plaintiff's Title VII and ADA claims because plaintiff failed to allege that he received a Right to Sue letter from the EEOC, not because he failed to attach his Right to Sue letter to the complaint.

10    The Court acknowledges that upon receiving OSC's objection to Plaintiff's service, Plaintiff asked OSC to waive strict compliance with C.P.L.R. § 307(2). (See Pl.'s Opp. at 41; dkt. no. 16.)

11    Plaintiff alleges that "[b]y late February 2019, [his relationship with Tambini] was so bad that when Tambini went on vacation, he did not even tell Harris he would be out for the week." (Compl. ¶ 40.) While it is possible that this event occurred on or after February 26, 2019, this act relates to Plaintiff's retaliation claim. Similarly, Plaintiff's allegation that he "complained to Tambini that he was aware he was being ignored because he had urged Tambini to stop engaging in sexist misconduct in the office, which occurred in or about late February 2019" also relates to Plaintiff's retaliation claim, not his hostile work environment claim. (Id. ¶ 67.)

12    Plaintiff's allegation that he sent Schantz an e-mail "a day or two before" February 22, 2019 "to ask about Tambini's whereabouts" is untimely. (Compl. ¶ 46.) Plaintiff does not allege how Schantz responded to his e-mail, just that Tambini told Plaintiff that Schantz "did not want to receive direct communications" from him.

(Id. ¶ 47.) Regardless of whether Schantz responded, Plaintiff's allegations pertain to his retaliation claim, not his hostile work environment claim.

13    As OSC states, "[a]s for Mr. Tambini, the last event involving the sexually hostile work environment that plaintiff identifies in his Complaint is alleged to have occurred in January 2019." (OSC Br. at 13.) And for Schantz, "no events relating to a hostile work environment could have occurred after December 27, 2018" because that is when Plaintiff stopped communicating with Schantz daily. (Id.) Plaintiff also alleges that in or about January 2019, "Plaintiff 'de-friended' Schantz on social media and told Schantz he no longer wanted to interact with him anymore." (Compl. ¶ 53.)

14    Plaintiff does not identify which of Burke's comments were informed by an illegal stereotype. However, Plaintiff alleges that "Burke made dismissive comments about Plaintiff's allegations regarding Tambini's retaliatory treatment, claiming that she had to arrange the holiday party for her office." (Compl. ¶ 75.) Taking Plaintiff's claim as true, the Court does not find that this statement contains a reference to gender stereotyping, as Burke-the opposite sex of Plaintiff-empathized with Plaintiff on having to plan a work event. Moreover, a stray remark, such as this one, "is insufficient to support a claim for hostile work environment." 🔖Jowers v. Fam. Dollar Stores, Inc., No. 09 Civ. 2620, 2010 WL 3528978, at *4 (S.D.N.Y. Aug. 16, 2010).

15    In arguing that he pled sufficient facts to state hostile work environment claims under Section 1983 and NYSHRL against Defendants Tambini and Schantz, Plaintiff contends that "a reasonable assessment of Burke's treatment of Harris [on March 4, 2019] is that she downplayed the seriousness of the misconduct because she viewed the situation through the lens of the gender stereotype that 'real men' are not bothered by harassment." (Pl.'s Opp. at 19.) Taking Plaintiff's allegations as true, the Court disagrees with Plaintiff's conclusion. There are other, non-gendered explanations for why Burke's demeanor did not demonstrate concern about Plaintiff's allegations regarding Schantz's alleged mistreatment.

16    Plaintiff does not argue why the continuing violation doctrine should apply to his hostile work environment claims against OSC; rather, Plaintiff merely cites to 🔖⚠️Petrosino v. Bell Atl., 385 F.3d 210 (2d Cir. 2004) for the proposition that a plaintiff need only plead one act of hostile work environment within the statute of limitations to state a continuing violation claim. (See Pl.'s Opp. at 26.) The Court agrees with that proposition. See 🔖Patterson v. County of Oneida, 375 F.3d 206, at 220 (2d Cir. 2004). However, that does not resolve whether Plaintiff's alleged termination is enough to state a continuing violation claim.

17    Plaintiff argues that "the Court's view of whether the alleged hostile work environment was sufficiently pled should be informed by Harris' allegations that both Tambini and Schantz subjected Plaintiff to comments and 'jokes' that focused on him." (Pl.'s Opp. at 18.) However, the Complaint does not contain allegations of coordinated or planned jokes about Plaintiff. Rather, Plaintiff alleges that Tambini and Schantz separately made sexist jokes to Plaintiff.

18    A plaintiff may sue individual defendants in their personal capacities under NYSHRL and NYCHRL "for acts which 'aid, abet, incite, compel, or coerce' " actions prohibited by NYSHRL or NYCHRL. Lopes v. Caffe Centrale LLC, 548 F. Supp. 2d 47, 54-55 (S.D.N.Y. 2008) (citation omitted). Here, Plaintiff alleges that Tambini and Schantz personally incited the gender-based harassment against Plaintiff. (See Pl.'s Opp. at 25.)

19    It is well established that "Title VII-based hostile work environment claims by government employees are actionable under § 1983." 🔖Raspardo, 770 F.3d at 114.

20    "The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the New York State Human Rights Law is essentially the same." 🚩Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011).

21    "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." 🚩Erasmus v. Deutsche Bank Ams. Holding Corp., 15 Civ. 1398, 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015).

22    Tambini argues that the Court may take judicial notice of government records which show that this retirement party occurred in December 2014, not September 2017. (See Tambini Br. at 3-4.) At this stage, the Court declines taking judicial notice of these documents as Exhibits E and F to Tambini's Affidavit [dkt. no. 44] are not publicly available. Rather, they are internal records within OSC.

23    Unlike under § 1983 and NYSHRL, to prevail on a hostile work environment claim under the NYCHRL, a plaintiff "need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." 🚩Mihalik, 715 F.3d at 111 (quoting 🚩Williams, 872 N.Y.S.2d at 39).

24    However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). If neither party objects to the authenticity or accuracy of the document, then the court may consider the full text of documents partially quoted in a complaint. See 🚩San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996).

25    Plaintiff alleges that Tambini excluded him from a project plans meeting in or around January 8, 2019. (See Compl. ¶ 38.)

26    Plaintiff alleges that in "late February 2019," Tambini did not tell Plaintiff that he was going on vacation. (Id. ¶¶ 40-41.) Plaintiff also alleges that on February 22, 2019, Tambini gave Harris "an assignment with a deadline, suggesting that Plaintiff did not get his work done in a timely manner." (Id. ¶ 43.)

27    Plaintiff alleges that Tambini was promoted to Director of Audits for OSC's OUF in September 2018. (See Compl. ¶ 24.) Defendants OSC, Tambini, and Schantz oppose this representation, and contend that Tambini was promoted in September 2017. (See OSC Br. at 17 n.7; Tambini Br. at 2; Schantz Br. at 2 n.1.) OSC argues that the Court may take judicial notice of government records reflecting that Tambini was promoted to Director of Audits in September 2017. (See OSC Br. at 17 n.7.) The Court agrees with OSC. The Court may consider Exhibit G to the Affirmation of Michael Kogut [dkt. no. 39] to note what the record states regarding Tambini's promotion to Director of Audits for OSC's OUF because Exhibit G is a public government record. (See OSC Reply at 1 (noting that Exhibit G is "submitted only to establish a date—the date on which Mr. Tambini was promoted").) However, the Court does not consider Exhibit G to the Affirmation of Michael Kogut for the purpose of proving the truth of its contents.

28    As stated above, the Court only considers Plaintiff's claim that OSC retaliated against him on March 4, 2019, as Plaintiff's claims of retaliation in 2018 are untimely.

29    "[T]he allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under McDonnell Douglas in the initial phase of a Title VII litigation." 🚩Littlejohn, 795 F.3d at 316.

30    The Court also notes that Plaintiff does not allege that either Tambini or Schantz spoke with Burke about Plaintiff prior to March 4, 2019. While it is not clear from the Complaint how Burke decided to visit Plaintiff,

the fact that "Burke asked Plaintiff what was going on" suggests that neither Tambini nor Schantz spoke with Burke prior to March 4, 2019. (See Compl. ¶ 69.)

31    The Court retains supplemental jurisdiction over the remaining state and local claims because the Court finds that Plaintiff's federal retaliation claim based on his complaint to Burke on March 3, 2019 survives. (See Tambini Br. at 21-22.)

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

## Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

## DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising this discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

 **\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge

recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 122 of 134

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 5:23-cv-00490-GTS-ML    Document 6    Filed 08/14/23    Page 123 of 134

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

*5  Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See* Christopher v. Laidlaw Transit, Inc. 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing Ricciuti v. New York City Transit Authority, 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5005655
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Jennifer Berkeley CARR, Plaintiff-Appellant,

v.

NEW YORK CITY TRANSIT AUTHORITY, Marva
Brown, and David Chan, Defendants-Appellees.

No. 22-792-cv
|
August Term 2022
|
Argued: May 18, 2023
|
Decided: August 7, 2023

**Synopsis**

**Background:** Employee brought action against city transit
authority and her supervisors asserting claims for age,
race, and gender discrimination and retaliation under Age
Discrimination in Employment Act (ADEA), Title VII, and
§ 1981. The United States District Court for the Southern
District of New York, Vernon S. Broderick, J., 2022 WL
824367, entered summary judgment in defendants' favor, and
employee appealed.

**Holdings:** The Court of Appeals, Parker, Circuit Judge, held
that:

[1] decision not to promote employee because successful
applicants were more qualified was not pretext for
discrimination, and

[2] allegedly retaliatory actions that transit authority allegedly
took against employee together did not constitute unlawful
retaliation.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (10)

[1]  **Federal Courts** 🔑 Summary judgment

Court of Appeals reviews district court's grant of
summary judgment de novo.

[2]  **Summary Judgment** 🔑 Favoring
nonmovant; disfavoring movant

In evaluating motions for summary judgment,
district court must resolve any doubts and
ambiguities and draw all reasonable inferences in
nonmoving party's favor.

[3]  **Civil Rights** 🔑 Employment practices
**Civil Rights** 🔑 Effect of prima facie case;
shifting burden
**Civil Rights** 🔑 Age discrimination

Under 🚩 *McDonnell Douglas* burden-shifting
framework, once plaintiff has established
prima facie case of discrimination under Age
Discrimination in Employment Act (ADEA),
Title VII, or § 1981, burden shifts to employer
to articulate some legitimate, nondiscriminatory
reason for employer's action against employee;
if employer does so, then burden shifts
back to employee to show that employer's
articulated reason is pretext for discrimination
and employee bears ultimate burden of
persuading court that she has been victim of
intentional discrimination. Age Discrimination
in Employment Act of 1967 § 2 et seq., 29
U.S.C.A. § 621 et seq.; 🚩 42 U.S.C.A. § 1981;
Civil Rights Act of 1964 § 703, 🚩 42 U.S.C.A.
§ 2000e-2.

[4]  **Civil Rights** 🔑 Motive or intent; pretext
**Civil Rights** 🔑 Motive or intent; pretext
**Civil Rights** 🔑 Motive or intent; pretext

City transit authority decision not to promote
African American female of Caribbean descent
to senior director positions in its capital programs

department because successful applicants had worked at transit authority longer, had technical backgrounds she lacked, and interviewed better was not pretext for discrimination on basis of race, sex, and age, in violation of Age Discrimination in Employment Act (ADEA), Title VII, and § 1981, notwithstanding minor variations in hiring process, absent allegation that any impermissible promotion criteria were used. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2.

**[5]** **Civil Rights** 🔑 Employment practices

**Civil Rights** 🔑 Presumptions, Inferences, and Burden of Proof

**Civil Rights** 🔑 Age discrimination

In evaluating discrimination claims under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981, where employer's explanation, offered in clear and specific terms, is reasonably attributable to honest evaluation of qualifications, no inference of discrimination can be drawn. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2.

**[6]** **Civil Rights** 🔑 Employment practices

**Civil Rights** 🔑 Retaliation claims

*McDonnell Douglas* framework applies to retaliation claims, whether brought under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3.

**[7]** **Civil Rights** 🔑 Adverse actions in general

**Civil Rights** 🔑 Harassment; work environment

To establish retaliation claim under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981, plaintiff need only show that allegedly retaliatory actions, taken either singularly or in aggregate, were materially adverse; claim of retaliatory hostile work environment must therefore be treated identically to claim that employer took multiple retaliatory actions that were, in aggregate, materially adverse. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3.

**[8]** **Civil Rights** 🔑 Practices prohibited or required in general; elements

To establish prima facie case of retaliation under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981, plaintiff must demonstrate that (1) she engaged in protected activity, (2) defendant was aware of that activity, (3) she was subjected to retaliatory action, or series of retaliatory actions, that were materially adverse, and (4) there was causal connection between protected activity and materially adverse action or actions. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3.

**[9]** **Civil Rights** 🔑 Adverse actions in general

"Materially adverse action," for purposes of retaliation claim under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981, is one that well might have dissuaded reasonable worker from making or supporting charge of discrimination. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981; Civil

Rights Act of 1964 § 704, 🚩 42 U.S.C.A. § 2000e-3.

[10]    **Civil Rights** 🔑 Public Employment

**Municipal Corporations** 🔑 Grounds

**Public Employment** 🔑 Causal connection; temporal proximity

Allegedly retaliatory actions that city transit authority allegedly took against employee— including her diminishing performance ratings, not having analysts reporting directly to her, being assigned additional projects, and her supervisor's hostile tone in e-mails— together did not constitute unlawful retaliation under Age Discrimination in Employment Act (ADEA), Title VII, or § 1981, notwithstanding actions' temporal proximity to her discrimination complaints; alleged retaliatory actions were result of generally applicable workplace policies, and there was no evidence or pretext or that those policies were applied to her and not others. Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq.; 🚩 42 U.S.C.A. § 1981; Civil Rights Act of 1964 § 704, 🚩 42 U.S.C.A. § 2000e-3.

On Appeal from the United States District Court for the Southern District of New York

**Attorneys and Law Firms**

Gregory G. Smith, (Janet J. Lennon, on the brief), Law Office of Gregory Smith, Brooklyn, NY, for Plaintiff-Appellant.

Mariel A. Thompson, Executive Agency Counsel New York City Transit Authority, New York, NY, for Defendants-Appellees.

Before: Pooler, Parker, and Nathan, Circuit Judges.

**Opinion**

Parker, Circuit Judge:

**\*1** Jennifer Berkeley Carr appeals from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*). The district court granted the motion of the New York City Transit Authority, Marva Brown, and David Chan (collectively, "NYCTA") for summary judgment and dismissed Carr's claims of age, race, and gender discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 🚩 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 🚩 42 U.S.C. § 1981.

On appeal, Carr contends that the district court applied an incorrect legal standard to her retaliation claim and that it erroneously concluded that she had failed to demonstrate that the NYCTA's race neutral explanations for its failure to promote her were pretextual. First, we hold that Carr has not demonstrated that the NYCTA's explanations for her two non-promotions were pretextual. Next, we conclude that although the district court applied an incorrect standard to her retaliatory hostile work environment claim, Carr has nevertheless failed to make out a prima facie case of retaliation or demonstrate that the NYCTA's explanations for its actions were pretextual. We therefore **AFFIRM** the judgment of the district court.

**BACKGROUND**

Carr, an "African-American female of Caribbean descent" born in 1955, worked for the New York City Transit Authority (the "Transit Authority") from 2000 to 2022. Joint App'x at 1103 ¶ 4. Carr holds a bachelor's degree in economics and a master's degree in public administration. During the relevant period, Carr worked as a director in the Transit Authority's Capital Programs Department with the title Director of Telecommunications and Systems, Capital Programs. Capital Programs was led by Appellee Marva Brown, also an "African-American female of Caribbean descent." Joint App'x at 1104 ¶ 5. In 2013 and 2014, Carr applied for two senior director positions in the department, but after an application process Brown ultimately selected a younger non-Black man to fill each role. The application process for both positions included an interview with a panel of three Transit Authority employees. The first promotion that Carr applied for was to the position of Senior Director, Program Management and Oversight. That promotion went to Joseph DiLorenzo, a white man in his early 50s who had worked at the Transit Authority since 1989 and had a

technical background in architecture. The second promotion that she applied for was to the position of Senior Director, Program Management & Analysis. That promotion was given to David Chan. Chan, a 55-year-old Asian man, had worked at the Transit Authority since 1987 and had a background in electrical engineering and business administration.

Carr does not allege that either man promoted was unqualified. It is uncontested that both men had worked at the Transit Authority longer than Carr and had technical backgrounds that Carr lacked. What is more, one of the interviewers for the second promotion testified that Chan interviewed particularly well, and that Carr was openly hostile toward Brown in her interview. After receiving the promotion, Chan became Carr's supervisor.

**\*2**  In September 2014, after failing to receive the two promotions she had sought, Carr filed a complaint with the Transit Authority's Equal Employment Opportunity Office. In May 2015, she filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission. After receiving a right-to-sue letter, Carr initiated this lawsuit in December 2016. In her amended complaint, she alleged that the NYCTA discriminated against her on the basis of her age, gender, and race by denying her the promotions and that it discriminated against her by creating a hostile work environment based on her age.[1] 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981. Carr also alleged that the NYCTA violated the ADEA, Title VII, and Section 1981 by creating a hostile work environment in retaliation for her complaints of discrimination. 29 U.S.C. § 626 *et seq.*; 42 U.S.C. § 2000e-3; 42 U.S.C. § 1981.

Carr alleges that after she began to report discrimination in September 2014, her relationships with her supervisors and her performance evaluations deteriorated, which she attributes to retaliation. Among other things, Carr asserts that Chan was disrespectful and hostile to her in emails; that Chan assigned her increased job responsibilities including responsibility for Elevator and Escalator Communications, compiling a new Employee Training Manual, and completing various other reports; that Chan threatened to cancel her vacation time if she did not complete her projects; and that analysts who worked under her were removed.

Despite these conflicts, Carr received "Good" performance reviews in 2014 and 2015, a decline from her previous

"Excellent" ratings, but a rating that did not affect her compensation or position. In both her 2016 and 2017 annual reviews, however, Carr received a "Needs Improvement" rating that prevented her from receiving a wage increase. Carr retired in 2022. She contends that her mistreatment, including the increased workload and the negative evaluations, was in retaliation to her complaints of discrimination. In contrast, Chan contended in summary judgment proceedings that Carr was treated like any other employee and that the negative evaluations were appropriate because of problems with the completeness and timeliness of her work.

The NYCTA moved for summary judgment and the district court granted it. The district court first held that although Carr had made out a prima facie case of a discriminatory non-promotion, she had failed to demonstrate that the reasons the NYCTA provided for promoting DiLorenzo and Chan were pretextual. *Carr v. N.Y.C. Transit Auth.*, No. 16-cv-9957 (VSB), 2022 WL 824367, at \*9–12 (S.D.N.Y. Mar. 18, 2022). The district court noted that Carr had failed to identify any inconsistencies in the hiring criteria and concluded that she had relied on "speculation alone" to support her discrimination claim. *Id.* at \*12 (quotation marks omitted).

The district court then analyzed Carr's retaliation claims and found that she had not made out a prima facie case because she failed to provide admissible evidence tending to show the alleged retaliatory actions, such as the "Needs Improvement" performance reviews, were caused by her complaints of discrimination or that the retaliation against her was "sufficiently severe or pervasive to alter the conditions of [her] employment" and therefore she could not make out a prima facie case for a retaliatory hostile work environment. *Id.* at \*14–15 (quotation marks omitted).

**\*3**  Finally, the district court concluded that, even assuming that Carr had made out a prima facie case, she had failed to demonstrate that the NYCTA's legitimate, non-discriminatory reasons for the alleged retaliatory actions were pretextual. *Id.* at \*15. The district court concluded that "[t]here is ample record evidence to support Defendants' stated belief that Plaintiff was not doing her job adequately and was unpleasant and difficult to work with, thus warranting the negative performance reviews" and that Carr had put forward no evidence of pretext. *Id.* Accordingly, the district court granted the NYCTA's motion for summary judgment. Carr then appealed to this Court.

## DISCUSSION

**[1]** **[2]** We review the district court's grant of summary judgment de novo. *See* *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020). "In evaluating such motions, the district court must resolve any doubts and ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Id.* "Summary judgment is required if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (internal quotation marks omitted).

### I. Discrimination Claims

**[3]** Carr asserts that age, race, and gender discrimination motivated the decision not to select her for senior director positions. Discrimination claims under Title VII, the ADEA, and Section 1981 are analyzed under the *McDonnell Douglas* burden-shifting framework. *See* *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). Under this familiar framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86–87 (2d Cir. 2022) (cleaned up). The plaintiff bears "the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The district court concluded, and the parties do not dispute, that Carr established a prima facie case of discrimination on the basis of race, sex, and age and that the defendants proffered a nondiscriminatory reason for not promoting her – that the two younger men who Brown hired instead of Carr had worked at the Transit Authority longer, had technical backgrounds she lacked, and interviewed better. *See* *Carr*, 2022 WL 824367, at *9–10. The dispute is over the third step: pretext.

As proof of pretext, Carr points to perceived inconsistencies in the hiring criteria and changes to the hiring process, such as that the original job descriptions did not specify a technical background was required and the panel of interviewers changed between the first and second openings she applied for. The district court concluded that no reasonable juror could find that the reasons the NYCTA provided for selecting the other candidates for promotions were pretextual. The district court observed that there was nothing inconsistent about the NYCTA's explanations for why DiLorenzo and Chan were promoted over Carr. *Id.* at *12.

**[4]** **[5]** We agree. The NYCTA adduced evidence that DiLorenzo or Chan were equally, if not more, qualified for the positions than Carr, and there is no allegation that any impermissible promotion criteria were used. *See* *Burdine*, 450 U.S. at 259, 101 S.Ct. 1089 ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria."). While "entirely ignor[ing]" explicit hiring criteria or an "unprecedented" departure from an employer's established hiring practice can show pretext, Carr's allegations regarding minor variations in the hiring process and the emphasis on the other candidates' technical backgrounds are not the sorts of "departures from procedural regularity" that could allow a jury to infer pretext. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 310, 314 (2d Cir. 1997) (quotation omitted). Where, as here, "an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest ... evaluation of qualifications, no inference of discrimination can be drawn." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (cleaned up). We therefore affirm the district court's grant of summary judgment on Carr's discrimination claim.

### II. Retaliation Claims

**\*4** **[6]** Carr also claims that she was retaliated against for complaining that Brown's promotion decisions were discriminatory. Although retaliation claims under Title VII are governed by 42 U.S.C. § 2000e-3, rather than § 2000e-2, which governs discrimination claims, the *McDonnell Douglas* framework applies to retaliation claims, whether brought under the ADEA, Title VII, or Section 1981. *See* *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42–43 (2d Cir. 2019); *Hicks v. Baines*, 593 F.3d

159, 164 (2d Cir. 2010). The specific requirements for a prima facie case of retaliation were set forth in 🚩 *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("🚩 *Burlington Northern*"). *See* p. —— *infra*. As in the discrimination context, a defendant may rebut a prima facie showing of retaliation by providing a legitimate, non-retaliatory reason for the allegedly retaliatory action. *See* 🚩 *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). Then "the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." 🚩 *Id.* (cleaned up).

In 🚩 *Burlington Northern*, the Supreme Court considered the level of harm required to establish a claim of retaliation. The Court held that no matter the theory of retaliation, to satisfy the third element of the prima facie case a plaintiff need only show that the employer's retaliatory actions, considered either singularly or in the aggregate, were "materially adverse." 🚩 *Id.* at 68, 126 S.Ct. 2405. Given that standard, we hold that no reasonable juror could conclude that Carr has suffered material adverse retaliatory actions.

In 🚩 *Burlington Northern*, a railroad employee, White, claimed that she was retaliated against after successfully raising gender discrimination concerns. 🚩 *Burlington Northern*, 548 U.S. at 58, 126 S.Ct. 2405. The alleged retaliation consisted of, among other things, White's reassignment from forklift duty to "track laborer tasks," which were more arduous. 🚩 *Id.* The Supreme Court granted certiorari to resolve a circuit split regarding "whether the challenged action has to be employment or workplace related and about how harmful that action must be to constitute retaliation." 🚩 *Id.* at 60–61, 126 S.Ct. 2405.

🚩 *Burlington Northern* focused on the difference between two sections of Title VII: its antidiscrimination provision, 🚩 42 U.S.C. § 2000e-2, and its antiretaliation provision, 🚩 42 U.S.C. § 2000e-3. Title VII's antidiscrimination provision makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 🚩 42 U.S.C. § 2000e-2(a)(1). The antiretaliation provision bars actions that "discriminate against" an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 🚩 42 U.S.C. § 2000e-3(a). The Court noted that Title VII's antiretaliation provision prohibits discrimination more broadly than its substantive antidiscrimination provision, which prohibits only actions affecting certain enumerated aspects of employment, and, consequently, held that the two provisions were not coterminous and should be interpreted differently. 🚩 *Burlington Northern*, 548 U.S. at 62–63, 126 S.Ct. 2405 (citing 🚩 42 U.S.C. § 2000e-2(a)). The Court went on to hold that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." 🚩 *Id.* at 67, 126 S.Ct. 2405.

The Court then defined the level of harm necessary for an alleged retaliatory action to support a prima facie case of retaliation. It held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 🚩 *Id.* at 68, 126 S.Ct. 2405 (internal quotation marks omitted). The Court rejected the reasoning of some circuits, which required that a retaliation plaintiff show a "materially adverse change in the terms and conditions of employment," just like in the substantive discrimination context. 🚩 *Id.* at 60, 126 S.Ct. 2405 (internal quotation marks omitted). However, the Court emphasized that to be "materially adverse," an action must cause more than "trivial harms" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." 🚩 *Id.* at 68, 126 S.Ct. 2405. Harms such as these were not actionable, it held, because they would not deter reasonable employees from making complaints of discrimination. 🚩 *Id.* Applying this holding to the retaliation alleged by White, the Court held that her reassignment was a materially adverse action. 🚩 *Id.* at 70–71, 126 S.Ct. 2405.

**\*5** As mentioned above, 🚩 *Burlington Northern* stands for the proposition that the definition of "adverse action" in

the Title VII antiretaliation context is broader than in the antidiscrimination context. Consequently, there are adverse actions that would suffice to make out a prima facie case for retaliation because they are "materially adverse" but would be insufficient to make out a prima facie case for discrimination because they did not alter the terms and conditions of employment. 🚩 *Burlington Northern* therefore left us with a single standard that applies to all retaliation claims: a plaintiff need only show that the retaliatory actions she was subjected to were materially adverse, meaning that the actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 🚩 *Id.* at 68, 126 S.Ct. 2405.

Following 🚩 *Burlington Northern,* this Court noted that "the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination," 🚩 *Davis-Garett,* 921 F.3d at 43, and that "[p]rior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment, no longer represent the state of the law," 🚩 *Hicks,* 593 F.3d at 165 (internal citations omitted). Recently, the Fourth Circuit correctly applied 🚩 *Burlington Northern* to a retaliatory hostile work environment claim in *Laurent-Workman v. Wormuth,* 54 F.4th 201 (4th Cir. 2022). It held that to make out a prima facie case of a retaliatory hostile work environment, a plaintiff must allege that the retaliatory actions would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman,* 54 F.4th at 218 (quoting 🚩 *Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405). It then concluded that "the consistent (even if not constant) conduct Laurent-Workman alleges plausibly qualifies as materially adverse" and that she "has adequately pled that a reasonable employee may have been dissuaded from following through with her complaints." *Id.* We find this decision persuasive because it follows the standard set forth in 🚩 *Burlington Northern* and aligns the standard for retaliatory hostile work environment claims with the broader retaliation standard.

**[7]** Applying 🚩 *Burlington Northern*'s unified standard, we hold that to satisfy the third element of a prima facie retaliation case, a plaintiff need only show that the allegedly retaliatory actions, taken either singularly or in the aggregate, were "materially adverse." A claim of "retaliatory hostile work environment" must therefore be treated identically to a claim that an employer took multiple retaliatory actions that were, in the aggregate, "materially adverse."

**[8]** **[9]** Accordingly, we hold that to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions. [2] As we have noted, under 🚩 *Burlington Northern,* a "materially adverse" action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 🚩 548 U.S. at 68, 126 S.Ct. 2405 (quotation marks omitted).

On appeal, Carr primarily argues that she was subjected to a retaliatory hostile work environment, and that the district court erred by using the incorrect standard in concluding that the NYCTA's treatment of her, in the aggregate, was not materially adverse. The NYCTA counters that Carr must make the same showing as she would to make out a prima facie case in a discriminatory hostile work environment claim, *i.e.*, that she must show the retaliatory actions were sufficiently severe and pervasive that they altered the terms and conditions of her employment. *See Williams v. N.Y. City Hous. Auth.,* 61 F.4th 55, 68–69 (2d Cir. 2023) (setting out the standard in a discriminatory hostile work environment case). The district court appeared to accept the NYCTA's argument and applied the standalone hostile work environment standard to Carr's claim. *Carr,* 2022 WL 824367, at \*14. As explained above, we disagree.

**\*6** **[10]** Although the NYCTA's test for a retaliatory hostile work environment was not fully consistent with 🚩 *Burlington Northern,* we nevertheless conclude that Carr failed to make out a prima facie case because the allegedly retaliatory actions were not materially adverse. Carr argues that her diminishing performance ratings, not having analysts reporting directly to her, being assigned additional projects, and Chan's hostile tone in emails, together constitute unlawful retaliation. However, the alleged retaliatory actions were the result of generally applicable workplace policies and Carr has not adduced evidence that these policies were applied to her and not others. We have held that absent allegations of more direct hostile conduct, a reasonable employee would not be dissuaded from taking protected action simply because

they are subject to the same policies as other employees. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568, 570-71 (2d Cir. 2011). We conclude that these complaints, even when taken in the aggregate, would not dissuade a reasonable employee from lodging a complaint and therefore, they were not materially adverse.

Our Court, [3] and district courts in this Circuit, [4] have on occasion failed to apply the *Burlington Northern* standard faithfully. As noted, when analyzing a retaliation claim, the sole inquiry regarding the third element of the prima facie case is whether the allegedly retaliatory actions were materially adverse. Even if a plaintiff labels her retaliation claim as a "retaliatory hostile work environment" claim, courts should not consider whether the allegedly retaliatory actions meet the higher "severe and pervasive" standard. All that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination.

**\*7** To be sure, Carr's "Needs Improvement" performance reviews in 2016 and 2017, which made her ineligible for raises, constitute materially adverse actions on their own. But even assuming *arguendo* that Carr could establish that her complaints of discrimination caused the poor performance evaluations, the district court correctly concluded that Carr's claim would fail at the third step of the *McDonnell Douglas* burden-shifting framework because she cannot establish pretext. *Carr*, 2022 WL 824367, at \*15.

The NYCTA's evidence supporting summary judgment established that Carr received negative performance evaluations because she was not adequately or timely completing her duties and had become increasingly challenging to work with. Carr has not rebutted this showing with evidence demonstrating that the reasons the NYCTA provided for the poor performance reviews were pretextual. Instead, she argues that the performance reviews must have been retaliatory due to their temporal proximity to her complaints. But she offers nothing more to establish causation and we have been clear that temporal proximity "alone is insufficient to defeat summary judgment at the pretext stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Absent other evidence, no factfinder could reasonably determine that Carr's protected activities were the but-for cause of her negative evaluations. We therefore affirm the district court's grant of summary judgment on this claim.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

### All Citations

--- F.4th ----, 2023 WL 5005655

---

## Footnotes

1    Carr does not challenge the dismissal of her standalone claim for a hostile work environment under the ADEA. We therefore do not address that claim. *See* *Jackson v. Fed. Express*, 766 F.3d 189, 194–95 (2d Cir. 2014). To the extent Carr also intended to challenge the denial of her motion for Judge Vernon S. Broderick's recusal, she waived this issue by failing to brief it. *Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

2    Although it is not relevant to this case, this definition acknowledges *Burlington Northern*'s holding that one can be retaliated against by actions taken outside of the workplace. 548 U.S. at 67, 126 S.Ct. 2405.

3    *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (applying, without analysis, the "severe and pervasive" standard from a discriminatory hostile work environment claim to a retaliatory hostile work environment claim).

4    *Compare Stevenson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 1:21-cv-355 (GWC), 2022 WL 179768, at *6 (W.D.N.Y. Jan. 20, 2022) ("alleging a retaliatory hostile environment is an *alternative* way to establish that element of a retaliation claim. ... Here, Plaintiffs have alleged multiple acts ... that, when considered together, plausibly indicate a retaliatory hostile environment that constitutes adverse employment action.") (internal quotation marks omitted), *with Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (E.D.N.Y. 2015) ("To establish a claim for retaliatory hostile work environment, a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct.") (quotation marks omitted), 🚩 *Villar v. City of New York*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015) ("To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment."), *Senior v. Conn. Workers' Comp. Comm'n, Third Dist.*, No. 3:17-cv-1205 (JBA), 2018 WL 4288643, at *4 (D. Conn. Sept. 7, 2018) ("To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims"), *and Colton v. N.Y. Div. of State Police*, No. 5:14-cv-00801 (TJM), 2017 WL 5508911, at *13 (N.D.N.Y. Feb. 8, 2017) ("If a plaintiff shows a causal connection between the protected activity and the adverse conduct, the same 'severe or pervasive' standard [as applies in a gender-based hostile work environment claim] applies to a retaliatory hostile work environment claim.") (quotation marks omitted).

---

**End of Document**           © 2023 Thomson Reuters. No claim to original U.S. Government Works.